IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO: 04-101610REK

| | |
|---|---|
| ROBERT J. ZAMMITO, JR.;<br>PAUL M. ZAMMITO;<br>CHRISTOPHER ZAMMITO; and<br>VALARIE A. MORDINI,<br>    Plaintiffs and Counterclaim Defendants<br><br>v.<br><br>HARRY W. HEALEY, JR., GRANTOR TRUST and<br>PETER W. HEALEY as Trustee of<br>HARRY W. HEALEY, JR., GRANTOR TRUST,<br><br>    Defendants and Counterclaim Plaintiffs<br><br>HARRY W. HEALEY, JR. individually, and as Trustee of<br>THE HUNTINGTON FORBES CHARITABLE<br>REMAINDER TRUST;<br><br>HUNTINGTON FORBES, LTD.;<br>STANTON CUMMINGS, LTD.;<br>PETER W. HEALEY, as Trustee of<br>THE HEALEY GRANDCHILDREN'S TRUST – II,<br>    Third Party Plaintiffs<br><br>v.<br><br>ROBERT J. ZAMMITO, SR.;<br>VALERIE L. ZAMMITO;<br>ASA HOLDING COMPANY, INC.; and<br>THE ASA HOLDINGS LP,<br>    Third Party Defendants<br><br>MELLON BANK (aka Mellon Trust of New England),<br>    Bank Trustee | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

### DEFENDANT AND THIRD PARTY PLAINTIFFS' OPPOSITION TO PLAINTIFFS' MOTION FOR JUDGMENT ON THE PLEADINGS AND TO STRIKE AFFIRMATIVE DEFENSES

## Relevant Facts

In 1991, Robert Zammito ("Zammito") was the owner and operator of a family owned regional ambulance company in Southeastern Massachusetts. Later that year, Zammito hired Harry W. Healey, Jr. ("Healey") as a consultant to assist in the identification, acquisition and integration of other ambulance service companies. Healey, who has over thirty years experience in the banking industry, owned and operated a financial consulting firm known as Huntington Forbes, Ltd.

In 1995, after acquiring a number of regional ambulance service companies through Healey's advice and assistance, Zammito sold his interest in the firm as part of a ninety million dollar acquisition. Subsequently, Zammito hired Healey to continue to work with him to invest the proceeds from the sale of his ambulance service company by identifying and acquiring other businesses. As compensation, Healey received a monthly consulting fee; a ten percent commission on each acquisition; and, an option to purchase with no time limit an interest of up to $1/6^{th}$ of each business acquired at Zammito's acquisition cost. Together, Zammito and Healey identified and acquired nearly a dozen businesses and based upon Healey's advice, Zammito's net worth increased from 1.5 million dollars in 1991 to more than 57 million dollars in 2000.

In October of 1999, as part of Zammito's acquisition of two businesses known as: 1) National Check Protection Services, Inc. ("NPSC-Inc"); and, 2)

2

National Data Verification Service, Inc. ("NDVS-Inc"), Healey executed four separate recourse promissory notes totaling $50,000 and four separate *non-recourse* promissory notes representing a total value of $100,000 in stock as partial consideration for a 1/6th interest in each of these entities. Under the terms of the recourse and *non-recourse* notes, all notes were due and payable, with interest on October 31, 2003.

Crucial to this Court's understanding of the defendant/third-party plaintiffs' defense in this case is the fact that following Healey's purchase of stock in these entities and his execution of the promissory notes in question, plaintiffs secretly and fraudulently converted NPSC-Inc and NDVS-Inc to the NCPS and NDVS business trusts divesting Healey of his ownership interest and providing Zammito, through his children as trustees, with absolute discretion over the business activities of these two entities. This was a significant change in the corporate structure of NPSC-Inc and NDVS-Inc which divested Healey of his ownership interests as minority shareholder.

In 2002, Healey first became aware of the existence of these business trusts when he received a letter from Zammito's attorney requesting that he execute a set of restated promissory notes. Those restated notes referenced the NCPS and NDVS business trusts. Later, Healey also discovered that Zammito had been involved in a pattern of racketeering activity whereby he had improperly siphoned funds from NPSC-Inc and NDVS-Inc and several other legitimate

business entities and unjustly enriched himself and members of the Zammito family to the detriment of Healey and minority shareholders. These racketeering activities, involving NPSC-Inc and NDVS-Inc and other legitimate businesses, included: 1) the payment of exorbitant and unearned management fees; 2) obtaining non-interest bearing advances; 3) the payment of salaries to Zammito's children and others for no-show jobs; 4) the payment of personal expenses for Zammito and members of his family; 5) the unauthorized liquidation of corporate assets and the misappropriation of the proceeds by Zammito and family members; and, 6) the misuse of corporate assets that resulted in the unjust enrichment of Zammito and members of his family.

Zammito's criminal activities and corporate malfeasance adversely impacted Healey's interest in NPSC-Inc and NDVS-Inc and gave Healey reasonable grounds to conclude that Zammito was in breach of his obligations under the notes. Accordingly, on October 20, 2003, prior to the required time of performance, Healey notified Zammito of the lenders' breach citing "irregularities in accounting and management practices; the apparent failure to observe corporate formalities; and, other irregularities . . . " and requested that Zammito provide Healey with reasonable assurances that such breach had been cured. When Zammito failed to respond to Healey's request for reasonable assurances, Healey notified Zammito and placed in escrow an amount equal to the principal and interest due on the recourse notes.

**Legal Argument and Authorities**

I. **THE PLAINTIFFS MOTION FOR JUDGMENT ON THE PLEADINGS SHOULD BE DENIED AS THE DOCTRINE OF FRUSTRATION OF PURPOSE AFFIRMATIVELY DISCHARGED THE DEFENDANTS' OBLIGATION TO PERFORM UNDER THE PROMISSORY NOTES AT ISSUE**

The doctrine of frustration of purpose discharges the Defendants' contractual obligation to render performance under the promissory notes. Accordingly, the Court should deny Plaintiffs' Motion for Judgment on the Pleadings and to Strike Affirmative Defenses.

The doctrine of frustration of purpose excuses contractual obligations under certain defined circumstances. *Fredette V. Allied Van Lines, Inc., 66 F.3d 369 (1st Cir. 1995)*. The Massachusetts Supreme Judicial Court codified the doctrine in *Chase Precast Corp. v. John J. Paonessa Co.*, when it held:

> *Where, after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are discharged, unless the language or the circumstances indicate the contrary.*

409 Mass. 371, 374-375 (1991), quoting from Restatement (Second) of Contracts, § 265 (1981). The Court further held that the doctrine attaches when the expected value of performance to the party seeking to be excused has been destroyed by an unanticipated circumstance that has made performance vitally different from what was reasonably expected and whose risk should not fairly be placed on the party seeking to be excused. *Id*, quoting *Lloyd v. Murphy, 25 Cal.2d 48, 53-54, 153 P.2d, 47 (1944)*; see also, Bilingual Parents Adv. Col. V.

*Boston School*, No. CA011826F (Massachusetts Superior Court, May 15, 2002); *Saab v. Norton Family*, 2000 Mass. App. Div. 200 (2000).

In the instant case, the expected value of the Defendants' performance under the promissory notes was destroyed by an unanticipated circumstance which arose out of the Plaintiffs' improper conduct relative to the Defendants' minority ownership in NCPS-Inc and NDVS-Inc. As a consequence of this unanticipated, unforeseeable circumstance, performance under the promissory notes became vitally different than what was reasonably expected to the extent that the nature and purpose of the transactions were irrevocably undermined. In addition, as the unanticipated circumstance arose out the Plaintiffs' misconduct, it cannot be said that the risk of its occurrence can fairly be placed upon the Defendants.

As stated above, on or about October 31, 1999, Healey, through Stanton Cummings, Ltd., exercised his option to purchase a one-sixth share in NCPS-Inc and NDVS-Inc. Ownership in NCPS-Inc and NDVS-Inc was taken by the Harry William Healey, Jr. Grantor Trust ("HWHG-Trust"). The exercise of the option to purchase the one-sixth share was accomplished by the financing of debt through the HWHG-Trust's delivery of two notes to each of the Zammito's four children (who were the sole owners of NCPS-Inc and NDVS-Inc). Specifically, HWHG-Trust delivered a separate recourse note, each in the principal amount of $12,500 (twelve thousand five hundred dollars) to each of the Zammito's four children. Additionally, HWHG-Trust delivered a separate non-recourse note, each in the principal amount of $25,000 (twenty-five thousand dollars), to each of

the four Zammito children. Under the terms of the notes, the principal and accrued interest on all of the notes became due and payable on October 31, 2003. See, Affidavit of Harry W. Healey, Jr., ¶¶ 74-76; Third Party Complaint, ¶¶ 72-74.

It is undisputed that a *basic assumption* of the promissory notes was that all fiduciary duties owed to the HWHG-Trust, as minority shareholder in NCPS-Inc and NDVS-Inc, would be fulfilled by the Zammito control group. *Chase Precast Corp.*, at 374-375 (adopting Restatement of (Second) Contracts 265 (1981)). Unfortunately, since the HWHG-Trust acquired a one-sixth share in NCPS-Inc and NDVS-Inc, the transactions have been completely devalued by irregularities in accounting and management practices, the apparent failure to observe corporate formalities and other serious irregularities described herein. Third Party Complaint, ¶¶ 72-74. This pattern of misconduct constitutes a material breach of fiduciary duties owed to minority shareholders. Furthermore, the pattern constitutes an unanticipated circumstance of the type contemplated by the doctrine of frustration of purpose. It materially altered the nature & purpose of the transactions – the acquisition of minority ownership positions which would receive fair and equitable treatment, consistent with the Massachusetts law as applied to closely held corporations.

### a) Fraudulent Conveyance of National Check Protection Service, Inc. and National Data Verification Service, Inc. to Business Trusts

On or about January 1, 2001, Zammito family stockholders in NCPS-Inc and NDVS-Inc formed the National Check Protection Service Business Trust ("NCPSB-Trust") and the National Data Verification Business Trust ("NDVSB-

Trust") without the knowledge or consent of either Defendant. Both NCPSB-Trust and NDVSB-Trust provided the four Zammito children, as trustees, with autonomous control over the business activities of the two companies, including discretionary authority with respect to distributions. This was a significant change in the corporate structure of NCPS-Inc and NDVS-Inc which divested HWHG-Trust of its ownership interest as minority shareholder. See, Affidavit of Harry W. Healey, Jr. at ¶ 110; Third Party Complaint ¶¶ 72-74.

As stated above, the Defendants first became aware of the existence of the business trusts in 2002, only when Healey received correspondence from a Zammito attorney requesting that the trustee of the HWHG-Trust sign a set of restated notes. The restated notes referenced the NCPSB-Trust and the NDVSB-Trust. As the trustee had no actual or constructive knowledge that a material change in corporate structure had occurred, he refused to sign such notes, as it was unclear whether acceptance of same would ratify the material change in corporate structure effected by the Zammito control group. See, Affidavit of Harry W. Healey, Jr. at ¶ 111; Third Party Complaint ¶¶ 108-109.

It is also significant that a Report of Voluntary Associations and Trusts was filed with the Secretary of State of the Commonwealth of Massachusetts in May 2002, listing the HWHG-Trust as trustee of both NCPSB-Trust and NDVSB-Trust. This is obviously incorrect and misleading. The trustees are specifically limited to the four Zammito children as evidenced in the declarations of trust. See, Affidavit of Harry W. Healey, Jr. at ¶ 112; Third Party Complaint ¶ 110.

### b) Unearned Management Fees

In September 2000, NCPS-Inc began to make distributions to a management company owned by Zammito shareholders. According to consolidated financial statements, "management fees" for the year ending December 31, 2002, totaled $370,000, or 8.5% gross revenue for the year. It is significant that the payment of such fees commenced within a year of the execution of Healey's option to purchase a 1/6 share in NCPS-Inc and NDVS-Inc and accelerated at year-end a payment in the amount of $230,000 in December, 2000. See, Affidavit of Harry W. Healey, Jr. at ¶¶ 102-104; Third Party Complaint ¶¶ 101-102; Affidavit of Counsel, Exhibit 1, NCPS-Inc NDVS-Inc Combined Financial Statements December 31, 2000 and 1999.

The practice of making distributions to the Zammito management company continued in the years that followed. In 2001, management fees totaled $458,000, or 10.2% of NCPS-Inc gross revenue. In the first seven months of 2002, such fees totaled $294,000, or 10.4% of gross revenue year to date. Distributions to the Zammito management company occurred after July 2002 and currently continue to be made. See, Affidavit of Harry W. Healey, Jr. at ¶¶ 102-104; Third Party Complaint ¶¶ 100-102; Third Party Complaint, Exhibit 9, NCPS-Inc NDVS-Inc Combined Financial Statements December 31, 2002 and 2001.

It is significant that the Zammito management company provided virtually no quantifiable services in exchange for the fees it received. Indeed, an internal accounting document generated by NCPS-Inc and NDVS-Inc specifically

9

classified the $458,000 management fee distributed in 2001 as an expense "put through NDVS/NDVS-Non related to NCPS...." See, Affidavit of Harry W. Healey, Jr. at ¶¶ 100-102; Third Party Complaint ¶¶ 100-102; See also, Affidavit of Counsel, Exhibit 2, NCPS-Inc NDVS-Inc Internal Accounting Documents and Related Correspondence.

### c) Zammito Family Non-Interest Bearing Advances

According to the consolidated financial statements of NCPS-Inc and NDVS-Inc, non-interest bearing advances were made to Zammito shareholders from 1998 through the present. The NCPS-Inc/NDVS-Inc Combined Financial Statements for 1998 and 1999 state at Note 8:

> *During 1999 and 1998, non-interest bearing advances were made to owners. The outstanding advances amounted to $74,417 at December 31, 1999 and $35,684 at December 31, 1998.*

See, Affidavit of Harry W. Healey, Jr. at ¶¶ 102-104; Third Party Complaint ¶¶ 100-102; See also, Affidavit of Counsel, Exhibit 3, NCPS-Inc NDVS-Inc Combined Financial Statements December 31, 1999 and 1998.

The NCPS-Inc/NDVS-Inc Combined Financial Statements for 1999 and 2000 state at Note 7:

> *During 2000 and 1999, non-interest bearing advances were made to owners. The outstanding advances amounted to $113,203 at December 31, 2000 and $66,902 at December 31, 1999. Advances expected to be paid within one year are classified as due from affiliates and advances expected to be paid after one year are classified as advances to owners.*

See, Affidavit of Harry W. Healey, Jr. at ¶¶ 102-104; Third Party Complaint ¶¶ 100-102; See also, Affidavit of Counsel, Exhibit 3, NCPS-Inc NDVS-Inc Combined Financial Statements December 31, 2000 and 1999.

The NCPS-Inc/NDVS-Inc Combined Financial Statements for 2001 and 2002 state at Note 7:

> *During 2002 and 2001, non-interest bearing advances were made to owners. The outstanding advances amounted to zero at December 31, 2002, and $116,996 at December 31, 2001. Due from affiliates consists of legal costs and other expenses which the Companies paid on behalf of these other entities, as of December 31, 2002 and 2001, the outstanding balances were $51,739 and $81,938, respectively. Advances expected to be paid within one year are classified as due from affiliates and advances expected to be paid after one year are classified as advances to owners.*

See, Affidavit of Harry W. Healey, Jr. at ¶¶ 102-104; Third Party Complaint ¶¶ 100-102; Third Party Complaint Exhibit 9, NCPS-Inc NDVS-Inc Combined Financial Statements December 31, 2002 and 2001.

These financial statements establish to a certainty that the Zammito family improperly received and continues to improperly receive substantial non-interest bearing advances.

### d) Employment

Within a year of acquiring NCPS-Inc and NDVS-Inc, all four Zammito children were placed on the NCPS-Inc payroll. With the exception of Robert Zammito Jr. however, none of the children worked at either NCPS-Inc or NDVS-Inc. In 1996, the NCPS-Inc payroll expense attributable to non-working Zammito family members amounted to $92,723, excluding benefits. In 1997, that figure increased to $176,373, and in 1998, it again rose to $181,528. According to an

internal accounting document generated by NCPS-Inc in 2000, the NCPS-Inc payroll expense attributable to non-working Zammito family members totaled $226,346. As with the alleged management fees, the internal document classifies this expense as an expense "put through NCPS/NDVS-Non related to NCPS...." In addition to salaries, substantial performance bonuses were also issued to Zammito children. See, Affidavit of Harry W. Healey, Jr. at ¶¶ 102-104; Third Party Complaint ¶¶ 100-102; See also, Affidavit of Counsel, Exhibits 2-3, NCPS-Inc NDVS-Inc Internal Accounting Documents and Related Correspondence.

### e) Personal Expenses

According to NCPS-Inc and NDVS-Inc records, the personal expenses of Zammito shareholders were passed through NCPS-Inc and NDVS-Inc. For instance, in 1999, Robert, Christopher and Paul Zammito received an auto allowance of $21,6000 and a health insurance benefit in the amount of $19,763.13. In the same year, NCPS-Inc paid expenses associated cellular phone accounts of eight Zammito family members, totaling $6,350.59. NCPS-Inc records classify each of the foregoing transactions as "[e]xpenses put through NCPS-Non related to NCPS." *Id.*

In 2001, Robert, Christopher and Paul Zammito received a heath insurance benefit in the amount of $23,890.92. In that year, NCPS-Inc paid the cell phone expenses of ten Zammito family members, totaling $8,211.51. Again, NCPS-Inc records classify each of these transactions as "[e]xpenses put through

NCPS/NDVS-Non related to NCPS/NDVS...." Such records also state that such transactions "need to be backed out of NCPS and NDVS." *Id.*

In 2002, Robert, Christopher and Paul Zammito received a health insurance benefit in the amount of $14,671.86. In that year, NCPS-Inc paid the cell phone expenses of ten Zammito family members, totaling $5,882.94. Again, NCPS-Inc records classify each of these transactions as "[e]xpenses put through NCPS/NDVS-Non related to NCPS/NDVS...." Such records also state that such transactions "need to be backed out of NCPS and NDVS." *Id.*

In light of the foregoing, serious and substantial evidence exists to establish a systemic pattern of misconduct by the Plaintiffs, which constitutes a breach of the fiduciary duty owed to the Defendants as minority shareholders in NCPS-Inc and NDVS-Inc. *Smith v. Atlantic Properties, Inc.*, 13 Mass. App. Ct. 9 (1981)(*holding that controlling shareholders may not pursue any corporate policy that will harm a minority shareholder when a less harmful alternative exists*).

As controlling shareholders, the Plaintiffs fraudulently conveyed NCPS-Inc and NDVS-Inc to NCSPB-Trust and NDVSB-Trust, a material change in corporate structure which divested the Defendants' of their ownership interest and provided the Plaintiffs, as trustees, with autonomous control over the business activities of the two companies, including discretionary authority with respect to distributions. In this context, despite the payment of exorbitant management fees, the payment of salaries for no-show jobs and other improper payments received by Zammito, it is illustrative that the HWHG-Trust has never received a return on investment or distribution of any kind in connection with its

ownership in NCPS-Inc or NDVS-Inc. Indeed, since acquiring a one-sixth interest in NCPS-Inc and NDVS-Inc, the HWHG-Trust has paid all federal tax on income attributable to its ownership in the firms. See, Affidavit of Harry W. Healey, Jr. at ¶¶ 90; 100-101; Third Party Complaint ¶¶ 98-99.

By contrast, the Plaintiffs have and continue to receive substantial distributions in the form of improper "management fees." Such distributions satisfy not only Plaintiffs' tax liability but provide a enormous return on investment. In addition, the evidence presented unambiguously establishes that Plaintiffs caused NCPS-Inc and NDVS-Inc to employ family members in name only; issue reimbursement for unrelated, personal expenses; and, improperly advance of firm capital on an interest-free basis. In essence, the Plaintiffs operate NCPS-Inc and NDVS-Inc as an alter ego to the expense and substantial detriment of the Defendants as minority shareholders.

It is equally significant that the Defendants raised each and every issue cited in this memorandum prior to the required time of performance under the notes. In doing so, the Defendants expressly stated that they were ready, willing and able to perform their contractual obligations, provided that the Plaintiffs provided reasonable assurances that they would cure their breach of fiduciary duties and that, in the future, the Defendants would receive fair and equitable treatment as minority shareholders. See, Third Party Complaint, Exhibits 6-8. The Plaintiffs expressly refused to provide such assurances. Notwithstanding, the Defendants, in good faith, placed in escrow the principal and interest due

14

under the recourse notes.  As the non-recourse notes expressly limit damages for breach to a security interest in the underlying stock, principal and interest due under these notes was not placed in escrow.  The Defendants, however, expressly stated that such funds would immediately be deposited in escrow should the Plaintiffs provide reasonable assurances of the type describe above. *Id.*

Under these circumstances, the Plaintiffs' systemic breach of fiduciary duties constitutes an unanticipated circumstance of the type contemplated by the doctrine of frustration of purpose.  As a consequence of this pattern of misconduct, the Plaintiffs destroyed the expected value of performance under the promissory notes. Furthermore, as the Plaintiffs brought about the unanticipated circumstance presented in this case, it cannot be said that the risk of its occurrence can fairly be placed upon the Defendants.  For these reasons, the Court should deny the deny Plaintiffs' Motion for Judgment on the Pleadings and to Strike Affirmative Defenses.

II    **THE PLAINTIFFS MOTION TO STRIKE AFFIRMATIVE DEFENSES SHOULD BE DENIED AS THE PLAINTIFFS DEMAND FOR AN ATTACHMENT OF TRUSTEES PROCESS SUBSTANTIALLY EXCEEDS THE AMOUNT IN CONTROVERSY**

In the Demand Section of the Complaint, the Plaintiffs request that the Court allow "an attachment of Trustee Process in the amount of two hundred

twenty-five thousand and 00/100 ($225,000.00) dollars." Complaint, ¶ F. The basis of the amount requested appears to be the principal amount and interest due under all promissory notes, $16,073.13 (sixteen thousand seventy-three and 13/100 dollars) and $32,146.28 (thirty-two thousand one hundred forty-six 28/100 dollars) under the non-recourse and recourse notes, respectively. *See*, Affidavit of Robert J. Zammito, Jr., ¶¶ 7, 13; Affidavit of Paul M. Zammito, ¶¶ 7, 13; Affidavit of Christopher Zammito, ¶¶ 7, 13; and, Affidavit of Valarie A. Mordini, ¶¶ 7, 13. Assuming *arguendo* that principal and interest under the four sets of promissory notes is subject to judicial attachment, the total principal and interest due is only $188,877.64 (one hundred eighty-eight thousand eight hundred seventy-seven 64/100 dollars), or $36,122.36 (thirty-six thousand one hundred twenty-two 36/100 dollars) less than the Plaintiffs requested be judicially seized. According to their affidavits, therefore, the Plaintiffs' demand for pretrial security is overreaching and contrary to Massachusetts law. *See, Costa v. Goldenberg, 258 Mass. 264, 266 (1927)(a party who obtains an attachment in an amount unwarranted by the complaint is liable for abuse of process).*

However, setting aside the Plaintiffs request for attachment by Trustee Process and the affidavits which support it, a review of the non-recourse notes which account for $124,585.12 (one hundred twenty-four thousand five hundred eighty-five 12/100 dollars) of the amount in controversy indicates that the plaintiffs' rights in the event of default are strictly limited.[1] Specifically, each non-recourse note provides the following term relative to default:

---

[1] As there exist four non-recourse notes, one for each Zammito Plaintiff, the Plaintiffs calculate that the total principal and interest due under each note is $32,146.28 (thirty-two thousand one

16

> *Anything contained herein to the contrary notwithstanding, it is understood and agreed the no recourse shall be had under any rule of law, statue or constitution or by the enforcement of any assessments or penalties or otherwise for the payment of the principal of or interest or premium, if any, on the Note or for any claim based hereon or otherwise in respect hereof or based on or in respect of the Stock (other than as expressly set forth in the Recourse Note) against ... Buyer....*

Complaint, Exhibit B, pp. 3-4 of non-recourse notes. This provision of the four Non-Recourse Notes unambiguously indicates that the Plaintiffs' request for Trustee Process is grossly excessive. Indeed, the amount in controversy in the instant case, as calculated by reference to the four Recourse Notes, is only $64,292.52 (sixty-four thousand two hundred ninety-two 52/100 dollars), or $160,707.48 (one hundred sixty thousand seven hundred seven 48/100 dollars) less than the Plaintiffs' request for pretrial security.

Furthermore, the terms of the Non-Recourse notes, as cited above, plainly indicate that the Plaintiffs have no cause of action whatever to recover principal and interest under those notes.

### Conclusion

Accordingly, for all of the foregoing reasons, the Court should deny the Plaintiffs' Motion for Judgment on the Pleadings and to Strike Affirmative Defenses.

---

hundred forty-six 28/100 dollars). Taken together, the Plaintiffs claim that the total due under the non-recourse notes is $124,585.12 (one hundred twenty-four thousand five hundred eighty-five 12/100 dollars).

17

## Request for Oral Argument

Pursuant to Local Rule 7.1(D), defendant and third party plaintiffs believe that oral argument may assist the Court and wish to be heard if the Court concludes that there should be a hearing.

Respectfully submitted;

THE DEFENDANTS,
COUNTERCLAIM PLAINTIFFS, and
THIRD PARTY PLAINTIFFS

By their attorneys:

_____
Stephen J. Lyons
(BBO#309840)
KLIEMAN, LYONS, SCHINDLER
 & GROSS
21 Custom House Street
Boston MA 02110
Telephone: 617.443.1000

Dated: February 25, 2004

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by mail and in accordance with the requirements of Local Rule 7.1(B)(2) on February 25, 2004.

_____
Stephen J. Lyons