## COUNT XL

350.    Counterclaim Defendants and Third-Party Defendants incorporate by reference paragraphs 1 through 349 above, as it fully set forth herein.

351.    Counterclaim Defendants and Third-Party Defendants deny the allegations contained in paragraph 351.

352.    Counterclaim Defendants and Third-Party Defendants deny the allegations contained in paragraph 352.

353.    Counterclaim Defendants and Third-Party Defendants deny the allegations contained in paragraph 353.

## COUNT XLI

354.    Counterclaim Defendants and Third-Party Defendants incorporate by reference paragraphs 1 through 353 above, as it fully set forth herein.

355.    Counterclaim Defendants and Third-Party Defendants deny the allegations contained in paragraph 355.

356.    Counterclaim Defendants and Third-Party Defendants deny the allegations contained in paragraph 356.

357.    Counterclaim Defendants and Third-Party Defendants deny the allegations contained in paragraph 357.

358.    Counterclaim Defendants and Third-Party Defendants deny the allegations contained in paragraph 358.

359.    Counterclaim Defendants and Third-Party Defendants deny the allegations contained in paragraph 359.

## COUNT XLII

360.    Counterclaim Defendants and Third-Party Defendants incorporate by reference paragraphs 1 through 359 above, as it fully set forth herein.

361.    Counterclaim Defendants and Third-Party Defendants deny the allegations contained in paragraph 361.

362.    Counterclaim Defendants and Third-Party Defendants deny the allegations contained in paragraph 362.

363.    Counterclaim Defendants and Third-Party Defendants deny the allegations contained in paragraph 363.

## COUNT XLIII

364.    Counterclaim Defendants and Third-Party Defendants incorporate by reference paragraphs 1 through 363 above, as it fully set forth herein.

365.    Counterclaim Defendants and Third-Party Defendants deny the allegations contained in paragraph 365.

366.    Counterclaim Defendants and Third-Party Defendants deny the allegations contained in paragraph 366.

367.    Counterclaim Defendants and Third-Party Defendants deny the allegations contained in paragraph 367.

## COUNTS v. ASA HOLDING COMPANY, INC.
## COUNT XLIV

368.    Counterclaim Defendants and Third-Party Defendants incorporate by reference paragraphs 1 through 367 above, as it fully set forth herein.

369.    Counterclaim Defendants and Third-Party Defendants deny the allegations contained in paragraph 369.

370.    Counterclaim Defendants and Third-Party Defendants deny the allegations contained in paragraph 370.

371.    Counterclaim Defendants and Third-Party Defendants deny the allegations contained in paragraph 371.

### COUNTS v. ASA HOLDINGS LP
### COUNT XLV

372.    Counterclaim Defendants and Third-Party Defendants incorporate by reference paragraphs 1 through 371 above, as it fully set forth herein.

373.    Counterclaim Defendants and Third-Party Defendants deny the allegations contained in paragraph 373.

374.    Counterclaim Defendants and Third-Party Defendants deny the allegations contained in paragraph 374.

375.    Counterclaim Defendants and Third-Party Defendants deny the allegations contained in paragraph 375.

### COUNTS FOR TRUSTEE PROCESS
### COUNT XLVI

376.    Counterclaim Defendants and Third-Party Defendants incorporate by reference paragraphs 1 through 375 above, as it fully set forth herein.

377.    Counterclaim Defendants and Third-Party Defendants deny the allegations contained in paragraph 377.

378.    Counterclaim Defendants and Third-Party Defendants deny the allegations contained in paragraph 378.

379.    Counterclaim Defendants and Third-Party Defendants deny the allegations contained in paragraph 379.

380.    Counterclaim Defendants and Third-Party Defendants deny the allegations contained in paragraph 380.

381.    Counterclaim Defendants and Third-Party Defendants deny the allegations contained in paragraph 381.

382.    Counterclaim Defendants and Third-Party Defendants deny the allegations contained in paragraph 382.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

Counterclaim and Third-Party Plaintiffs have failed to state a claim upon which relief can be granted.

### Second Affirmative Defense

Counterclaim and Third-Party Plaintiffs are barred from recovery by the doctrine of laches.

### Third Affirmative Defense

Counterclaim and Third-Party Plaintiffs are barred from recovery by the doctrine of unclean hands, based upon their numerous improper, fraudulent and illegal actions with regard to matters at issue in this case.

### Fourth Affirmative Defense

Counterclaim and Third-Party Plaintiffs are barred from recovery by the Statute of Frauds.

### Fifth Affirmative Defense

Counterclaim and Third-Party Plaintiffs are barred from recovery by their failure to bring the action within the statutory time to file said action.

44

### Sixth Affirmative Defense

Counterclaim and Third-Party Plaintiffs are barred from recovery by their own illegal conduct.

### Seventh Affirmative Defense

Counterclaim and Third-Party Plaintiffs are barred from recovery by the doctrine of waiver.

### Eighth Affirmative Defense

Counterclaim and Third-Party Plaintiffs are barred from recovery by the doctrine of accord and satisfaction.

### Ninth Affirmative Defense

Counterclaim and Third-Party Plaintiffs are barred from recovery because they subjected Counterclaim Defendants and Third-Party Defendants to duress.

### Tenth Affirmative Defense

Counterclaim and Third-Party Plaintiffs are barred from recovery by the doctrine of estoppel.

### Eleventh Affirmative Defense

Counterclaim and Third-Party Plaintiffs are barred from recovery for failure of consideration.

### Twelfth Affirmative Defense

Counterclaim and Third-Party Plaintiffs are barred from recovery for failure to plead with particularity the count of fraud pursuant to Fed.R.Civ.P. Rule 9(b).

### Thirteenth Affirmative Defense

Counterclaim and Third-Party Plaintiffs are barred from recovery due to the doctrine of cancellation.

### Fourteenth Affirmative Defense

Counterclaim and Third-Party Plaintiffs are barred from recovery due to their willful violation of the terms of the promissory notes.

### Fifteenth Affirmative Defense

Counterclaim and Third-Party Plaintiffs are barred from recovery for partial failure of consideration.

### Sixteenth Affirmative Defense

Counterclaim and Third-Party Plaintiffs are barred from recovery by their own fraudulent conduct.

### Seventeenth Affirmative Defense

Counterclaim and Third-Party Plaintiffs are barred from recovery for failure to join a party indispensable under Fed.R.Civ.P. Rule 19, pursuant to Fed.R.Civ.P. Rule 12(b)(7).

### Eighteenth Affirmative Defense

Counterclaim and Third-Party Plaintiffs have waived their right to file a Counterclaim for their failure to include in the Counterclaim an allegation of facts demonstrating that the requirement of subject matter jurisdiction is met.

### Nineteenth Affirmative Defense

If Counterclaim and Third-Party Plaintiffs sustained any damages as alleged in their Counterclaim, they were caused by the acts of third parties over whom plaintiffs/defendants in counterclaim and Third-Party Defendants had no control.

### Twentieth Affirmative Defense

The allegations in the Counterclaim and Third-Party Complaint are knowingly false, made in bad faith, and are solely for the purpose of delay.

### Twenty-first Affirmative Defense

The claims are insubstantial, frivolous and not advanced in good faith entitling the Plaintiffs/Defendants in Counterclaim/Third-Party Defendants to their reasonable attorneys' fees and costs pursuant to Massachusetts General Laws Chapter 233, Section 6F.

### Twenty-second Affirmative Defense

Plaintiffs in Counterclaims and Third-Party Plaintiffs have suffered no damages.

### Twenty-third Affirmative Defense

The counterclaim and third party complaint must be dismissed pursuant to Fed.R.Civ.P. Rule 12(e).

**WHEREFORE**, Counterclaim Defendants and Third-Party Defendants respectfully request that the Court dismiss the counterclaim and Third-Party Complaint, deny all relief sought thereunder and award Counterclaim Defendants and Third-Party Defendants their costs, reasonable attorneys' fees, and such other relief as the Court deems just.

## COUNTERCLAIM AND THIRD-PARTY COMPLAINT
## PARTIES - COUNTERCLAIM PLAINTIFFS AND THIRD-PARTY PLAINTIFFS

1.     Counterclaim Plaintiff, Robert J. Zammito, Jr., is an adult individual residing in Wrentham, Norfolk, County Massachusetts.

2.     Counterclaim Plaintiff, Paul M. Zammito, is an adult individual residing in Foxborough, Norfolk County, Massachusetts.

3.     Counterclaim Plaintiff, Christopher Zammito, is an adult individual residing in Foxborough, Norfolk County, Massachusetts.

4.     Counterclaim Plaintiff, Valarie A. Mordini, a/k/a Valarie L. Mordini, is an adult individual residing in Norfolk, Norfolk County, Massachusetts.

5.     Third-Party Plaintiff, Robert J. Zammito, Sr. ("Mr. Zammito"), is an individual residing in Mashpee, Barnstable County, Massachusetts.

6.     Third-Party Plaintiff, Valerie L. Zammito ("Mrs. Zammito"), is an individual residing in Mashpee, Barnstable County, Massachusetts.

7.     Third-Party Plaintiff, ASA Holdings, Inc., is a corporation organized under the laws of the Commonwealth of Massachusetts with a principal place of business in Mashpee, Barnstable County, Massachusetts.

8.     Third-Party Plaintiff, ASA Holdings LP, is a corporation organized under the laws of the Commonwealth of Massachusetts with a principal place of business located at 36 Popponesset Island Road, Mashpee, Barnstable County, Massachusetts.

## COUNTERCLAIM DEFENDANTS AND THIRD-PARTY DEFENDANTS

9.     Counterclaim Defendant, Harry W. Healey, Jr., Grantor Trust ("HWGH-Trust"), is a Massachusetts irrevocable trust created by Declaration of Trust made at Boston, Massachusetts on January 13, 1995. Harry W. Healey, Jr. ("Healey") is Grantor

48

of the Grantor Trust. Peter W. Healy ("Peter Healey") and John A. Malloy, III ("Malloy") are Trustees of the HWHG-Trust.

10.    Counterclaim Defendant, Peter W. Healy, is an individual residing in Hingham, Plymouth County, Massachusetts and is trustee of the HWHG-Trust.

11.    Counterclaim Defendant, Harry W. Healey, Jr. ("Healey"), is an individual residing in Hingham, Plymouth County, Massachusetts. Healey is President of Huntington Forbes, Ltd. ("HF-Ltd.") and Stanton Cummings, Ltd. ("SC-Ltd").

12.    Counterclaim Defendant, Huntington Forbes, Ltd. ("HF-Ltd."), is a corporation organized under the laws of the Commonwealth of Massachusetts, with a principal place of business at 209 Lazell Street, Hingham, Plymouth County, Massachusetts.

13.    Counterclaim Defendant, The Huntington Forbes Charitable Remainder Trust ("HFCR-Trust"), is a Massachusetts charitable remainder trust created by a Declaration of Trust made at Boston, Massachusetts on August 7, 1995. HF-Ltd. is the Grantor. Healey is the Trustee.

14.    Counterclaim Defendant, Stanton Cummings, Ltd. ("SC-Ltd."), is a corporation organized under the laws of the Commonwealth of Massachusetts, with a principal place of business located at 209 Lazell Street, Hingham, Plymouth County, Massachusetts.

15.    Counterclaim Defendant, The Healey Grandchildren's Trust – II ("HGC-Trust"), is a Massachusetts irrevocable trust created by a Declaration of Trust made at Boston, Massachusetts on October 30, 2002. Healey is the Grantor. Peter Healey is the Trustee.

## THIRD-PARTY DEFENDANTS

16.     John A. Malloy, III ("Malloy") is an adult individual residing in Plymouth, Plymouth County, Massachusetts. At all times relevant hereunder, Malloy had both personal and business relationship with Harry W. Healey, Jr., and was a Trustee of the Harry W. Healey Grantor Trust.

17.     William R. Healey is an adult individual residing at 175 Derby Street, Hingham, Plymouth County, Massachusetts, and is the son of Harry W. Healey, Jr. William R. Healey is a certified public accountant. While serving as investment advisor to Plaintiffs and Third-Party Defendants (hereafter "Zammito entities"), Harry W. Healey, Jr. insisted that they hire William Healey to provide detailed financial analysis on various investment opportunities.

## FACTS

18.     In 1975, Robert J. Zammito, Sr. started the ambulance company known as Norfolk-Bristol County Ambulance Service (the "Company") based in Foxborough and Mansfield, Massachusetts. The Company was very successful and grew rapidly. Mr. Zammito's wife, Valerie L. Zammito, also was involved in the management of the Company. As their children grew older they, too, each actively worked for the Company.

19.     From the very beginning, the business plan grew through strategic acquisitions. It expanded geographically in a way that permitted a smooth integration from an operational standpoint.

20.     Within the first year of operations, the Company acquired Colonial Ambulance Company.

21.     By the end of the 1970's, the Company had also acquired Hayward Ambulance Company, which was based in Middleboro, Massachusetts.

22.     The Company continued to flourish, and during the 1980's it acquired two more ambulance companies, known as Commonwealth Ambulance and Beemis.

23.     During the 1989-1990 timeframe, the Company expanded the business yet again by the acquisition of Stavis Ambulance Company.

24.     By 1991, Norfolk-Bristol Ambulance was extremely successful, it had continued to grow strategically, and was poised for further acquisition opportunities. The basic business operations were fairly straight-forward. In the beginning, the Company primarily transported patients for routine medical appointments; it later expanded into emergency transfer services. The billing procedures, however, were complex and cumbersome. The federal government, under the Medicare Part B Program, covered the transportation costs through an elaborate regulatory labyrinth involving the Health Care Financing Administration ("HCFA"), now known as the Centers for Medicare and Medicaid Services. The HCFA, in turn, assigned to private insurance carriers the task of processing and paying Part B claims from the Medicare Trust Fund. With most of the Company's revenues flowing through this billing system (hereafter "Third-Party Billing"), appropriate and efficient billing procedures became the Company's biggest difficulty.

## Healey Hired As Financial Controls Consultant
## 1991-1995

25.     By approximately 1991, the Company had an existing banking relationship with John A. Malloy, III, who had been employed by U.S. Trust. Mr. Zammito met Mr. Malloy in his capacity as a banker who had done business with the

Company. Mr. Malloy told Mr. Zammito that the Company needed to improve its financial controls, and that he knew someone who could help. Mr. Malloy then introduced him to Harry W. Healey, Jr. Unbeknownst to Mr. Zammito at that time, Healey and Malloy had enjoyed a longstanding personal and business relationship. Although Norfolk-Bristol's business was flourishing, the Company was looking for assistance with its billing systems. Annual revenues were in the tens of millions of dollars and the Company had in excess of twenty people working in the billing department. Mr. Healey represented to Mr. Zammito that his company, Huntington-Forbes, Ltd., had experience and expertise dealing with Third-Party Billing practices and that he could help manage the billing systems. Healey further represented that he had been Chairman of the Board of South Shore Hospital and was knowledgeable about the billing requirements.

26.    Relying on these representations, Norfolk-Bristol hired Mr. Healey's company as a consultant to advise the Company on its financial controls. Based upon Mr. Healey's professed expertise, Norfolk-Bristol agreed to pay Huntington-Forbes $10,000 per month for his services.

27.    After a review of the Company's billing systems, Mr. Healey made recommendations with regard to the Company's billing systems. The Company followed Mr. Healey's recommendations on these matters.

28.    Meanwhile, the Company continued to grow and Mr. Zammito identified potential new acquisitions. In approximately 1992, Mr. Zammito and Robert J. Zammito, Jr., commenced discussions about acquiring Worcester-Himmer Ambulance Company. During the same time, Healey sought to expand his role as consultant to Norfolk-Bristol.

52

Mr. Zammito agreed to the continuation of the relationship and included him on the team involved with the acquisition.

29.    Typically, Mr. Zammito alone worked with the Company's accountants and lawyers on the transactions. Healey now became involved in the process.

30.    Mr. Zammito next identified Charter Ambulance Company as another acquisition target, and commenced negotiations for its acquisition. Healey again participated as part of the team on the Charter acquisition.

31.    Healey was not responsible for identifying either the Worcester-Himmer or Charter acquisitions. His involvement began only after the initial decision for acquisition had made by Mr. Zammito.

32.    By the early 1990's, Norfolk-Bristol had changed its name to Ambulance Systems of America, Inc. (ASA-Inc.), and had acquired a total of seven other ambulance companies. Of the seven acquisitions, Healey participated only in the last two. By the mid 1990's, Mr. Zammito had identified Chaulk Ambulance as a potential partner for a merger. Healey became aware of the interest. At this time Mr. Zammito's and his wife, Valerie L. Zammito, owned approximately sixty (60%) percent of the combined companies, and their four children collectively owned approximately forty (40%) percent.

### Healey Learns Of Chaulk Merger Deal
### 1994-1995

33.    After learning of the potential merger deal with Chaulk, Healey approached Mr. Zammito and requested that he be given a ten (10%) percent interest in ASA should the merger take place. On behalf of ASA, Mr. Zammito agreed that Healey would get the ten (10%) percent interest conditioned on the merger with Chaulk taking place.

34.     In January 1995, ASA and Chaulk merged and retained the ASA name. After the merger, Mr. Zammito's and his wife, Valerie L. Zammito, owned approximately twenty-four (24%) percent of the merged Company and their four children collectively owned approximately sixteen (16%) percent. Healey was given an interest in the Company equally to approximately five (5%) percent.

35.     As part of the agreement for merger, former executives of Chaulk became President, Chief Executive Officer and Chief Financial Officer. Robert J. Zammito, Jr. became Vice President. Neither Mr. Zammito nor Mrs. Zammito remained actively involved in the Company on a regular basis.

## ASA Sold
## 1995

36.     Approximately ten months later, ASA was acquired by American Medical Response, Inc. for approximately ninety million ($90,000,000) dollars.

37.     At the time of the acquisition by AMR, there was an escrow account established in the amount of eleven million, two hundred fifty thousand ($11,250,000) dollars to cover potential claims by Medicare over billing practices by ASA.

38.     During 1996, two former ASA employees began a qui tam action that led the office of the U.S. Attorney to begin an investigation into the billing practices of ASA and several of its predecessor corporations.

39.     In approximately June 2002, AMR entered into a settlement agreement with the U.S. Attorneys Office to resolve the investigation into billing irregularities. As part of the settlement, approximately eight million five hundred thousand ($8,500,000) dollars of the ASA escrow was paid to the government.

40.     As a result of the settlement, Mr. and Mrs. Zammito and their four children received approximately three million eight hundred thousand ($3,800,000) dollars less from the escrow fund than they otherwise would have received.  The alleged billing irregularities that caused the loss of this money occurred during the years that Healey was paid to advise the Company on its billing systems.

### Healey Hired As Investment Advisor
### 1996-2002

41.     ASA Holdings LP ("ASA Holdings"), a Massachusetts limited partnership, was established and funded by the four Zammito children.  The purpose of ASA Holdings was for each child to contribute towards a pool of money that would be used for investment purposes.  The idea behind ASA Holdings was for the children to have a fund available to invest in business opportunities.  It was intended that the children would establish a "holding company" entity and invest equally together, while actively participating in the management of their investments.

42.     After the sale of ASA, Healey approached Mr. Zammito about continuing a professional relationship in which he would serve as investment advisor to the children and Mr. Zammito.  He stated that within several years their money would multiply several times over.  The children planned to utilize their ASA Holdings investment fund to invest in businesses that they would actively participate in managing, then sell their interests within three to five years.  ASA Holdings agreed to hire Healey as its investment advisor and paid him a monthly fee of between five thousand ($5,000) and ten thousand ($10,000) dollars.

43.     Mr. Zammito never told Healey that he would have an option, with no time limit, to acquire a one-sixth interest in any of the ASA Holdings investments.

55

44.    Upon information and belief, Healey was never a registered investment advisor, licensed to provide investment advice.

## COUNT I
## COLORNET GRAPHICS LLC
## BREACH OF CONTRACT

45.    Counterclaim Plaintiffs and Third-Party Plaintiffs incorporate by reference paragraphs 1 through 44 above, as it fully set forth herein.

46.    In or about 1999, Healey, as investment advisor to the Zammito children, advised them to invest in Colornet Graphics LLC. Healey recommended that his son, William Healey, be hired to perform further financial analysis. The children, through ASA LP, directly or indirectly, hired William Healey, and relied upon the advice of both Healeys in making a seven hundred fifty thousand ($750,000) dollar investment in the company. Their investment was lost.

47.    In accordance with the agreement of the parties, Healey received a one-sixth (1/6) interest in the Company for which he owed ASA one hundred fifty thousand ($150,000) dollars. Healey never paid for his interest, and thereby breached the contract.

## COUNT II
## NEW ENGLAND ROLL-OFF SERVICES LLC
## BREACH OF CONTRACT

48.    Counterclaim Plaintiffs and Third-Party Plaintiffs incorporate by reference paragraphs 1 through 47 above, as it fully set forth herein.

49.    In or about 1999, Healey, as investment advisor to the Zammito children, advised them to invest in New England Roll-Off Services LLC. Healey recommended that his son, William Healey, be hired to perform further financial analysis. The children, through ASA LP, directly or indirectly, hired William Healey, and relied upon the advice

of both Healeys in making a five hundred sixty-two thousand five hundred ($562,500) dollar investment in the company. Their investment was lost.

50.    In accordance with the agreement of the parties, Healey received a one-sixth (1/6) interest in the Company for which he owed ASA ninety-three thousand seven hundred fifty ($93,750) dollars. Healey never paid for his interest, and thereby breached the contact.

**COUNT III**
**NORFOLK-BRISTOL AMBULANCE COMPANY, INC.**
**BREACH OF CONTRACT**

51.    Counterclaim Plaintiffs and Third-Party Plaintiffs incorporate by reference paragraphs 1 through 50 above, as if more fully set forth herein.

52.    Defendant Healey represented to Mr. Zammito that he had knowledge and experience in handling Third-Party Billing with the Federal Government's Medicare program.

53.    Based upon this representation, Norfolk-Bristol entered into a contract with Healey to make certain its Third-Party Billings systems were efficient and in accordance with government regulations.

54.    The parties came to a meeting of the minds on all essential terms of the contract, and Norfolk-Bristol accepted Healey's terms and conditions.

55.    In consideration of and compensation for Healey's services, Norfolk-Bristol entered into a contract with Healey and paid him $10,000 per month for his services.

56.    The Company fully completed its obligations under the terms of the contract.

57.    Healey misrepresented his knowledge of the third-party billing system.

58.    This misrepresentation by Healey was a material breach of the contract.

59.    As a direct result of Healey's breach, Counterclaim Plaintiff and Third-

Party Plaintiffs suffered significant damages including the loss of three million eight

hundred thousand ($3,800,000) dollars from the escrow fund.

**COUNT IV**
**BREACH OF THE IMPLIED COVENANT**
**OF GOOD FAITH AND FAIR DEALING**

60.    Counterclaim Plaintiffs and Third-Party Plaintiffs incorporate by reference

paragraphs 1 through 59 above, as if more fully set forth herein.

61.    Defendant's actions violated the implied covenant of good faith and fair

dealing implicit in every contract.

62.    As a direct result of Defendant's violation of the implied covenant of good

faith and fair dealing, Zammitos entities suffered damages.

**COUNT V**
**ABUSE OF PROCESS**

63.    Counterclaim Plaintiffs and Third-Party Plaintiffs incorporate by reference

paragraphs 1 through 62 above, as if more fully set forth herein.

63.    By filing the Counterclaim and Third-Party Complaint, the Healey

Defendants filed a baseless lawsuit and continue to prosecute it for the purpose of

damaging the Zammito entities.

64.    As a direct and proximate result of this abuse process, the Zammito

entities have suffered loss of money and damage to reputation.

65.    Healey's allegations that he had no knowledge of the establishment of the National Check Protection Service Business Trust and National Data Verification System Business Trust are false, and made with fraudulent intent.

66.    At all times relevant thereto, Healey knew of the establishment of the Trusts, as evidenced by the attached Exhibits "A" and "B."

### COUNT VI
### BREACH OF CONTRACT
### HARTE TOYOTA

67.    Counterclaim Plaintiffs and Third-Party Plaintiffs incorporate by reference paragraphs 1 through 66 above, as if more fully set forth herein.

68.    Mr. Zammito retained the services of Healey to provide investment advice with regard to the purchase of Harte Toyota.

69.    Mr. Healey agreed to provide the services. Healey so negligently and poorly performed his obligations that Mr. Zammito was caused to expend approximately one million ($1,000,000) dollars more for the acquisition than was originally agreed.

70.    By failing to perform services as promised, Healey breached the contract with Mr. Zammito.

71.    As the direct result thereof, Mr. Zammito suffered damages.

### COUNT VII
### 93A

72.    Counterclaim Plaintiffs and Third-Party Plaintiffs incorporate by reference paragraphs 1 through 71 above, as if more fully set forth herein.

73.    Healey's actions constituted unfair and deceptive practices under Massachusetts General Laws Chapter 93A, and have caused significant damages to Counterclaim Plaintiffs and Third-Party Plaintiffs.

74. As the direct result thereof Counterclaim Plaintiffs and Third-Party Plaintiffs have suffered and continue to suffer damages.

**COUNT VIII**
**NCPS/NVDS**
**BREACH OF CONTRACT**

75. Counterclaim Plaintiffs and Third-Party Plaintiffs incorporate by reference paragraphs 1 through 74 above, as if more fully set forth herein.

76. In or about 1996, Healey, as investment advisor to the Zammito children, advised them to invest in NCPS/NVDS. The children, through ASA LP, and relied upon the advice of Healey in making a two million two hundred fifty thousand ($2,250,000) dollar investment in the company.

77. In accordance with the agreement of the parties, Healey received a one-sixth (1/6) interest in the Company for which he owed ASA three hundred seventy-one thousand two hundred fifty ($371,250) dollars. Healey never paid for his interest, and thereby breached the contract.

**COUNT VIII**
**FE HOLDINGS INC.**
**BREACH OF CONTRACT**

78. Counterclaim Plaintiffs and Third-Party Plaintiffs incorporate by reference paragraphs 1 through 77 above, as if more fully set forth herein.

79. In or about 1996, Healey, as investment advisor to the Zammito children, advised them to invest in FE Holdings Inc. The children, directly or indirectly, through ASA LP, relied upon the advice of Healey in making approximately one million five hundred thousand ($1,500,000) dollar investment in the company.

80.     In accordance with the agreement of the parties, Healey received a one-sixth (1/6) interest in the Company for which he owed ASA approximately two hundred forty-seven thousand five hundred ($247,500) dollars. Healey never paid for his interest, and thereby breached the contract.

**WHEREFORE**, Counterclaim Plaintiffs and Third-Party Plaintiffs respectfully demand that judgment enter in their favor on the Counterclaim and Third-Party Complaint; and that they be awarded their costs, damages, reasonable attorneys' fees, and such other relief as the Court deems just.

> Respectfully submitted,
> ROBERT J. ZAMMITO, JR.,
> PAUL M. ZAMMITO,
> CHRISTOPHER ZAMMITO AND
> VALARIE M. MORDINI,
> ROBERT J. ZAMMITO, SR.,
> VALERIE L. ZAMMITO,
> ASA HOLDINGS, INC. and
> ASA HOLDINGS LP,
> By their attorneys,
>
> Kevin M. Considine (BBO #542253)
> Timothy M. Mitchelson (BBO #630331)
> Kevin M. Considine, P.C.
> One Boston Place – 28th Floor
> Boston, MA 02108
> 617-723-9900

DATED: April 12, 2004

## CERTIFICATE OF SERVICE

I, Kevin M. Considine, hereby certify that I have this day served a copy of the foregoing Reply to Counterclaim, Third-Party Answer, Third-Party Complaint and Affidavit of Robert J. Zammito, Sr. to counsel of record, Stephen J. Lyons, Esquire, Klieman, Lyons, Schindler & Gross, 21 Custom House Street, Suite 920, Boston, Massachusetts 02110, via first class mail, postage prepaid, this 12th day of April 2004.

Kevin M. Considine

62