UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 04-101610REK

| | |
|---|---|
| ROBERT J. ZAMMITO, JR.,<br>PAUL M. ZAMMITO,<br>CHRISTOPHER ZAMMITO and<br>VALARIE A. MORDINI,<br>    Plaintiffs and Counterclaim Defendants,<br>    v.<br>HARRY W. HEALEY, JR., GRANTOR TRUST<br>and PETER W. HEALEY, as Trustee of<br>HARRY W. HEALEY, JR., GRANTOR TRUST,<br>    Defendants and Counterclaim Plaintiffs<br><br>HARRY W. HEALEY, JR., individually, and as<br>Trustee of THE HUNTINGTON FORBES<br>CHARITABLE REMAINDER TRUST,<br><br>HUNTINGTON FORBES, LTD.,<br>STANTON CUMMINGS, LTD.,<br>PETER W. HEALEY, as Trustee of<br>THE HEALEY GRANDCHILDREN'S TRUST II,<br>    Third-Party Plaintiffs,<br>    v.<br>ROBERT J. ZAMMITO, SR.,<br>VALERIE L. ZAMMITO,<br>ASA HOLDINGS, INC., and<br>ASA HOLDINGS LP,<br>    Third-Party Defendants,<br><br>MELLON BANK<br>(a/k/a Mellon Trust of New England),<br>    Bank Trustee. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## AFFIDAVIT OF ROBERT J. ZAMMITO, SR.

I, Robert J. Zammito, Sr., upon oath do depose and say as follows:

1. My name is Robert J. Zammito, Sr. I reside at 36 Popponesett Island Road, Mashpee, Massachusetts, with my wife, Valerie L. Zammito. We have four adult

children: Robert J. Zammito, Jr., Paul M. Zammito, Christopher Zammito, and Valarie A. Mordini.

2. This Affidavit is made in support of the defenses to the claims made by Harry W. Healey, Jr., et al, in **"Defendants' Answer, Counterclaims and Third-Party Complaint,"** and in support of Plaintiffs' and Third-Party Defendants' various claims against Healey, et al. All statements made herein are based upon my personal knowledge, unless made upon information and belief. Where facts are stated upon information and belief, I believe them to be true.

### Norfolk-Bristol Ambulance
### 1975-1991

3. In 1975, I started the ambulance company known as Norfolk-Bristol County Ambulance Service based in Foxborough and Mansfield, Massachusetts. The Company was very successful and grew rapidly. My wife, Valerie L. Zammito, also was involved in the management of the Company. As our children grew older they, too, each actively worked for the Company.

4. From the very beginning, my plan was to grow the Company through strategic acquisitions. Ideally, I wanted to expand geographically in a way that would permit a smooth integration from an operational standpoint.

5. Within my first year of operations, I was able to acquire Colonial Ambulance Company.

6. By the end of the 1970's, I had also acquired Hayward Ambulance Company, which was based in Middleboro, Massachusetts.

7. The Company continued to flourish, and during the 1980's I acquired two more ambulance companies, known as Commonwealth Ambulance and Beemis.

8. During the 1989-1990 timeframe, I was able to expand the business yet again by the acquisition of Stavis Ambulance Company.

9. By 1991, Norfolk-Bristol Ambulance was extremely successful, it had continued to grow strategically, and I was poised for further acquisition opportunities. The basic business operations were fairly straight-forward. In the beginning, the Company primarily transported patients for routine medical appointments; it later expanded into emergency transfer services. The billing procedures, however, were complex and cumbersome. The federal government, under the Medicare Part B Program, covered the transportation costs through an elaborate regulatory labyrinth involving the Health Care Financing Administration ("HCFA"), now known as the Centers for Medicare and Medicaid Services. The HCFA, in turn, assigned to private insurance carriers the task of processing and paying Part B claims from the Medicare Trust Fund. With most of the Company's revenues flowing through this billing system (hereafter "Third-Party Billing"), appropriate and efficient billing procedures became the Company's biggest difficulty.

### Healey Hired As Financial Controls Consultant
### 1991-1995

10. By approximately 1991, I had an existing banking relationship with John A. Malloy, III, who had been employed by U.S. Trust. I met Mr. Malloy in his capacity as a banker who had done business with the Company. Mr. Malloy told me that the Company needed to improve its financial controls, and that he knew someone who could help me. Mr. Malloy then introduced me to Harry W. Healey, Jr. Unbeknownst to me at that time, Healey and Malloy had enjoyed a longstanding personal and business relationship. Although Norfolk-Bristol's business was flourishing, the Company was

3

looking for assistance with its billing systems. Annual revenues were in the tens of millions of dollars and the Company had in excess of twenty people working in the billing department. Mr. Healey represented to me that his company, Huntington-Forbes, Ltd., had experience and expertise dealing with Third-Party Billing practices and that he could help us manage our billing systems. Healey further represented that he had been Chairman of the Board of South Shore Hospital and was knowledgeable about the billing requirements.

11. Relying on these representations, Norfolk-Bristol hired Mr. Healey's company as a consultant to advise the Company on its financial controls. Based upon Mr. Healey's professed expertise, Norfolk-Bristol agreed to pay Huntington-Forbes $10,000 per month for his services.

12. After a review of the Company's billing systems, Mr. Healey made recommendations with regard to the Company's billing systems. The Company followed Mr. Healey's recommendations on these matters.

13. Meanwhile, the Company continued to grow and I identified potential new acquisitions. In approximately 1992, I, along with my son, Robert J. Zammito, Jr., commenced discussions about acquiring Worcester-Himmer Ambulance Company. During the same time, Healey sought to expand his role as consultant to Norfolk-Bristol. I agreed to the continuation of the relationship and included him on the team involved with the acquisition.

14. Typically, I alone worked with the Company's accountants and lawyers on the transactions. Healey now became involved in the process.

15. I next identified Charter Ambulance Company as another acquisition target, and commenced negotiations for its acquisition. Healey again participated as part of the team on the Charter acquisition.

16. Healey was not responsible for identifying either the Worcester-Himmer or Charter acquisitions. His involvement began only after the initial decision for acquisition had made by me.

17. By the early 1990's, Norfolk-Bristol had changed its name to Ambulance Systems of America, Inc. (ASA-Inc.), and had acquired a total of seven other ambulance companies. Of the seven acquisitions, Healey participated only in the last two. By the mid 1990's, I had identified Chaulk Ambulance as a potential partner for a merger. Healey became aware of my interest. At this time my wife, Valerie L. Zammito, and I owned approximately sixty (60%) percent of the combined companies and our four children collectively owned approximately forty (40%) percent.

### Healey Learns Of Chaulk Merger Deal
### 1994-1995

18. After learning of the potential merger deal with Chaulk, Healey approached me and requested that he be given a ten (10%) percent interest in ASA should the merger take place. On behalf of ASA, I agreed that Healey would get the ten (10%) percent interest conditioned on the merger with Chaulk taking place.

19. In January 1995, ASA and Chaulk merged and retained the ASA name. After the merger, my wife and I owned approximately twenty-four (24%) percent of the merged Company and our four children collectively owned approximately sixteen (16%) percent. Healey was given an interest in the Company equally to approximately five (5%) percent.

5

20. As part of the agreement for merger, former executives of Chaulk became President, Chief Executive Officer and Chief Financial Officer. Robert J. Zammito, Jr. became Vice President. Neither my wife nor I remained actively involved in the Company on a regular basis.

## ASA Sold
## 1995

21. Approximately ten months later, ASA was acquired by American Medical Response, Inc. for approximately ninety million ($90,000,000) dollars.

22. At the time of the acquisition by AMR, there was an escrow account established in the amount of eleven million, two hundred fifty thousand ($11,250,000) dollars to cover potential claims by Medicare over billing practices by ASA.

23. During 1996, two former ASA employees began a qui tam action that led the office of the U.S. Attorney to begin an investigation into the billing practices of ASA and several of its predecessor corporations.

24. In approximately June 2002, AMR entered into a settlement agreement with the U.S. Attorneys Office to resolve the investigation into billing irregularities. As part of the settlement, approximately eight million five hundred thousand ($8,500,000) dollars of the ASA escrow was paid to the government.

25. As a result of the settlement, my family received approximately three million eight hundred thousand ($3,800,000) dollars less from the escrow fund then it otherwise would have received. The alleged billing irregularities that caused the loss of this money occurred during the years that Healey was paid to advise the Company on its billing systems.

## Healey Hired As Financial Advisor
## 1996-2002

26.    ASA Holdings LP ("ASA Holdings"), a Massachusetts limited partnership, was established and funded by my four children. The purpose of ASA Holdings was for each child to contribute towards a pool of money that would be used for investment purposes. The idea behind ASA Holdings was for the children to have a fund available to invest in business opportunities. It was intended that the children would establish a "holding company" entity and invest equally together, while actively participating in the management of their investments.

27.    After the sale of ASA, Healey approached me about continuing a professional relationship in which he would serve as investment advisor to my children and me. He stated that within several years our money would multiply several times over. The children planned to utilize their ASA Holdings investment fund to invest in businesses that they would actively participate in managing, then sell their interests within three to five years. ASA Holdings agreed to hire Healey as its investment advisor and paid him a monthly fee of between five thousand ($5,000) and ten thousand ($10,000) dollars.

28.    I never told Healey that he would have an option, with no time limit, to acquire a one-sixth interest in any of the ASA Holdings investments.

Signed under the pains and penalties of perjury, this 12 day of April 2004.

Robert J. Zammito, Sr.