IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO: 04-10161-REK

ROBERT J. ZAMMITO, JR.;                                           )
PAUL M. ZAMMITO;                                                  )
CHRISTOPHER ZAMMITO; and                                          )
VALARIE A. MORDINI,                                               )
        Plaintiffs and Counterclaim Defendants            )
                                                                 )
                                                                 )
v.                                                                )
                                                                 )
HARRY W. HEALEY, JR., GRANTOR TRUST and                           )
PETER W. HEALEY as Trustee of                                     )
HARRY W. HEALEY, JR., GRANTOR TRUST,                              )
        Defendants and Counterclaim Plaintiffs            )
                                                                 )
HARRY W. HEALEY, JR. individually, and as Trustee of              )
THE HUNTINGTON FORBES CHARITABLE                                  )
REMAINDER TRUST;                                                  )
                                                                 )
HUNTINGTON FORBES, LTD.;                                          )
STANTON CUMMINGS, LTD.;                                           )
PETER W. HEALEY, as Trustee of                                    )
THE HEALEY GRANDCHILDREN'S TRUST – II,                            )
        Third Party Plaintiffs                            )
        Third Party Defendants in Counterclaim            )
                                                                 )
v.                                                                )
                                                                 )
ROBERT J. ZAMMITO, SR.;                                           )
VALERIE L. ZAMMITO;                                               )
ASA HOLDING COMPANY, INC.; and                                    )
THE ASA HOLDINGS LP,                                              )
        Third Party Defendants                            )
        Third Party Plaintiffs in Counterclaim            )
        Third Party Plaintiffs                            )
                                                                 )
v.                                                                )
                                                                 )
JOHN A. MALLOY, III and                                           )
WILLIAM R. HEALEY,                                                )
        Third Party Defendants                            )
                                                                 )
MELLON BANK (aka Mellon Trust of New England),                    )
        Bank Trustee                                      )

**MOTION FOR A PRELIMINARY INJUNCTION AND OTHER EQUITABLE
RELIEF WITH STATEMENT OF REASONS AND AUTHORITIES**

**NOW COMES** the defendant and counterclaim plaintiff, Peter W. Healey, as Trustee of the Harry W. Healey, Jr. Grantor Trust, and pursuant to Federal Rule of Civil Procedure 65 hereby moves that this Court issue a Preliminary Injunction and other equitable relief described herein enjoining the plaintiffs from misappropriating 3.2 million dollars from the proceeds of the sale of NCPS/NDVS which is presently scheduled to take place on or about Friday, April 22, 2005 and which belongs to the Harry W. Healey, Jr., Grantor Trust, and to prevent further irreparable injury.  The reasons for this motion are set forth in detail below.

## Relevant Procedural History and Factual Background

### The Claims and Counterclaims

This action was commenced by Robert J. Zammito, Jr., Paul M. Zammito, Christopher Zammito and Valarie A. Mordini (hereinafter "the Zammitos") on December 24, 2003 by the filing of a complaint in the Massachusetts Superior Court entitled *Robert J. Zammito, Jr., Paul M. Zammito, Christopher Zammito and Valarie A. Mordini v. Harry W. Healey, Jr., Grantor Trust and Peter W. Healey, As Trustee, Suffolk Superior Court, Civil Action No. 03-6083BLS.* According to the complaint, the action seeks to recover the sum of $225,000 allegedly due on eight separate promissory notes.

In reply, defendant, Harry W. Healey, Jr., (hereinafter "Healey"), brought counterclaims against the plaintiffs alleging fraud, breach of contract, breach of fiduciary duty to shareholders, and violations of 18 USC §§1961-1968, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), among other claims.  In his counterclaim, Healey asserts a right to recover the sum of at least

$3,369,641, exclusive of interest, costs, punitive damages, attorneys fees and other damages. Thus, the controversy involves a federal question or claim or right arising under the Constitution, Treaties or Law of the United States (28 USC §1331) and was properly removed to the United States District Court pursuant to 28 USC §1441(b) on January 23, 2004 and is presently known as *Robert J. Zammito, Jr., et als. v. Harry W. Healey, Jr., et als., Civil Action No: 04-101610REK* (hereinafter "the Zammito action").

### The Parties

In 1991, Healey, who has over 25 years' experience in corporate management and the banking industry, owned and operated a financial consulting firm known as Huntington Forbes, Ltd. [Affidavit of Harry W. Healey, Jr. (hereinafter "Healey Affidavit"), ¶26]  The Zammitos operated a regional ambulance company known as Norfolk Bristol Ambulance Company, Inc. [Healey Affidavit ¶28]  Robert J. Zammito, Sr., his wife, Valerie Zammito, and his four children, Robert Zammito, Jr., Paul Zammito, Christopher Zammito and Valarie Zammito owned and operated the business. [Id.]

### The Consulting Relationship

After being introduced by a third party, Healey was hired by Robert J. Zammito, Sr. (hereinafter "Zammito"), to provide financial and corporate managerial consulting services to Norfolk Bristol Ambulance Company, Inc. [Healey Affidavit ¶30]

3

*Healey's Compensation*

After an initial period of time, Healey was hired to provide consulting services on a continuing basis. As part of this continuing professional relationship, the Zammitos agreed to pay Healey a monthly consulting fee of $10,000 in exchange for one day of consulting a week. At this time, the Zammitos believed Norfolk Bristol Ambulance Company, Inc., to be worth 15 million dollars and agreed, as part of the professional relationship, that if the Company were sold, Healey would receive a bonus equal to ten percent of the sale amount above the 15 million dollar valuation. [Healey Affidavit ¶31] It is important to note that this bonus did not represent a "finder's fee" or compensation for services rendered in connection with the sale of the business. This additional compensation was for the business consulting services that Healey would render on a day-to-day basis at Norfolk Bristol Ambulance Company, Inc., between 1991 and 1995. [Second Affidavit of Harry W. Healey, Jr. (hereinafter "Second Healey Affidavit") ¶4] Later, in 1995 after the purchase of several other smaller ambulance companies, Healey negotiated the merger of Norfolk Bristol Ambulance Company, Inc., with AmNet, Inc., and, pursuant to his compensation agreement, acquired ten percent of Ambulance Systems of America, Inc., (the successor to Norfolk Bristol Ambulance Company, Inc.). Ambulance Systems of America, Inc., was then acquired in 1995 by American Medical Response, Inc., for 90 million dollars. [Healey Affidavit ¶¶31-45]

*Continuation of the Consulting Relationship*

After the merger, Robert Zammito, Sr., asked Healey to continue to work with him to invest the proceeds of the sale in part by identifying, acquiring and managing businesses that his four children would help to operate. It was agreed that Healey would provide consulting services one day per week in exchange for (1) a monthly consulting fee of $5,000 that would increase to $10,000 after two acquisitions; (2) a ten percent commission or bonus for each completed investment; and (3) an option to purchase (with no time limit) up to one-sixth of the Zammito's interest in each business acquired.  [Healey Affidavit ¶¶48-50] Again, the ten percent commission or bonus was not a "finder's fee" or compensation for services rendered solely in negotiating the sale or acquisition of any business.  As with Norfolk Bristol Ambulance Company, Inc., this additional compensation was intended to compensate Healey for the consulting services that he would be required to provide on a day-to-day basis with each new acquisition that Healey would be required to manage.  [Second Healey Affidavit ¶5]

*The Acquisition of NCPS/NDVS*

In 1996, Healey identified two businesses for possible acquisition.  They were National Check Protection Service, Inc., ("NCPS"), which is engaged in the business of providing background information on new accounts to banks and financial institutions, and National Data Verification Services, Inc. ("NDVS"), which provides pre-employment screening to corporate clients.  The Zammitos acquired NCPS/NDVS for 2.25 million dollars.  The transaction was structured

5

such that the Zammito children became the sole shareholders. [Healey Affidavit ¶51-53] Healey agreed to defer receipt of his $225,000 bonus on this transaction until such time as he decided whether to invest in these companies at which time his bonus of $225,000 would be used as credit toward his acquisition of one sixth of the Zammitos' ownership interest in NCPS/NDVS. [Healey Affidavit ¶54]

### Healey Acquires an Interest in NCPS/NDVS

In October 1999, Healey exercised his option to acquire a one-sixth share of the Zammitos' interest in NCPS/NDVS. The total consideration paid by Healey was $375,000. This included Healey's incentive bonus ($225,000) and his execution of eight promissory notes (two to each of the Zammito children with a total value of $150,000). [Healey Affidavit ¶¶54, 74-75]

### The Promissory Notes

As partial consideration for his purchase of a one-sixth percent equity position in the NCPS/NDVS companies, Healey executed eight promissory notes with a total value of $150,000. The eight promissory notes included four non-recourse notes for $25,000 each and four recourse notes for $12,500 each, representing partial consideration for 32 shares of stock in NCPS and NDVS. According to their terms, the promissory notes were due and payable on October 31, 2003. [Healey Affidavit ¶¶75-76]

### The Fraudulent Conversion of NCPS/NDVS to Business Trusts

In January of 2001 and without Healey's knowledge or consent, the Zammitos formed the National Check Protection Service Business Trust and the National Data Verification Service Business Trust. The business trusts provided

the four Zammito children with absolute autonomous control over the business activities of the two companies, including discretionary authority with respect to distributions. [Healey Affidavit ¶110]  To accomplish this fraudulent conversion, the Zammitos prepared a fraudulent Exchange Agreement purporting to convey Healey's stock in NCPS/NDVS to the business trusts by forging the signature of Peter Healey as Trustee in the process.  [Healey Affidavit ¶¶110-112; see also Affidavit of Counsel[1], Ex. 25 (Deposition of Peter Healey), pp. 19-24]   The fraudulent conversion of NCPS/NDVS to business trusts was not discovered by Healey until 2002 when the Zammitos requested that he execute restated promissory notes which referenced the business trusts. [Healey Affidavit ¶11]

### The Fraudulent Racketeering Scheme

In 2003, prior to the notes becoming due, Healey learned that the Zammitos, who owed Healey more than 1.5 million dollars for consulting services rendered in connection with other business ventures, had engaged in a pattern of related racketeering activities by which the Zammitos improperly siphoned away funds from legitimate business entities, including NCPS/NDVS, and enriched themselves to the detriment of Healey and other minority shareholders.  These racketeering activities included:  (1) the payment of more than 2.26 million dollars in fraudulent and unearned management fees to a limited liability company organized under the laws of the State of Delaware and wholly owned by the Zammitos;  (2) obtaining non-interest bearing loans and advances for the Zammitos;  (3) the payment of more than 2.15 million dollars in salaries and other

---

[1] All subsequent references to Exhibits ("Ex.") within this document correspond to exhibits attached to the Affidavit of Counsel filed in conjunction with this motion for preliminary injunctive relief.

compensation to the Zammitos by companies for which they did not work; (4) the payment of personal expenses for the Zammitos; (5) the unauthorized liquidation of corporate assets and  misappropriation of the proceeds by the Zammitos; and (6) other misuse of corporate assets which resulted in the unjust enrichment of the Zammitos.  [Healey Affidavit ¶¶102-104; see also Ex. 29 (Expert Report of Jimmy S. Pappas, CPA, CFE (hereinafter "Pappas Report"))]

### The Request for Financial Transparency and Accountability and the Establishment of the Escrow Account

Upon learning of this scheme, on October 20, 2003, Healey, by his attorneys, wrote to legal counsel for the Zammitos outlining his concerns over non-interest bearing advances made to the Zammitos; management fees; no-show jobs for the Zammito children; personal and other unrelated expenses paid by NCPS/NDVS for the Zammitos; and other serious irregularities, including fraud and self-dealing by the Zammitos. [Ex. 1] In that letter, Healey notified the Zammitos that he had placed in escrow a sum equal to his obligation under the recourse notes and would deposit additional escrow funds sufficient to satisfy his obligations under the non-recourse notes in return for a full accounting, financial transparency, correction of accounting irregularities, repayment of all misappropriated monies, and reinstatement of corporate formalities. [Id.] When the Zammitos failed to account for the financial irregularities and other improprieties, provide financial transparency, and, rather than return monies which were improperly siphoned away through phony management fees and salaries, escalated their illegal activities, Healy refused to add to or release the funds placed in escrow. [Ex. 2, 3] In response, the Zammitos sued Healey on

8

the promissory notes and Healey counterclaimed alleging fraud, breach of contract, breach of fiduciary duty to shareholders, and violations of 18 USC §§1961-1968, the Racketeer Influenced and Corrupt Organization Act ("RICO") among other claims. [See Complaint and Healey's Answer and Counterclaim]

*Management Fees Paid by NCPS/NDVS*

According to its Combined Financial Statements, beginning in September, 2000, NCPS/NDVS began paying management fees "to a management company with shareholders in common with the Companies". [Ex. 8 (Combined Financial Statements of NCPS/NDVS), note 7]  That management company was RPCV, LLC ("RPCV"), a limited liability company wholly owned by the four Zammito children organized under the laws of the State of Delaware. [Ex. 22 (Deposition of Robert Zammito, Jr.), pp. 30-32]  Between September, 2000 and December 31, 2004, NCPS/NDVS was caused to pay RPCV management fees of $2,269,000.  [Ex. 8-10 (Combined Financial Statements of NCPS/NDVS 2000-2004)]  RPCV has no employees; no contract to provide management services; no itemized statements describing the management services provided; and no clients except for business owned by the Zammitos.  Except for "talking about the business of the company on a regular basis with his brother and sister," Robert Zammito, Jr., who also received more than $462,911 in salary from NCPS/NDVS between 2000 and 2004, could not cite a single example of the "management services" for which NCPS/NDVS paid RPCV $2,269,000 over a four year period. [Ex. 22 (Deposition of Robert Zammito, Jr.), pp. 30-32, 83-86]  In a bizarre but revealing exchange that best captures the Zammitos' disregard for corporate

formalities and the rights of minority shareholders, Robert Zammito, Jr., when asked to define his fiduciary duty to shareholders as an officer of NCPS/NDVS, opined that the payment of hundreds of thousands of dollars in expenses, including personal expenses, which were unrelated to the business of NCPS/NDVS was consistent with that duty: "Because I do." [Id., pp. 108-111]

By contrast, according to the deposition testimony of its President, Daniel Lalumiere, NCPS/NDVS had an experienced management team in place when it was acquired by the Zammitos and needed no management services. Indeed, Lalumiere could not cite a single example of a management responsibility that he and his management team performed prior to the sale that has since been taken over by Robert Zammito, Jr., or any other member of his family. [Ex. 21 (Deposition of Daniel Lalumiere), pp. 17-24, 85-88, 93-98] Perhaps more astonishing still is Lalumiere's testimony that he was completely unaware of the amounts paid by NCPS/NDVS as management fees to RPCV from 2000 through 2004. [Id., pp. 123-124]

### Salaries for the Zammito Children

In addition to management fees exceeding $2,269,000, based upon the payroll records of NCPS/NDVS, between 2000 and 2004 NCPS/NDVS was caused to pay the four Zammito children salaries amounting to more than $2,153,163 even though, for the most part, they did not work there. [Ex. 29 (Pappas Report), p. 5] For example, between 2000 and 2004, Paul Zammito received $516,086 from NCPS/NDVS even though he did not work there and was employed for most of the period of time in one of his father's automobile

dealerships.    [Ex. 24 (Deposition of Paul Zammito), pp. 17-28, 50-54]
Christopher Zammito received $472,294 between 2000 and 2004 from
NCPS/NDVS despite also being employed at one of his father's automobile
dealerships since 2000 and performing no work for NCPS/NDVS.    [Ex. 23
(Deposition of Christopher Zammito), pp. 15, 30, 36-42]  Valarie Mordini has
received more than $179,662 in salary from NCPS/NDVS since 2000 even
though she didn't worked there during that period of time either.    [Ex. 24
(Deposition of Valarie Mordini), pp. 24-29]  And, as stated above, despite the fact
that Robert Zammito, Jr. was paid $462,911 between 2000 and 2001, the
President of NCPS/NDVS could not cite a single example of a management
function that was performed prior to the sale that Robert Zammito, Jr. has
assumed since that time.  Indeed, Daniel Lalumiere has testified that while he
was aware that the Zammito children were employed elsewhere he was also
aware that they were receiving salaries from NCPS/NDVS. [Ex. 21 (Deposition
of Daniel Lalumiere), pp. 77-79, 116-121]

### The Forensic Audit

In response to the Zammitos' activities and their refusal of Healey's
request for financial transparency and accountability, Healey retained the
accounting and consulting firm of Tofias, P.C. of Cambridge, Massachusetts to
perform a forensic audit of NCPS/NDVS and other Zammito controlled
businesses.    The audit investigation has been headed by Jimmy Pappas
(hereinafter "Pappas"), a Certified Public Accountant and Certified Fraud
Examiner and a Principal of the Dispute and Investigative Advisory practice of

Tofias, P.C.   Pappas has extensive experience in providing investigative and dispute advisory services to law firms, publicly traded companies and privately held entities in the context of internal investigations, shareholders' disputes, securities fraud, audit malpractice, business disputes, crisis management and related litigation. [Ex. 29 (Pappas Report), p. 2, Appendix I]

Based upon his review of the corporate and financial records of NCPS/NDVS and other documents, Pappas determined that from 2000 through 2004 NCPS/NDVS paid management fees and salaries to the Zammito children which were unearned and for which there was no business or legal justification in the amount of $2,368,960. [Ex. 29 (Pappas Report), pp. 3-7]

The American Institute of Certified Public Accountants ("AICPA") defines asset misappropriation as:

> "the **theft** of an entity's assets...Misappropriation of assets can be accomplished in various ways, including embezzling receipts, stealing assets, or **causing an entity to pay for goods or services that have not been received.** Misappropriation of assets may be accompanied by false or misleading records or documents, possibly created by circumventing controls."

(See AICPA Professional Standards as of June 1, 2004, AU Section 316, *Consideration of Fraud in a Financial Statement Audit*, paragraph 6) (bold emphasis added)

Pappas further states that the $2,368,960 received by the Zammito children or by RPCV, LLC, the management company which they wholly own and control, constitutes asset misappropriation or theft according to the AICPA guidelines and that because Healey was a minority shareholder during the time

and was not aware of the scheme, the misappropriation was to Healey's financial detriment. [Ex. 29 (Pappas Report), p. 6]

### The Zammitos' Violations of 18 USC §1961, The Racketeer Influenced and Corrupt Organizations Act (RICO)

By siphoning away corporate funds in the form of management fees through RPCV and their other misappropriation of corporate assets and self-dealing, the Zammitos, acting in concert individually and through corporate entities they owned and controlled, created an illegal enterprise and engaged in a pattern of racketeering activities prohibited by 18 USC §1961, the Racketeer Influenced and Corrupt Organizations Act ("RICO"). Section 1961 enumerates more than twenty types of conduct prohibited under federal and state law that are each considered to be acts of "racketeering activity" and in RICO parlance are often referred to as "predicate acts".

### The Predicate Acts

Discovery conducted to date has revealed at least 121 separate predicate acts involving mail fraud (18 USC §1341); wire fraud (18 USC §1343); interstate transportation of fraudulently obtained funds (18 USC §2314); tax evasion (26 USC §7201); submitting false income tax returns (26 USC §7206(1)); embezzlement (MGL c. 266 §30); extortion (18 USC §1951; MGL c. 265 §25); threats of economic harm (MGL c. 271 §39); and unlawful debt collection activities (18 USC §1964(a)).

13

*Mail and Wire Fraud*

       i.     *False and Deceptive Financial Statements*

The creation of false and deceptive financial statements or the omission of important information from financial statements constitutes fraud. [Ex. 29 (Pappas Report), pp. 8-10] In this case, the financial statements created by the Zammitos contained material misrepresentations of fact concerning the so-called "management fees". Those financial statements were used to conceal the Zammitos' criminal activities by characterizing as management fees what in reality was the misappropriation of corporate funds. The use of the United States mail to distribute these false and deceptive financial statements to Healey and other minority shareholders constitutes at least four separate predicate acts of mail fraud.

       ii.     *Fraudulent Solicitation of Capital by Mail*

In addition, discovery has revealed that in 2002, Robert Zammito, Jr., sent a letter to Healey and the other minority unit holders of Fleet Environmental Services, LLC, soliciting additional capital contributions. That letter states that unless additional capital contributions are received, Fleet would face foreclosure proceedings. [Ex. 15] In reality, Fleet's financial difficulties were caused by the fact that the Zammitos had caused Fleet to pay unwarranted management fees. The use of the mails in an attempt to obtain additional funds in furtherance of the Zammitos scheme also constitutes at least three additional acts of mail fraud.

### iii.    The Fraudulent Business Trusts Correspondence

As stated above, in January of 2001, the Zammitos fraudulently converted NCPS/NDVS to business trusts without the knowledge or consent of Healey. In furtherance of this scheme, the Zammitos created so called Exchange Agreements bearing the falsified signatures of Peter Healey, as Trustee. [Ex. 13, 14] In furtherance of this scheme, the Zammitos, through their accountant, Kevin P. Martin, CPA (hereinafter "Martin"), used the mails to request that Healey execute restated promissory notes on behalf of the Harry W. Healey Grantor Trust.   At the time of trial, Healey will introduce evidence from a forensic document examiner and handwriting expert, Paul McDonald, who was formerly a criminal investigator for the Massachusetts State Police, who will testify that the signatures of Peter Healey appearing on these documents are not genuine.  The creation of these fraudulent business trusts furthered the Zammitos' racketeering activities in that the trusts divested Healey of his rights as a shareholder and provided the Zammito children with autonomous control over not only the operation but also distributions from NCPS and NDVS.  The use of the mails in connection with this racketeering activity constitutes at least four additional acts of mail fraud.

### iv.    The Healey/Zammito Relationship Correspondence

On September 10, 2001, Healey wrote to Martin, the Zammitos' accountant, concerning distributions from NCPS/NDVS and his tax liability. [Ex. 16]  On September 27, 2001, following this request, Martin wrote a letter to Robert Zammito, Sr. to inform him of Healey's request for a distribution from

NCPS/NDVS.   [Ex. 17]   In that letter, Martin included a schedule of the Zammito/Healey transactions that accurately sets forth Healey's contributions and compensation.   There followed a series of meetings and discussions between Martin and Zammito in which Martin urged Zammito to alter his compensation arrangements with Healey. [Ex. 27 (Deposition of Kevin P. Martin, pp. 140-149] On October 4, 2001, Martin sent a facsimile letter to Zammito and at least one other on November 26, 2002, reducing Zammito's obligation to Healey while increasing Healey's obligation to Zammito. [Ex. 18, 19, 20] These communications furthered the Zammitos' racketeering activities in that they demanded that Healey pay additional funds to the Zammitos in order to maintain his "partnership" position in the investments.   As such, these wire communications are in violation of 18 USC §1343 (wire fraud) and constitute at least two additional separate predicate acts.

b)    Tax Fraud

The deduction of unearned and improper management fees as a legitimate business expense resulted in the underreporting of corporate income for NCPS/NDVS and Fleet by the Zammitos. The Zammitos also failed to report this as income on their individual tax returns. By concealing the income they received from RPCV as management fees and expenses, the Zammitos intentionally and fraudulently underreported their income and the income of NCPS/NDVS and Fleet in violation of 26 USC §7201 (tax evasion) and 26 USC §7206(1) (submitting false income tax returns).   The filing of fraudulent tax returns in furtherance of "any scheme or artifice to defraud or for obtaining

16

money or property by means of false or fraudulent pretenses, representations, or promises" constitutes mail fraud in violation of Section 1341. *Ideal Steel Supply Corp. v. Anza, 373 F.3d 251 (2nd Cir. 2004); Lincoln National Life Insurance Co. v. Silver, 114 F.3d 1191 (7th Cir. 1997); United States v. Richman, 944 F.2d 323 (7th Cir. 1991); Liquid Air Corp. v. Rogers, 834 F.2d 1297 (7th Cir. 1987); Illinois Department of Revenue v. Phillips, 771 F.2d 312 (7th Cir. 1985).* The mailing by the Zammitos of at least twenty fraudulent individual returns and eight fraudulent corporate returns constitutes at least forty-eight additional acts of mail fraud.

     *c)*    *Embezzlement*

According to the deposition testimony, Robert Zammito, Jr., exercised exclusive autonomous control over the financial accounts of NCPS/NDVS and Fleet. Discovery revealed that in furtherance of their scheme to defraud minority shareholders, the Zammitos, through RPCV, issued monthly "invoices" to NCPS/NDVS and Fleet. According to the general ledgers of NCPS/NDVS and Fleet, the Zammitos received monthly payments from NCPS/NDVS and Fleet in the amount of these invoices. There were at least fifty-two such transactions based upon document and electronic data reviewed to date by Healey's forensic auditors. [Ex. 29 (Pappas Report), pp. 4-5] Each such distribution represents a separate act of embezzlement of funds from NCPS/NDVS and Fleet and a violation of MGL c. 266 §30. As such, each act of embezzlement constitutes a separate predicate act under RICO. See *D'Orange v. Feely, 894 Supp. 159 (S.D.N.Y. 1995); Carpenter v. United States, 484 U.S. 19, 98 L.Ed.2d. 275, 108 S.Ct. 316 (1987); United States v. Altman, 48 F.3d. 96 (2nd Cir. 1995).*

d)    *Extortion and Illegal Debt Collection Activities*

In 2003, Healey wrote to the Zammitos' accountant, Kevin P. Martin, to request an allocation of tax losses incurred by Fleet Environmental Services, LLC to which he was entitled as a unit owner. Despite several requests for this and other information necessary for the preparation of Healey's income tax returns, the Zammitos refused to provide this information unless Healey agreed to execute certain promissory notes in the amount of $100,000 and payable to RTFE. In his letters to Martin, Healey stated that it was his belief that he had executed such notes in 2000 after being requested to do so by Martin in a memorandum dated December 26, 2000. The notes were apparently lost. On March 12, 2003, Martin wrote to Healey to request that Healey sign promissory notes indicating that unless Healey executed the notes, he was not entitled to an allocation of tax loss. This was false. In fact, Healey had received appropriate tax credit in the previous year despite the absence of such promissory notes. There followed a series of no fewer than fifteen letters, including eight letters from either Martin or Robert Zammito, Jr., in which the execution of replacement notes was stated as a condition for providing Healey with the information he needed to complete his tax returns. In addition to eight separate acts of mail fraud, these letters constitute violations of 18 USC §1951, MGL c. 265 §25 (extortion), MGL c. 271 §39 (threats of economic harm), and 18 USC §1964(a) (unlawful debt collection activities).

*Remedies Available in the Event of Healey's Default on
the Promissory Notes*

While Healey does not concede that he is in default or waive any of his

defenses or counterclaims, the remedies available under the terms of the

promissory notes *in the event of default* by Healey are limited and do not include

the forfeiture of Healey's ownership interest in NCPS/NDVS or any portion

thereof.

The notes provide in relevant part:

Upon the occurrence and during the continuance of an Event of
Default, the Seller shall thereafter have the following rights and remedies
(to the extent permitted by applicable law) in addition to the rights and
remedies of a secured party under the Uniform Commercial Code of the
Commonwealth of Massachusetts, all such rights and remedies being
cumulative, not exclusive, and enforceable alternatively, successively or
concurrently:

(a)    If the Seller so elects and gives written notice of such
election to the Buyer, the Seller may vote any and all of the Stock
held by it possessing voting rights (whether or not the same shall
have been transferred into its name or the names of its nominee or
nominees and give all consents, waivers and ratifications in respect
of the Stock held by it and otherwise act with respect thereto as
though it were the outright owner thereof), the Buyer hereby
irrevocably constituting and appointing the Seller the proxy and
attorney-in-fact of the Buyer, with full power of substitution, to do so;

(b)    The Seller may demand, sue for, collect or make any
compromise or settlement in respect of any Stock held by it
hereunder that it deems suitable;

(c)    After fifteen (15) days' written notice to the Buyer, the
Seller may sell, resell, assign and deliver, or otherwise dispose of
any or all of the Stock held by it, for cash and/or credit and upon
such terms at such place or places and at such time or times and to
such persons, firms, companies or corporations as the Seller shall
approve, all without demand for performance by the Buyer or
advertisement or any further notice whatsoever except such as may
be required by law; and

(d)    The Seller may at any time, at its option, cause all or any part of the Stock held by it to be transferred into its name or the name of its nominee or nominees, receive any income thereon and hold such income as additional collateral or apply it to the obligations hereunder.

Notwithstanding anything herein to the contrary, upon the occurrence of an Event of Default, or as a result of death or disability of the Buyer, all of the unpaid principal and interest hereunder shall be immediately due and payable automatically and without any requirement of any notice from or action by the Seller and without presentment, demand, protest and other notice of any kind, all of which are hereby expressly waived by the Buyer.

No provision of this Note shall require the payment of, or permit contracting for, charging, receiving or collecting interest in excess of the rate then permitted by applicable law. Regardless of any provision contained herein, the Seller shall not be entitled to contract for, charge, take, reserve, receive or apply, as interest hereunder, any amount in excess of the highest lawful rate, and, in the event the Seller ever contracts for, charges, takes, reserves, receives or applies as interest any such excess, it shall be deemed a partial prepayment of principal and treated hereunder as such, and if the principal debt is paid in full, any remaining excess shall forthwith be paid to the Buyer.

Thus, the right to transfer stock is limited to the occurrence and continuation of an event of default. It is a *temporary* right enabling the lender to collect income or receive distributions to which the stockholder would ordinarily be entitled and apply those directly to the borrower's obligation or hold the same as collateral. This right of transfer, however, is temporary and ends as soon as the borrower's obligation is satisfied. It decidedly does not constitute a right of permanent transfer or forfeiture.

*The Proposed Sale of NCPS/NDVS and the Zammitos' Threat to Confiscate 100 Percent of Healey's Share of the Sale Proceeds*

On February 24, 2005, the Zammitos, through their legal counsel, orally notified Healey for the first time that an offer to purchase NCPS/NDVS had been received in September of 2004 from eFunds Corporation and Chex Systems,