Inc., in the approximate amount of 20 million dollars.  Subsequently, on March 7, 2005, counsel for the Zammitos informed Healey that in the event the sale of NCPS/NDVS were to occur, it would be the Zammitos' position that Healey's share of the sale proceeds would be reduced 40 percent (from 16 percent to 10 percent) on the grounds that Healey had defaulted on the promissory notes and had forfeited a pro rata share of his interest in NCPS/NDVS. [Ex. 4]  This would reduce Healey's share of the sale proceeds in NCPS/NDVS from approximately 3.2 million dollars to 2 million dollars and result in a confiscation of 1.2 million dollars that belongs to Healey.   Later, on April 11, 2005, counsel for the Zammitos informed counsel for Healey that Healey's remaining 10 percent share in NCPS/NDVS was also forfeit because it was purchased with a "voidable commission" earned by Healey for business consulting services provided to NCPS/NDVS. [Ex. 5, 6]   The forfeiture of Healey's remaining interest in NCPS/NDVS would result in the confiscation of 3.2 million dollars that belongs to the Grantor Trust.

## Legal Argument

### The Legal Standard

The purpose of a preliminary injunction is to preserve the status quo pending the outcome of litigation; status quo refers to the last uncontested status that preceded the pending controversy.  *United Mine Workers v. International Union, United Mine Workers, 412 F.2d 165, 168 (US App DC 1969); CMM Cable Rep. v. Ocean Coast Properties, 48 F.3d 618, 621 (1st Cir. 1995) (a preliminary injunction preserves status quo pending full adjudication on merits).*

The issuance of a preliminary injunction is justified upon a showing of four factors: (1) the moving party has a substantial likelihood of success the merits; (2) a substantial threat exists that the moving party will suffer irreparable injury if the injunction is not granted; (3) the threatened injury to the moving party outweighs the harm that injunction will cause the non-moving party; and (4) the injunction will not dissolve the public interest. *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 15 (1st Cir. 1996); *Narragansett Ind. Tribe v. Guilbert*, 934 F.2d 4, 5 (1st Cir. 1991).   Although the issuance of a preliminary injunction is dependent upon all four factors, the sine qua non of the inquiry is likelihood of success on the merits; if the moving party cannot demonstrate that it is likely to succeed, the remaining factors become matters of idle curiosity. *New Comm. Wireless Servs. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002).

The decision to issue a preliminary injunction lies within the sound discretion of the District Court and may be reversed only upon showing of an abuse of such discretion.   The issuance of a preliminary injunction will be set aside only if the District Court mistook the law, clearly erred in its factual assessments, or otherwise abused its discretion in granting the interim relief. *Ross-Simons, 102 F.3d at 15; Narragansett Ind. Tribe, 934 F.2d at 5.*   As discussed below, the Court is well within its authority to grant the issuance of the preliminary injunction sought by Healey in this matter to protect the rights of the Grantor Trust to assets resulting from the Zammitos' imminent sale of NCPS/NDVS. In the absence of a Court order to protect Healey's interests, the

Zammitos are certain to continue their pattern and practice of irreparably depriving Healey of compensation due to him.

*I*    *There Can Be No Dispute That Healey Owns 16 Percent of NCPS/NDVS and Is Entitled to 16 Percent of the Sale Proceeds*

It is incontrovertible that Healey is the owner of 16 shares of stock in NCPS/NDVS, which he received in October 1999 when he chose to exercise his option to acquire one-sixth of the ownership in the companies. [Second Healey Affidavit ¶10; copies of the stock certificates are attached] The NCPS/NDVS Business Trusts, though fraudulently created, acknowledge Healey's 16 percent ownership interest. His ownership interest further has been acknowledged by the Zammitos in various documents and correspondence, as well as in depositions in this litigation. Even the Asset Purchase Agreement confirms this ownership interest. In fact, until March 2005 neither the Zammitos nor their counsel ever questioned this fact. They did quite the opposite: they acted in all regards in total agreement with this reality.

The uncontested fact that Healey owns 16 percent of NCPS/NDVS alone is sufficient to show that he is entitled to 16 percent of the sale proceeds and that there is a strong likelihood of success on the merits. However, if the Zammitos are permitted to carry out their threat to sell the companies and confiscate his rightful share of the sale proceeds, Healey will suffer irreparable harm. Healey is not attempting to prevent the sale from occurring; he only wants the Court's protection to ensure that, when a final determination is made in this litigation, he will not find himself legally right yet financially wronged.

As discussed below, until March 2005 neither the Zammitos nor their counsel ever questioned Healey's ownership of 16 percent of NCPS/NDVS. They did quite the opposite: they acted in all regards in total agreement with this reality. Now, in an effort to deprive Healey of his rightful share of the proceeds of the sale of NCPS/NDVS, they belatedly attempt to recharacterize the compensation that Healey received for business consulting services provided by Healey at NCPS/NDVS between 1996 and 2002. Their newly created allegation that Healey was no more than a "broker" or "finder" is nothing more than an unsupportable attempt to confiscate Healey's share of the NCPS/NDVS sale proceeds as well as to set the stage for avoidance of other compensation due to Healey, totaling more than 1.5 million dollars, for his professional services performed in connection with other businesses acquired by the Zammitos.

II.    *The Zammitos' Attempt to Confiscate Any Portion of the Sale Proceeds Due to Healey Is Improper and Illegal*

a.    *The Zammitos' Claim, That Healey's 10 Percent Share of NCPS/NDVS That Was Purchased with $225,000 Credited to Healey for Professional Services Rendered Is Forfeit Due to the Statute of Frauds, Is Without Legal Authority or Logic*

The Zammitos' belated claim, that Healey's 10 percent share in NCPS/NDVS is forfeit because the $225,000 credited to Healey in 1996 for consulting services rendered and which he used to purchase a portion of his interest in NCPS/NDVS is a "voidable commission", is without legal authority or logic. While this argument is similar to an argument advanced by the Zammitos to avoid the payment of 1.5 million dollars in compensation owed to Healey, for the reasons stated below, there is no legal basis or logic in that argument

applying retroactively to compensation that was credited to Healey in 1996 and after Healey received stock reflecting his 16 percent ownership interest and where that ownership interest was repeatedly acknowledged and affirmed by the Zammitos.

      1)    *Healey Provided Comprehensive Financial and Corporate Managerial Consulting Services to the Zammitos and Was Not a Broker or a Finder*

From 1991 through 2002, Healey provided continuous and ongoing comprehensive services to the Zammitos on a day-to-day basis as a financial and corporate managerial consultant, during which time he identified, acquired and managed several businesses on behalf of the Zammitos, including NCPS/NDVS. The services that Healey provided for more than a decade in connection with the acquisition and management of more than six businesses on behalf of the Zammitos included establishment of strategic business objectives; the approval of policies and programs; the establishment of financial controls; the review of middle management and other executive staff; the review of documents and reports produced by middle managers and senior staff members; the selection and coordination of independent contractors who provided legal, technical and other professional services to the organizations; the representation of the organizations in negotiations or other official functions; and the attendance at management and board of director meetings, at which he provided advice concerning business affairs. [Second Healey Affidavit ¶6]

In fact, Healey's ongoing work in the NCPS and NDVS businesses was so extensive that he had an office at the companies in order to do what the

Zammitos expected him to do. [Id.] In large part, Healey's work at NCPS, NDVS, and the other Zammito businesses involved the training and tutoring of the four Zammito children so that they might hopefully one day have the skills to monitor their investments themselves. [Id.] This aspect of Healey's work was somewhat difficult and time consuming since the four Zammito children lacked the requisite business education, training and experience to manage such complex business entities. [Id.] For example, Robert Zammito, Jr. had little formal business education or experience; he worked with an ambulance company in charge of operations. Paul Zammito was a mechanic who worked on ambulances and subsequently became a customer service representative with no education, training, or experience in business. Valerie Zammito was a housewife and mother with no education, training or experience in business. Finally, Christopher Zammito was a college graduate who worked as an administrator of a nursing home owned by his father but who also had no formal business education or experience. [Second Healey Affidavit ¶7] Nevertheless, Zammito requested – and Healey accepted the task of – tutoring the Zammito children so that they eventually could learn how to monitor the businesses that they acquired. [Id. ¶8]

Zammito and Healey agreed that Healey's compensation for these services would continue to include his monthly compensation of $10,000 (based on the original one day per week formula) as well as the equivalent of ten percent of the value of any business acquired by the Zammitos with an option to

purchase a one-sixth share of the equity in each business so acquired with no time limit. [Id. ¶9]

The structuring of this compensation formula was directly related to the ongoing financial and corporate managerial services and training with which Healey was charged, with the expectation and necessity of a "hands-on" approach in the day-to-day operations of multiple Zammito businesses. In recent communications, counsel for the Zammitos has made the unsupported – and entirely new – argument that Healey's entire business arrangement with the Zammitos made him no more than a "broker" or "finder" in the negotiation of the purchase, sale, or exchange of a business. This groundless attempt to revise history is nothing more than an effort to shoehorn the Zammito-Healey professional relationship into the parameters of a particular statute of frauds, Massachusetts General Laws Chapter 259, Section 7, that requires written evidence of any agreement to pay for such limited services.

> 2) *The Statute of Frauds Is Irrelevant to the Business Arrangement Between Healey and Zammito Because Healey's Comprehensive Services During the Course of a Decade Do Not Apply to the Statute's Requirements for a "Broker" or "Finder" or Negotiator for the "Purchase, Sale or Exchange of a Business"*

The particular statute of frauds raised by counsel for the Zammitos is MGL c. 259 §7, titled "Agreements to Pay Compensation for Service as Broker or Finder or for Service for Negotiating Loan, Purchase Required to be in Writing". The statute states in its entirety:

> Any agreement to pay compensation for service as a broker or finder or for service rendered in negotiating a loan or in negotiating the purchase, sale or exchange of a business, its good will, inventory, fixtures, or an interest therein, including a majority of

voting interest in a corporation, shall be void and unenforceable unless such agreement is in writing, signed by the party to be charged therewith, or by some other person authorized. For the purpose of this section, the term "negotiating" shall include identifying prospective parties, providing information concerning prospective parties, procuring an introduction to a party to the transaction or assisting in the negotiation or consummation of the transaction. The provisions of this section shall apply to a contract implied in fact or in law to pay reasonable compensation but shall not apply to a contract to pay compensation for professional services of an attorney-at-law or a licensed real estate broker or real estate salesman acting in their professional capacity.

As described above and in Healey's affidavit, the fact that Healey assisted the Zammitos in identifying and acquiring businesses describes a small percentage of the work that Healey performed for the Zammitos in various business ventures over more than a decade. Although the Zammitos have belatedly begun to characterize Healey's work as that of with a "broker" or "finder", actually Healey's compensation was a range of professional business consulting services rendered in connection with the acquisition *and management* of NCPS/NDVS and other businesses so that each acquisition would remain a worthwhile and profitable investment for the Zammito children.

Although "the purpose of the statute is to require written agreements for compensation for certain services, …the scope of such services, based upon the statutory language, is unclear." *Bay Colony Marketing Company, Inc. v. Fruit Salad, Inc., 41 Mass.App.Ct. 662, 665 (1996).* The Appeals Court of Massachusetts, while not in favor of a narrow construction of the statute, nevertheless has concluded that the statute is specific enough "to require written agreements where there is to be compensation 'for service as a broker or finder', or 'for services rendered in negotiating a loan or in negotiating the purchase, sale

or exchange of a business [or component elements thereof].'" *Id.* Clearly, the services provided by Healey were far more comprehensive that those of a broker or finder in negotiating the sale of a business.

In *Bay Colony*, the plaintiff was a true "broker", a "corporation performing the functions of a broker in the food industry." *Id. at 663.* At issue in the *Bay Colony* case was a claim by the plaintiff for additional commissions allegedly earned subsequent to the defendant's written termination of an ongoing oral agreement. The Appeals Court determined that the trial judge's ruling that the statute did not apply to *all* brokerage contracts but only those that related to the negotiation of a loan or for purchase or sale of a business was too restrictive. However, the decision rests squarely within the concept that, whether the transactions at issue are for a loan, purchase, sale, or "for purposes of placing the seller's food products in military commissaries,,, [or] the civilian market", *id. at 663*, it is solely because the actions are those of a "broker" that the statute is applicable.

In contrast, the vast scope of Healey's professional duties as a financial and corporate managerial consultant go far beyond the definition of a mere "broker" or "finder". As noted in *Stavaridis v. Dynamic Machine Works, Inc.,* 2 *Mass.L.Rep. 446 (Middle Superior Court 91-1276-E 1994):*

The word "broker" has been defined as:

An agent employed to make bargains and contracts for compensation. A dealer in securities issued by others. *White v. Financial Guarantee Corporation,* 13 Cal. App. 2d 93, 56 P.2d 550, 553. A middleman or negotiator between parties. A person dealing with another for sale of property. A person whose business it is to bring buyer and seller together. One who is engaged for others, on

a commission, to negotiate contracts relative to property. *North Carolina Licensing Board v. Aikens*, 31 N.C. App. 8, 228 S.E.2d 493, 496. An agent of a buyer or a seller who buys or sells stocks, bonds, commodities, or services, usually on a commission basis. The term extends to almost every branch of business, to realty as well as personalty. *Black's Law Dictionary* at 193 (6th ed. 1990). See generally *Griffith v. New England Telephone & Telegraph Co.*, 414 Mass. 824, 828, 610 N.E.2d 944 (1993) (court used Black's to assist in interpreting term "abandoned," as used in G.L. c. 21E).

By contrast, while it is true that Healey played a significant role in the negotiations leading to the acquisition of NCPS/NDVS, Healey's primary role was to stay on to assist in the management of the business for more than six years and to tutor the inexperienced and uneducated Zammito children so that one day they would monitor the investment themselves. Since the statute applies *only* to brokers and finders, and *not* to financial and corporate managerial consultants, it cannot be said to apply to Healey.

Similarly, as noted in *Lyons v. Kelley, 6 Mass.L.Rep. 709 (Middlesex Superior Court 96-5011) (1997)*:

A "finder" is "an intermediary who contracts to find, introduce and bring together parties to a business opportunity, leaving ultimate negotiations and consummation of business transaction to the principals," *Black's Law Dictionary* 631 (6th ed. 1990); see also, Annot., Validity, Construction, and Enforcement of Business Opportunities or "Finder's Fee" Contract, 24 A.L.R.3d 1160, 1164 (1969).

In *Ober Consulting, Inc. v. Ecredit Com, Inc., 12 Mass.L.Rep. 724 (Middlesex Superior Court 00-1840) (2000)*, "finder" as cited in MGL 259 §7 "has been defined as one who 'merely identifies a business opportunity' for another.' *State Tax Auditing & Research, Inc. v. Waters Corporation*, 2000 Mass. Super. LEXIS 134, 11 Mass.L.Rptr. 560, 562, C.A. 98-2594 (Worcester Super. April 5,

2000) (quoting *Bonin v. Chestnut Hill Towers Realty Co.*, 14 Mass. App. Ct. 63, 75, 436 N.E.2d 970 (1982)). The definition of a finder is to be interpreted broadly. See generally *Bay Colony Marketing Co., Inc. v. Fruit Stand, Inc.*, 41 Mass. App. Ct. 662, 672 N.E.2d 987 (1996)."

The Appeals Court recently delineated the distinction between "broker" and "finder" as intended by MGL c. 259 §7:

> A broker is "an agent who acts as an intermediary or negotiator, especially between prospective buyers and sellers; a person employed to make bargains and contracts between other persons in matters of trade, commerce, and navigation."   Black's Law Dictionary 187 (7th ed. 1999).  A finder is "an intermediary who brings together parties for a business opportunity.... A finder differs from a broker-dealer because the finder merely brings two parties together to make their own contract, while a broker-dealer usually participates in the negotiations."  Id. at 646.  A finder locates, introduces, and brings parties to a transaction together, while a broker does more, attempting to bring the parties to an agreement. See Shinberg v. Bruk, 875 F.2d 973, 978 (1st Cir. 1989).

*Christopher Cantell v. Hill Holiday Connors Cosmopulos*, 55 Mass.App.Ct. 550, 553-54 (2002).

Clearly, these definitions of "broker" and "finder" in MGL c. 259 §7 do not apply to Healey's ongoing business relationship with the Zammitos.   The $225,000 earned by Healey in connection with the NCPS/NDVS acquisition was not a 'finder's fee' or compensation for services rendered in connection with the negotiation or sale of a business.   Instead, it represents compensation for business consulting services that were rendered by Healey who was required to work on location, assist in the management of NCPS/NDVS, and tutor the Zammito children following its acquisition.  As such, it is not a finder's fee or compensation merely for negotiating the sale or acquisition of a business but, far

more importantly, is compensation for comprehensive services to be rendered over the course of several years following the acquisition of the business.

Further evidence that Healey was considered more than just a "finder" or "broker" is found in a letter dated November 26, 2002 and written by the Zammitos' accountant and agent, Kevin P. Martin, CPA. In that letter, Healey is described as part of a "Zammito/Healey Partnership". And, while the letter was written in the context of discussions with Healey about resolving his dispute with the Zammitos and does not accurately describe the financial aspects of that relationship, the letter nevertheless is an indication that even then the Zammitos did not consider Healey a broker or a finder, but instead a partner.

For all of the reasons stated above, it is clear that Healey was more than a "broker" or a "finder" and the belated attempt to recharacterize his business consulting relationship with the Zammitos on the eve of the sale of NCPS/NDVS is an effort to retroactively forfeit compensation paid to Healey in 1996 and confiscate Healey's share of the sale proceeds in NCPS/NDVS is improper and utterly without legal authority.

### 3) Even If the Statute of Frauds, as Described in MGL c. 259 §7, Did Apply, Its Requirements Are Satisfied by Sufficient Writing to Memorialize the Compensation Agreement

Even assuming *arguendo* that MGL c. 259 §7 did apply to Healey's compensation arrangements with the Zammitos and required documentation sufficient to satisfy the statute of frauds, the Zammitos have provided such evidence. Specifically, the statute is satisfied by a letter dated September 27, 2001 from the Zammitos' accountant and agent, Kevin P. Martin, to Robert

Zammito, Sr. [Ex. 17], and in the circumstances surrounding that document. The September 27 letter accurately and completely describes Healey's compensation and equity positions in each of the Zammito businesses. The meetings and other communications by and between Martin, Zammito, and Healey that occurred during the same time period provide additional evidence to support the documentation sufficient to satisfy the requirements of the statute of frauds.

"Although few courts have interpreted the writing requirement of the Statute relating to brokers and finders (G.L. c. 259, § 7), the law is well settled as to what constitutes a sufficient writing under the Statute relating to other contracts (G.L. c. 259, § 1). Since the purposes of the two Statutes are similar, we rely on cases construing the writing requirement of G.L. c. 259, § 1." *Ober Consulting, Inc. v. Ecredit Com, Inc., 12 Mass.L.Rep. 724 at n. 2 (Middlesex Superior Court 00-1840) (2000).*

Therefore, in applying the basic principles of the generic statute of frauds and relevant case law, it is well established that a memorandum sufficient to satisfy the statute "need not be a formal document intended to serve as a memorandum of the contract, but it must contain the terms of the contract agreed upon… and it must be signed by the party to be charged or by someone authorized to sign on his behalf." *Cousbelis v. Alexander, 315 Mass. 729, 730-31 (1944).* The memorandum need not consist of one document, but may consist of several documents that taken together contain the necessary information. *Schmoll Fils & Co., Inc. v. Wheeler, 242 Mass. 424, 469-70 (1922) (correspondence between plaintiff and defendant taken as a whole satisfied the*

statute); *Cousbelis, 315 Mass. at 730 (check from plaintiff given to defendant constituted a sufficient memorandum); Hunt v. Rice, 25 Mass.App.Ct. 622, 632 (1988) (deposit checks endorsed by defendant and bid papers were a sufficient memorandum).* Even correspondence is to be read as a single instrument in light of all the circumstances of a given contractual arrangement. *Schmoll, 242 Mass. at 469-70. See also Ober Consulting, Inc. v. Ecredit Com, Inc., 12 Mass.L.Rep. 724 at n. 2 (Middlesex Superior Court 00-1840) (2000).*

Martin's letter to his principal accurately describing Healey's compensation arrangements and equity positions in each Zammito acquisition, including NCPS/NDVS, came in response to a letter Healey wrote to Martin on September 10, 2001, requesting clarification of the financial arrangement that he had with Zammito regarding NCPS/NDVS. Healey was writing to Martin as the Zammitos' agent. When Martin wrote to Zammito, Sr. on September 27, 2001 summarizing their financial arrangements, he was doing so as the Zammitos' agent. The September 27, 2001 letter is the quintessential document that accurately describes those financial arrangements and, as such, satisfies any requirements of the statute of frauds. In addition to NCPS/NDVS, the letter and attachment detail Healey's and Zammito's interests in Colornet Graphics, Skyways, NE Rolloff, Fleet Environmental Services, Harte Toyota, and the AMR escrow. For the NCPS/NDVS business (as for Fleet and Harte Toyota), Healey's ten percent payment of $225,000 for the net investment of $2,250,000 is clearly indicated as well as his option to purchase one-sixth ownership of the entity by combining the

$225,000 amount owed to him with a further payment of $150,000 to equal $375,000, which is the equivalent of the one-sixth interest in NCPS/NDVS.

Martin himself has confirmed that he is the agent of the Zammitos. In his deposition, he testified that he has worked as the accountant for Zammito, Sr., the Zammito family, and the Zammito business enterprises continuously since the late 1970s or early 1980s [Ex. 27 (Deposition of Kevin P. Martin, CPA), pp. 15, 23, 25-29, 73-74, 79] Specifically, in the context of the September-October 2001 correspondence regarding the business relationship between Healey and the Zammitos, Martin held himself out as "representing primarily the children, but Bob, Sr. and I had talked about [the Healey-Zammito compensation formula] in coming up that Harry felt he was due X. And I said, 'Well, he may be due X, and you're due Y.' And I said, 'Let me try to put together a schedule of what I think the different transactions are.'" [Id., p. 106]

At both Martin's initiative and Zammito's request, Martin put together an accurate description of the business relationship between Healey and the Zammitos, as evidenced by the September 27, 2001 letter. [Id., p. 144] Martin testified, "[A]t one point, Harry was in my office with the Zammitos and a discussion came up about putting money into Fleet and about Harry owing money back to the Zammitos for the bad deals. And so this could have been as a result of that discussion where I went – at Bob's request, most likely – to try to summarize, account for the different deals that had gone on." [Id.]

Martin continued to act as the Zammitos' agent when he had "further conversations with Bob Zammito that I thought the way it was being done was

not fair to the Zammito interest. I felt that Harry was shortcutting the numbers, which is disadvantageous to them, to the Zammitos." [Id., p. 149] Subsequent to further conversations with Zammito, Sr., Martin testified that he took it upon himself to re-structure the long-standing financial arrangement in a way that he felt treated Zammito more fairly. [Id., pp. 158-160] Martin's role as agent to Robert Zammito, Sr. and the Zammito family in fact pre-dated these communications. Martin testified that "Mr. Healey was in my office with the Zammitos when the management company was discussed and it was decided to be formed" some time in 2000. [Id., p. 186]

All of Martin's actions, in conjunction with the corollary actions of Zammito, Sr. and the Zammitos indicate that Martin was their agent. Martin acted as the actual agent of Zammito, Sr. and the Zammitos in his dealings with Healey as described above. Furthermore, Martin's and the Zammitos' actions in that regard are sufficient for a finding of apparent authority. Apparent authority results from conduct by the principal that causes a third person reasonably to believe that a particular person has authority to make representations as his agent. *Hudson v. Massachusetts Property Ins. Underwriting Ass'n, 386 Mass. 450 (1982).* The conduct of Zammito, Sr. and the Zammitos in their ongoing business dealings using Martin as their financial spokesperson provides sufficient evidence of apparent authority that will bind them to Martin's actions as their agent. Furthermore, "if a third person goes on to change his position in reliance on this reasonable belief, the principal is estopped from denying that the agency is

36

authorized." *Veranda Beach Club Limited Partnership v. Western Surety Co.,* *936 F.2d 1364, 1377 (1st Cir. 1991).*

Whether or not an agent is initially authorized to act on behalf of a principal, the agent's actions may be attributed to the principal if the principal later ratifies the agent's conduct. *Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A., 290 F.3d 42, 55 (1st Cir. 2002).* All of the actions of Robert Zammito, Sr. and the Zammitos from September 2001 to the present have clearly and unequivocally ratified Martin's conduct as their agent, and they are therefore bound by Martin's acts and statements.

> 4) *Even If the Statute of Frauds, as Described in MGL c. 259 §7, Would Otherwise Apply to the Compensation Formula Between Healey and the Zammitos, and Even If There Is Not a Sufficient Writing to Meet the Requirements of the Statute, the Zammitos Cannot Be Permitted Under Law or Equity to Retroactively Negate the Transactions and Attempt to Confiscate Money Already Paid by Them to Healey*

In an attempt to justify the confiscation of Healey's share of the sale proceeds, the Zammitos, through their counsel, have belatedly made the claim that Healey should in essence pay back to them money for which he has been credited since 1996, when the Zammitos purchased NCPS/NDVS. At the time of the sale, Healey was credited with $225,000, representing ten percent of the purchase price of $2,250,000, against his potential exercise of his option to purchase one-sixth interest in the business. As stated above, this was compensation for business consulting services rendered by Healey and was not a finder's fee or broker's commission. Healey exercised his option in October 1999 by rolling over the deferred $225,000 payment and executing eight promissory notes totaling $150,000.

Within the last month – more than a year after the Zammitos filed their Reply to Counterclaim, Third-Party Answer, and Third-Party Complaint – the Zammitos have advanced an entirely new theory in an effort to confiscate a significant portion of the sale proceeds due Healey. They now argue that the compensation credited to Healey in 1996 was a "voidable commission" and, as such, 10 percent of Healey's recognized interest in NCPS/NDVS is retroactively forfeit. Even if such a novel theory of law existed, it was never raised by the pleadings and the time for amending the pleadings is past.

Federal Rule of Civil Procedure 13(a) requires that such counterclaims be made only at the time of serving an answer to a complaint:

> A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction.

Claims for set-offs against damages are compulsory counterclaims, not defenses. *In re Scaife, 825 F.2d 357 (11th Cir. 1987).*

The Zammitos cannot avail themselves of Fed.R.Civ.P. 13(f) either. That section of Rule 13 states: "When a pleader fails to set up a counterclaim through oversight, inadvertence, or excusable neglect, or when justice requires, the pleader may by leave of court set up the counterclaim by amendment." In this case, justice does not require the allowance of such an amendment for a plethora of reasons. The counterclaim is totally lacking in merit. *United Brick & Clay Workers v. Hydraulic Press Brick Co., 371 F.Supp. 818 (E.D. Mo. 1974).* The Zammitos have raised this entirely new theory in bad faith, in part because

there is a total absence of new fact involved in this allegation; the Zammitos literally had years to raise this issue, both before and after they commenced litigation. *Health Corp. of America, Inc. v. New Jersey Dental Assoc., 77 F.R.D. 488 (D.C.N.J. 1978).* The Zammitos' lengthy delay in fashioning this fresh theory is not due to excusable neglect, oversight, or inadvertence. *New York Petroleum, Inc. v. Ashland Oil, Inc., 568 F.Supp.1231 (S.D.Miss. 1983).*

The novel theory of a "voidable commission" (for which counsel for the Zammitos has yet to provide a single citation of authority) is further undone by the statute of limitations, which would have required any such claim to arise within six years of the events that created the cause of action. That time is long past. Healey earned and was credited with the $225,000 payment in 1996 when the Zammitos acquired NCPS/NDVS. The six-year statute of limitations for contracts (more generous than the corollary statute for torts) puts an end to any claim on this amount filed after 2002. MGL c. 260 §2.

      b.    *The Zammitos' Claim, That Healey's 6 Percent Share of NCPS/NDVS Secured by the Promissory Notes Is Forfeit Because He Is in Default, Is Also Without Legal Basis or Merit*

While Healey has raised valid defenses and counterclaims and does not concede that he is in default, as detailed in counsel's letter dated March 8, 2005 to Attorney Kevin M. Considine, the six percent of Healey's ownership interest in NCPS/NDVS which was secured by the eight promissory notes issued by Healey to the Zammito children is not subject to forfeiture *even if* Healey in the future is adjudged to be in default on those notes. This is because the Zammitos are only entitled to the remedies set forth by the terms of the promissory notes.

While the notes permit the holder to transfer ownership of stock pledged as collateral under the promissory notes, it is a *temporary* right, enabling the holder to collect income under the stock and apply it directly to any outstanding obligation or to hold same as additional collateral.  Once the default is cured, and the holder's may cure it to the extent that income is applied to any outstanding obligation, ownership must revert to the borrower.  Thus, while the Zammitos may arguably have a right to set aside an amount equal to $150,000 (the face value of the notes) in the event they can establish that Healey is in default, they do not have the right to appropriate six percent of Mr. Healey's ownership interest which is equal to 1.2 million dollars.  In any event, the Zammitos' assertion that Healey is in default on the notes is premature.  There has been no finding or verdict in favor of the Zammitos.

Furthermore, even if it were to be proved that Healey is in default, and that the Zammitos are entitled to the remedies set forth in the notes – which Healey does not concede – the threatened intention to confiscate six percent of the sale proceeds (totaling 1.2 million dollars) grossly exceeds the remedies available to the Zammitos under the terms of the notes and by law.  Rights of transfer are expressly limited to the proven occurrence and continuation of default as a temporary right, which enables the note holder to collect income under the stock and apply it directly to any outstanding obligation or to hold the same as additional collateral.  When a default is cured, ownership *must* revert to the borrower.  Nothing in this scheme gives the Zammitos the right to appropriate Healey's six percent ownership interest.

40

In addition, the law provides for a maximum of twelve percent interest and the limitation of attorney's fees to those that are reasonable. Only a court can determine the amount of attorney's fees, and the provision of *any* attorney's fees is extremely unlikely given that the Zammitos chose litigation over financial transparency and accountability.

Finally, Healey disputes the debt and has raised substantial defenses and counterclaims in this litigation that have yet to be adjudicated. Part of that dispute includes Healey's claim – as supported by a forensic audit – that in addition to his damages of more than 1.5 million dollars for consulting services rendered, the Zammitos misappropriated more than 2.3 million dollars from NCPS/NDVS between 2000 and 2004. Healey's share of the funds misappropriated by the Zammitos substantially exceeds the amount of any conceivable damages, including interest and attorneys fees, to which the Zammitos might be entitled even if Healey is adjudged to be in default of his obligations under the notes.

For all of these reasons, Healey is entitled to his full 16 percent share of the proceeds of the sale of the NCPS/NDVS to eFund, and any attempt by the Zammitos to further misappropriate assets due to Healey will cause him irreparable injury.

## Prayer for Relief

**WHEREFORE:** Defendant and counterclaim plaintiff, Peter W. Healey, as Trustee on behalf of the Harry W. Healey, Jr. Grantor Trust, respectfully requests

that this Court issue a preliminary injunction or other appropriate equitable relief as follows:

1.  enjoining the Zammitos from misappropriating any portion of the 3.2 million dollars due to the Grantor Trust from the proceeds of the sale of NCPS/NDVS; and

2.  directing that the Zammitos pay to the Grantor Trust sixteen percent of the proceeds realized from the sale of NCPS/NDVS; or, in the alternative,

3.  ordering that the entire proceeds of the sale of NCPS/NDVS be placed in escrow until such time as the litigation between the parties is concluded; and

4.  ordering such other relief as the Court determines is appropriate to protect the interests of the parties.

Respectfully submitted;

THE DEFENDANTS,
COUNTERCLAIM PLAINTIFFS, and
THIRD PARTY PLAINTIFFS

By their attorneys:


Stephen J. Lyons
(BBO#309840)
KLIEMAN, LYONS, SCHINDLER
& GROSS
21 Custom House Street
Boston MA 02110
Telephone: 617.443.1000

Dated: April 20, 2005

42

## PROOF OF SERVICE

Pursuant to the Federal Rules of Civil Procedure and Local Rule 5.2(b)(2), I hereby certify that a true copy of the above document together with all supporting affidavits, documents and exhibits thereto was served upon the attorney of record for all parties by hand on this 20th day of April, 2005.

Stephen J. Lyons

43