IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO: 04-10161-REK

ROBERT J. ZAMMITO, JR.;
PAUL M. ZAMMITO;
CHRISTOPHER ZAMMITO; and
VALARIE A. MORDINI,
    Plaintiffs and Counterclaim Defendants

v.

HARRY W. HEALEY, JR., GRANTOR TRUST and
PETER W. HEALEY as Trustee of
HARRY W. HEALEY, JR., GRANTOR TRUST,
    Defendants and Counterclaim Plaintiffs

HARRY W. HEALEY, JR. individually, and as Trustee of
THE HUNTINGTON FORBES CHARITABLE
REMAINDER TRUST;

HUNTINGTON FORBES, LTD.;
STANTON CUMMINGS, LTD.;
PETER W. HEALEY, as Trustee of
THE HEALEY GRANDCHILDREN'S TRUST – II,
    Third Party Plaintiffs
    Third Party Defendants in Counterclaim

v.

ROBERT J. ZAMMITO, SR.;
VALERIE L. ZAMMITO;
ASA HOLDING COMPANY, INC.; and
THE ASA HOLDINGS LP,
    Third Party Defendants
    Third Party Plaintiffs in Counterclaim
    Third Party Plaintiffs

v.

JOHN A. MALLOY, III and
WILLIAM R. HEALEY,
    Third Party Defendants

MELLON BANK (aka Mellon Trust of New England),
    Bank Trustee

**SECOND AFFIDAVIT OF HARRY W. HEALEY, JR.**

I, Harry W. Healey, Jr., depose and state as follows. The statements made herein are made in support of my motion for preliminary injunctive relief filed herewith and are made upon my personal knowledge, except those which are specifically noted as being made upon information and belief. Where the information herein is stated upon information and belief, I hereby state that I believe such information to be true.

1. I have over 25 years experience in corporate management and in the banking industry. In 1991, I owned and operated a business and financial consulting firm known as Huntington Forbes, Ltd. At the same time, the Zammitos operated a regional ambulance company known as Norfolk Bristol Ambulance Company, Inc. Robert J. Zammito, Sr., his wife, Valerie Zammito, and his four (4) children, Robert Zammito, Jr., Paul Zammito, Christopher Zammito and Valarie Zammito owned and operated the business.

2. Beginning in 1991, after being introduced by a third party, I was hired by Robert J. Zammito, Sr., to provide financial and corporate managerial consulting services to Norfolk Bristol Ambulance Company, Inc.,

3. After an initial period of time, my consulting firm, Huntington Forbes, Ltd., was hired to provide consulting services to Norfolk Bristol Ambulance Company, Inc., on a continuing basis. As part of this continuing professional relationship, the Zammitos agreed to pay Huntington Forbes, Ltd., a monthly consulting fee of $10,000 in exchange for one day of consulting per week. The business consulting services I rendered varied. Some related solely

to the business of Norfolk Bristol Ambulance Company, Inc. At other times, the business consulting services I provided were of a general nature.

4.   At this time, the Zammitos believed Norfolk Bristol Ambulance Company, Inc., to be worth 15 million dollars and agreed, as part of the compensation I would receive for professional consulting services rendered, that if the Company was sold, I would receive a bonus equal to 10 percent of the sale price above 15 million dollars. It is important to note that this bonus or "commission" did not represent a "finder's fee" or compensation for services rendered in connection with the sale of the business. This additional compensation was for the business consulting services that I would render on a day-to-day basis at Norfolk Bristol Ambulance Company, Inc., between 1991 and 1995. Later, in 1995 after the purchase of several other smaller ambulance companies, I assisted the Zammitos in the negotiation of the merger of Norfolk Bristol Ambulance Company, Inc., with AmNet, Inc., and, pursuant to my compensation agreement, acquired 10 percent of Ambulance Systems of America, Inc., (the successor to Norfolk Bristol Ambulance Company, Inc.). Ambulance Systems of America, Inc., was then acquired in 1995 by American Medical Response, Inc., for approximately 90 million dollars.

5.   After the merger, Robert Zammito, Sr., asked me to continue to work with him to invest the proceeds of the sale in part by identifying, acquiring and managing businesses that his four children would help to operate. As before, it was agreed that I would provide general consulting services one day per week in exchange for (1) a monthly consulting fee of $5,000 that would

increase to $10,000 after two acquisitions; (2) a ten percent commission or bonus for each completed investment; and, (3) an option to purchase (with no time limit) up to one-sixth of the Zammito's interest in each business acquired. Again, contrary to the assertions now being made by the Zammitos, the ten percent commission or bonus was not a "finder's fee" or compensation for services rendered in negotiating the sale or acquisition of any businesses. As with Norfolk Bristol Ambulance Company, Inc., this additional compensation was intended to compensate me for the consulting services that I was required to provide on a day-to-day basis with each new acquisition that I would be required to manage.

      6.    At National Check Protection Service, Inc., ("NCPS") and National Data Verification Services, Inc. ("NDVS"), in addition to successfully negotiating the acquisition of these businesses, I provided the companies with an additional two to three days of consulting services per week from 1996 to 2002. These services included the establishment of strategic business objectives; the approval of policies and programs; the establishment of financial controls; the review of middle management and other executive staff; the review of documents and reports produced by middle managers and senior staff members; the selection and coordination of independent contractors who provided legal, technical and other professional services to the organizations; the representation of the organizations in negotiations or other official functions; and, the attendance at management and board of director meetings, at which I provided advice concerning business affairs. These services required me to be present at NCPS

and NDVS. For this reason, I was provided an office at the companies. In addition to the consulting services which I provided NCPS and NDVS, I performed similar services at other business acquired by the Zammitos during this period. Such businesses included Fleet Environmental Services, LLC, Colornet Graphics LLC, Skyways Communications LLC, New England Roll-Off Services LLC and Harte Toyota. In each case, my compensation arrangement was the same.

7. In addition to providing the day-to-day business consulting services described above, Robert Zammito, Sr., explained that he was also interested in having his children learn and gradually become involved in the operation of the businesses he acquired and asked if I would consider, as part of my assignment, helping his four children become established in business. Robert Zammito, Jr., had worked with the ambulance company in charge of operations but had little or no formal business education or experience. Paul Zammito was a mechanic who worked on the ambulances. He subsequently became a customer service representative but had no education or experience in business management. Valerie Zammito was the payroll clerk. She was a housewife and mother with no education, training or experience in business. Christopher Zammito was a graduate of Stonehill College and became the administrator of a nursing home owned by his father. Like his siblings, he had no formal business education or experience.

8. Mr. Zammito explained that it was his intention that as each new business was acquired one of the Zammito children would be placed in the

company for the purpose of learning the business and hopefully eventually become involved in some way in the operation of the business. So, in addition to assisting in the management of each new business acquired, Mr. Zammito asked me to act as a business coach to the children or tutor them as the case may be with the objective that over time, they would learn the ways of the particular business so they could one day monitor these family investments themselves.

9. Because becoming involved in the day-to-day management of each new business acquisition would significantly increase the amount of time I would spend rendering these business consulting services, Mr. Zammito and I agreed that as compensation for these services, I would, in addition to my usual monthly compensation of $10,000 for one day a week, I would receive additional compensation in the form of a commission or bonus which was equal to 10 percent of the value of any business acquired by the Zammitos with an option to purchase a one-sixth share of the equity in each business so acquired with no time limit. Contrary to the new assertions by the Zammitos, the ten percent commission or bonus was *not* a "finder's fee" or compensation for services rendered solely in connection with the negotiation of the sale or acquisition of a business.

10. In 1996, I identified two businesses for possible acquisition by the Zammitos. They were NCPS, which is engaged in the business of providing background information on new accounts to banks and financial institutions, and NDVS, which provides pre-employment screening to corporate clients. The Zammitos acquired NCPS/NDVS for 2.25 million dollars. The transaction was

structured such that the Zammito children became the sole shareholders. As part of this transaction, at the request of Robert Zammito, Sr., I agreed to defer receipt of my $225,000 bonus on this transaction until such time as I decided whether or not to exercise my option to invest in these companies at which time it was agreed that my bonus of $225,000 would be used as credit toward my acquisition of one sixth of the Zammitos' ownership interest in NCPS/NDVS. Later, in October 1999, I decided to exercise my option to acquire a one-sixth share of the Zammitos' interest in NCPS/NDVS. The total consideration paid by was $375,000. This included my incentive bonus or commission ($225,000) and the execution of eight (8) promissory notes (two to each of the Zammito children with a total value of $150,000). Subsequently, I received 16 shares of stock in the corporations reflecting my 16 percent equity position. True and accurate copies of the stock certificates in the name of the Harry W. Healey, Jr., Grantor Trust are attached to this Affidavit.

Signed this 14th day of April, 2005, under the pains and penalties of perjury.

_____
Harry W. Healey, Jr.









No. 965

**National Check Protection Service, Inc.**
Common Stock
$0.01 Par Value

# CERTIFICATE

Issued to

Paul M. Zammito

For -21- Shares

Dated _____ 2000

From Whom Transferred

Self

| Dated | No. Original Certificate | No. Original Shares | No. of Shares Transferred |
|---|---|---|---|
| | 6 | 25 | 21 |

Received Certificate No. -21- Shares
For -11-
this _____ day of _____

---

## Stock Certificate

**NATIONAL CHECK PROTECTION SERVICE, INC.**

Common Stock, $0.01 Par Value

Massachusetts

** Paul M. Zammito **

is the owner of Twenty-one ******** Shares of the Capital Stock of

National Check Protection Service, Inc.

transferable only on the books of the Corporation by the holder hereof in person or by Attorney upon surrender of this Certificate properly endorsed.

In Witness Whereof, the said Corporation has caused this Certificate to be signed by its duly authorized officers and its Corporate Seal to be hereunto affixed
this _____ day of _____ A.D. 2000

President _____     Treasurer _____



(Stock certificate, rotated 90°: National Check Protection Service, Inc., Common Stock, $0.01 Par Value, Massachusetts. Issued to Valarie Mordini for Twenty-one (21) shares, 2000. Certificate No. 21. Original Certificate No. 7, 25 original shares; Received Certificate No. 12. Transferred from Self.)






No. 364













