IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO: 04-10161-REK

| | |
|---|---|
| ROBERT J. ZAMMITO, JR.;<br>PAUL M. ZAMMITO;<br>CHRISTOPHER ZAMMITO; and<br>VALARIE A. MORDINI,<br>     Plaintiffs and Counterclaim Defendants<br><br>v.<br><br>HARRY W. HEALEY, JR., GRANTOR TRUST and<br>PETER W. HEALEY as Trustee of<br>HARRY W. HEALEY, JR., GRANTOR TRUST,<br>     Defendants and Counterclaim Plaintiffs<br><br>HARRY W. HEALEY, JR. individually, and as Trustee of<br>THE HUNTINGTON FORBES CHARITABLE<br>REMAINDER TRUST;<br><br>HUNTINGTON FORBES, LTD.;<br>STANTON CUMMINGS, LTD.;<br>PETER W. HEALEY, as Trustee of<br>THE HEALEY GRANDCHILDREN'S TRUST – II,<br>     Third Party Plaintiffs<br>     Third Party Defendants in Counterclaim<br><br>v.<br><br>ROBERT J. ZAMMITO, SR.;<br>VALERIE L. ZAMMITO;<br>ASA HOLDING COMPANY, INC.; and<br>THE ASA HOLDINGS LP,<br>     Third Party Defendants<br>     Third Party Plaintiffs in Counterclaim<br>     Third Party Plaintiffs<br><br>v.<br><br>JOHN A. MALLOY, III and<br>WILLIAM R. HEALEY,<br>     Third Party Defendants<br><br>MELLON BANK (aka Mellon Trust of New England),<br>     Bank Trustee | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**MOTION FOR SUMMARY JUDGMENT AND/OR TO DISMISS
COUNTERCLAIMS AS TO HARRY W. HEALEY, JR.
WITH STATEMENT OF REASONS AND LEGAL AUTHORITIES**

**NOW COMES** the counterclaim defendant, Harry W. Healey, Jr., and hereby moves pursuant to Rule 56 (b) of the Federal Rules of Civil Procedure for summary judgment as to Counts I through VIII (sic) of the plaintiff's counterclaim and Third-Party Complaint. In the alternative, the counterclaim defendant moves pursuant to Rule 12 (b)(6) of the Federal Rules of Civil Procedure to dismiss the Third-Party Complaint on the grounds that the counterclaims asserted therein fail to state claims upon which relief can be granted and are barred by the plaintiffs' lack of standing and the applicable statute of limitations. The grounds for these motions are stated herein as follows:

## Relevant Procedural Background

### The Claims and Counterclaims

On December 24, 2003, Robert J. Zammito, Jr., Paul M. Zammito, Christopher Zammito and Valarie A. Mordini (collectively "plaintiffs") commenced an action against the Defendants and Counterclaim Plaintiffs by filing a complaint in the Massachusetts Superior Court entitled *Robert J. Zammito, Jr., Paul M. Zammito, Christopher Zammito and Valarie A. Mordini v. Harry W. Healey, Grantor Trust and Peter W. Healey, As Trustee*, Suffolk Superior Court, Civil Action No: 03-6083BLS.

In that action, defendant, Harry W. Healey, Jr., and others brought counterclaims against the plaintiffs alleging violations of 18 U.S.C., Sections 1961-1968, the Racketeer Influenced and Corrupt Organizations Act and other causes of action. In their counterclaims, defendants assert a right to recover the sum of at least $3,369,641, exclusive of interest, costs, punitive damages,

2

attorneys fees and other damages. Thus, the controversy involved a Federal question or claim or right arising under the Constitution, Treaties or Laws of the United States (28 U.S.C., Section 1331) and was removed to the United States District Court pursuant to 28 U.S.C., Section 1441(b) on January 23, 2004 and is presently known as *Robert J. Zammito, Jr., et als v. Harry W. Healey, Jr., et als, Civil Action No: 04-101610REK.*

On April 12, 2004, the plaintiffs filed their reply to the counterclaims, third-party answer and third-party complaint. In the so-called third-party complaint, the Zammitos name a total of nine (9) counterclaim and third-party defendants: Harry W. Healey, Jr., William R. Healey, Peter W. Healey, John A. Malloy, III, Huntington Forbes, Ltd., Stanton Cummings, Ltd., The Harry W. Healey, Jr., Grantor Trust, Huntington Forbes Charitable Remainder Trust, and, The Healey Grandchildren's Trust-II. *See, Third-Party Complaint, Paragraphs 9 through 17.* However, as discussed below, the third-party complaint, which contains nine (9) separate (but mis-numbered) counts, only states claims against one of the named defendants: Harry W. Healey, Jr., individually.

According to the scheduling order filed jointly by the parties in this action and adopted by the court on April 1, 2004, the time within which a party may file motions to join other parties or amend the pleadings expired on July 5, 2004. Likewise, the deadline for factual discovery was November 30, 2004 and expert discovery was to have been terminated March 30, 2005. Therefore, the plaintiffs and third-party defendants may not amend their third-party complaint at this time.

### Statement Of Material Facts Of Record As To Which There Is No Genuine Issue To Be Tried

#### The Parties

1. Counterclaim Defendant, Harry W. Healey, Jr., ("Healey"), is an individual residing in Hingham, Plymouth County, Massachusetts. Healey is President of Huntington Forbes, Ltd., ("HF-Ltd") and Stanton Cummings, Ltd. ("SC-Ltd") [Zammito Counterclaim and Third-Party Complaint, ¶ 11].

2. Counterclaim Defendant, Huntington Forbes, Ltd., ("HF-Ltd"), is a corporation organized under the laws of the Commonwealth of Massachusetts, with a principal place of business located at 209 Lazell Street, Hingham, Plymouth County, Massachusetts [Zammito Counterclaim and Third-Party Complaint, ¶ 12]. HF-Ltd was incorporated on July 29, 1991. [See, Articles of Organization, Appendix I, Exhibit 1]. Healey is President of HF-Ltd. [Affidavit of Harry W. Healey, Jr., hereinafter "Healey Affidavit", ¶ 5].

3. Counterclaim Defendant, Stanton Cummings, Ltd., ("SC-Ltd"), is a corporation organized under the laws of the Commonwealth of Massachusets, with a principal place of business located at 209 Lazell Street, Hingham, Plymouth County, Massachusetts [Zammito Counterclaim and Third-Party Complaint, ¶ 14]. SC-Ltd was incorporated on February 21, 1995. [See, Articles of Organization, Appendix I, Exhibit 2]. Healey is President of SC-Ltd. [Healey Affidavit, ¶ 6]

4. Counterclaim Defendant, Harry W. Healey, Jr., Grantor Trust ("HWHG-Trust"), is a Massachusetts irrevocable trust created by a Declaration of Trust made at Boston, Massachusetts on January 13, 1995. Harry W. Healey,

4

Jr., is the grantor of the Grantor Trust. Peter W. Healey ("Peter Healey"), and John A. Malloy III ("Malloy") are trustees of the HWHG-Trust. [Zammito Counterclaim and Third-Party Complaint, ¶ 9].

5.    Counterclaim Defendant, The Healey Grandchildren's Trust – II ("HGC-Trust"), is a Massachusetts irrevocable trust created by a Declaration of Trust made at Boston, Massachusetts on October 30, 2002. Healey is the Grantor. Peter Healey is the Trustee. [Zammito Counterclaim and Third-Party Complaint, ¶ 15].

6.    Counterclaim Defendant, The Huntington Forbes Charitable Remainder Trust ("HFCR-Trust"), is Massachusetts charitable remainder trust created by a Declaration of Trust made at Boston, Massachusetts on August 7, 1995. HF-Ltd. is the Grantor. Healey is the Trustee. [Counterclaim and Third-Party Complaint, ¶ 13].

7.    The HWHG-Trust is sole owner of Huntington Forbes, Ltd. and is a minority shareholder in National Check Protection Service, Inc. ("NCPS-Inc") and National Data Verification Service, Inc. ("NDVS-Inc"), and was a minority shareholder in Ambulance Systems of America, Inc. ("ASA-Inc"). [Healey Affidavit,  ¶ 3]  The HFCR-Trust was also at all relevant times a minority shareholder in ASA-Inc. [Healey Affidavit, ¶ 7].

8.    Third Party Defendant, ASA Holding Company, Inc. ("ASAHC-Inc"), is a corporation organized under the laws of the Commonwealth of Massachusetts and is the resident agent for The ASA Holdings LP with a principal place of business located at 400 Hingham Street, Rockland, Plymouth

County, Massachusetts. [Robert Zammito, Sr.'s Responses to First Request for Admission of Facts from Harry W. Healey, Jr., hereinafter "Admissions of Fact", ¶ 14, Appendix II, Exhibit 23; Healey Counterclaim and Third-Party Complaint, ¶ 15].

9.    Third Party Defendant, The ASA Holdings LP ("ASAH-LP"), is a limited partnership organized under the laws of the Commonwealth of Massachusetts with a principal place of business located either at 21 Cocasset Street, Foxboro, Norfolk County, Massachusetts, or at 36 Popponesset Island Road, Mashpee, Barnstable County, Massachusetts. [Admissions of Fact, ¶ 15, Appendix II, Exhibit 23; Healey Counterclaim and Third-Party Complaint, ¶ 16].

10.    Counterclaim Defendant, Robert J. Zammito, Sr. ("Zammito, Sr."), is an individual residing in Mashpee, Barnstable County, Massachusetts. [Admissions of Fact, ¶ 12, Appendix II, Exhibit 23].

11.    Counterclaim Defendant, Robert J. Zammito, Jr. ("Zammito, Jr."), is an individual residing in Wrentham, Norfolk County, Massachusetts.    Robert Zammito is the son of Robert Zammito, Sr. and Valerie L. Zammito. [Admissions of Fact, ¶ 8, Appendix II, Exhibit 23].

12.    Counterclaim Defendant, Paul M. Zammito ("Paul Zammito"), is an individual residing in Foxborough, Norfolk County, Massachusetts.    Paul Zammito is the son of Robert Zammito, Sr. and Valerie L. Zammito. [Admissions of Fact, ¶ 9, Appendix II, Exhibit 23].

13.    Counterclaim Defendant, Christopher Zammito ("Christopher Zammito"), is an individual residing in Foxborough, Norfolk County,

Massachusetts. Christopher Zammito is the son of Robert Zammito and Valerie L. Zammito. [Admissions of Fact, ¶ 10, Appendix II, Exhibit 23].

14.    Counterclaim Defendant, Valarie A. Mordini, is an individual residing in Norfolk, Norfolk County, Massachusetts. Valarie Mordini is the daughter of Robert Zammito, Sr. and Valerie L. Zammito.   [Admissions of Fact, ¶ 11, Appendix II, Exhibit 23].

15.    Counterclaim Defendant, Valerie L. Zammito ("Mrs. Zammito"), is an individual residing in Mashpee, Barnstable County, Massachusetts.   Mrs. Zammito is the spouse of Zammito. [Admissions of Fact, ¶ 13, Appendix II, Exhibit 23].

*Related Non-Parties*

16.    Zam-Cul Enterprises, Inc., ("ZCE-Inc"), was at all relevant times a corporation organized under the laws of the Commonwealth of Massachusetts with a principle place of business located at 4 Tech Circle, Natick, County of Middlesex, Massachusetts. Incorporated on August 29, 1975, ZCE-Inc was the predecessor of Norfolk-Bristol Ambulance Company, Inc.

17.    Norfolk-Bristol Ambulance Service, Inc., ("NBA-Inc") was at all relevant times a corporation organized under the laws of the Commonwealth of Massachusetts with a principal place of business located at 21 Cocasset Street, Foxboro, Norfolk County, Massachusetts. Incorporated in 1975, NBA-Inc was a regional ambulance company operating in southeastern Massachusetts and Rhode Island. NBA-Inc was managed and operated by Robert Zammito, Sr., his wife, Valerie Zammito, and their four children, Robert Zammito, Jr., Paul

Zammito, Christopher Zammito and Valarie Mordini. [Zammito Counterclaim and Third-Party Complaint, ¶ 18; Admissions of Fact, ¶¶ 30-31, Appendix II, Exhibit 23].

18.    Ambulance Systems of America, Inc. ("ASA-Inc"), was at all relevant times a corporation organized under the laws of the State of Delaware, with a principal place of business located at 4 Tech Circle, Natick, County of Middlesex, Massachusetts. Incorporated in the State of Delaware on July 6, 1993, ASA-Inc was the corporate successor to NBA-Inc. [Zammito Counterclaim and Third-Party Complaint, ¶ 32].  ASA-Inc was merged into American Medical Response of Massachusetts, Inc., on December 31, 1995.

19.    National Check Protection Service, Inc. ("NCPS-Inc"), is a corporation organized under the laws of the Commonwealth of Massachusetts and engaged in the business of background screening with a principal place of business located at 400 Hingham Street, Rockland, Plymouth County, Massachusetts. [Healey Counterclaim and Third-Party Complaint, ¶ 17 Admitted].

20.    National Data Verification Service, Inc. ("NDVS-Inc"), is a corporation organized under the laws of the Commonwealth of Massachusetts and engaged in the business of pre-employment screening with a principal place of business located at 400 Hingham Street, Rockland, Plymouth County, Massachusetts.    [Healey Counterclaim and Third-Party Complaint, ¶ 18 Admitted].

21.    Fleet Environmental Services LLC ("FleetES-LLC"), is a limited liability company organized under the laws of the Commonwealth of

8

Massachusetts and engaged in the business of environmental remediation with a principal place of business located at 75-D York Avenue, Randolph, Norfolk County, Massachusetts. [Healey Counterclaim and Third-Party Complaint, ¶ 21 Admitted].

22.   FE Holdings LLC ("FEH-LLC"), is a foreign limited liability company that is engaged in business within the Commonwealth of Massachusetts with a principal office located at 75-D York Avenue, Randolph, Norfolk County, Massachusetts. [Healey Counterclaim and Third-Party Complaint, ¶ 22 Admitted].

23.   Zammito Automotive Group, Inc. ("ZAG-Inc"), is a corporation organized under the laws of the Commonwealth of Massachusetts with a principal place of business located at 36 Popponesset Island Road, Mashpee, Barnstable County, Massachusetts. [Healey Counterclaim and Third-Party Complaint, ¶ 25 Admitted]. ZAG-Inc is the owner of the business known as Toyota of Dartmouth (formerly Harte Toyota). [Admissions of Fact, ¶ 25, Appendix II, Exhibit 23]. Zammito, Sr., is the sole shareholder in ZAG-Inc. [Admissions of Fact, ¶ 26, Appendix II, Exhibit 23].

24.   Zammito Automotive Real Estate LLC ("ZARE-LLC"), is a limited liability company organized under the laws of the State of Delaware that is engaged in business within the Commonwealth of Massachusetts and maintains a principal office located at 100 Faunce Corner Road, North Dartmouth, Bristol County, Massachusetts. [Admissions of Fact, ¶ 27, Appendix II, Exhibit 23]. ZARE-LLC is the owner of the real estate on which the business Toyota of Dartmouth is located. [Admissions of Fact, ¶ 28, Appendix II, Exhibit 23].

*The Consulting Relationship*

25.    On June 10, 1991, after being introduced by a third party, Huntington Forbes, Ltd., as part of a joint venture with Specialized Management Services Corporation, was hired by Zammito, Sr., as President of ZCE-Inc, to provide financial and corporate managerial consulting services to Norfolk Bristol Ambulance Company, Inc.  [Healey Affidavit, ¶30; June 10, 1991 Letter from Specialized Management Services to Robert Zammito, Appendix I, Exhibit 4]. On June 21, 1991, following a review of NBA-Inc, HF-Ltd and Specialized Management Services Corporation jointly issued a report of their findings and recommendations to Zammito, Sr. [June 21, 1991 Letter from HF-Ltd to Robert J. Zammito, Appendix I, Exhibit 5].

*Consulting Services Provided By Huntington Forbes, Ltd.*

26.    Later in 1991, and after its initial engagement, HF-Ltd was hired by Zammito, Sr. to provide consulting services to NBA-Inc on a continuing basis. As part of this continuing professional relationship, NBA-Inc agreed to pay HF-Ltd a monthly consulting fee of $10,000 in exchange for one day of consulting a week. [Zammito Counterclaim and Third-Party Complaint, ¶ 26].

27.    At this time, Zammito, Sr. believed NBA-Inc to be worth 15 million dollars and agreed, as part of the professional relationship, that if the Company were sold, HF-Ltd would receive a bonus equal to ten percent of the sale amount above the 15 million dollar valuation. [Healey Affidavit, ¶31]  It is important to note that this bonus did not represent a "finder's fee" or compensation for services rendered in connection with the sale of the business.  To the contrary,

this additional compensation represented payment in lieu of salary and was for the various business consulting services that Healey would render on a day-to-day basis at Norfolk-Bristol between 1991 and 1995. [Supplemental Answers of the Defendant, Harry W. Healey, Jr., to Plaintiffs' First Set of Interrogatories (hereinafter "Interrogatories") No. 10, pp. 32-39, Appendix II, Exhibit 31].

*The Ambulance Systems of America, Inc. and AmNet, Inc. Merger 1994-95*

28.    In 1994, at Zammito, Sr.'s request, Healey began to negotiate the possible merger of ASA-Inc and AmNet-Inc. [Admissions of Fact, ¶ 42, Appendix II, Exhibit 23]. On or about January 12, 1995, the merger between ASA-Inc and AmNet-Inc occurred. The resulting entity continued to be known as ASA-Inc. [Admissions of Fact, ¶ 55, Appendix II, Exhibit 23]. HF-Ltd acquired ten percent of Ambulance Systems of America, Inc. [Zammito Counterclaim and Third-Party Complaint, ¶ 33].

### Creation of Healey-Related Trusts 1995

29.    On or about January 13, 1995, Healey (as grantor) created the Harry W. Healey, Jr., Grantor Trust ("HWHG-Trust"). [Healey Affidavit, ¶ 3]. The HWHG-Trust became sole owner of HF-Ltd and, as such, a minority shareholder in ASA-Inc. [Healey Affidavit, ¶ 7].

30.    On or about August 7, 1995, Healey (as trustee) created The Huntington Forbes Charitable Remainder Trust ("HFCR-Trust"). Some, but not all, of HF-Ltd's shares in ASA-Inc were transferred to HFCR-Trust, at which time HFCR-Trust became a minority shareholder in ASA-Inc. [Healey Affidavit, ¶ 7].

*The American Medical Response, Inc. Acquisition of*
*Ambulance Systems of America, Inc.*
*And Creation of the Escrow*

31.    In 1995 and after the ASA-AmNet merger, a larger ambulance services entity known as American Medical Response, Inc. ("AMR-Inc") offered to acquire ASA-Inc. [Admissions of Fact, ¶ 60]. On or about October 2, 1995, AMR-Inc acquired ASA-Inc for approximately $90,000,000 (ninety million dollars) in cash and the assumption of certain debt. [Admissions of Fact, ¶ 61, Appendix II, Exhibit 23].

32.    As part of the terms of acquisition, an escrow amount of $11,250,000 (eleven million two hundred fifty thousand dollars) was held from the purchase price for a period of two to three years to provide coverage against potential Medicare challenges for services rendered by ASA-Inc prior to the AMR-Inc purchase and other potential liabilities. [Admissions of Fact, ¶ 62, Appendix II, Exhibit 23].

33.    Pursuant to this arrangement, a portion of the escrow funds were scheduled to be released two years after the closing date and the remaining balance three years after the closing date. HWHG-Trust (through its ownership of HF-Ltd) had a four percent interest in the escrow amount. HFCR-Trust had approximately one percent interest in the escrow amount. This, the two trusts had a combined interest of approximately five percent, for a total of approximately $573,455 (five hundred seventy-three thousand four hundred fifty-five dollars) on the date that AMR-Inc acquired ASA-Inc. [Healey Affidavit, ¶46]

12

### Incorporation of Stanton Cummings, Ltd.

34.   At approximately the same time, Healey had established a new company called Stanton Cummings Ltd. ("SC-Ltd") through which he provided business consulting and related services.   [Healey Affidavit, ¶ 6; Zammito Counterclaim and Third-Party Complaint, ¶ 14].

### Continuation of the Consulting Relationship

35.   After the merger, Zammito, Sr., asked Healey to continue to work with him as he invested the proceeds of the sale in part by identifying, acquiring and managing businesses that his four children would help to operate. [Zammito Counterclaim and Third-Party Complaint, ¶ 42].

36.   It was agreed that SC-Ltd would provide consulting services one day per week in exchange for (1) a monthly consulting fee of $5,000 that would increase to $10,000 after two acquisitions; (2) a ten percent commission or bonus for each completed investment; and (3) an option to purchase (with no time limit) up to one-sixth of the Zammito's interest in each business acquired. [Healey Affidavit, ¶¶48-50].

37.   The ten percent commission or bonus was not a "finder's fee" or compensation for services rendered solely in negotiating the sale or acquisition of any business. As with NBA-Inc, this additional compensation was intended as compensation for the consulting services that SC-Ltd, would be required to provide on a day-to-day basis with each new acquisition that Healey would be required to manage. [Interrogatories, pp. 34-39, Appendix II, Exhibit 31].

*Acquisition of National Check Protection Service, Inc. and*
*National Data Verification Service, Inc.*

38.    During   1995-1996,   two   businesses   based   in   Rockland,

Massachusetts, were identified for Zammito, Sr. to acquire.  The two businesses

were National Check Protection Service, Inc. ("NCPS-Inc"), which was engaged

in the business of providing banks and others with information on potential

customers and its related entity National Data Verification Service, Inc. ("NDVS-

Inc"), which was engaged in the business of pre-employment screening.

[Admissions of Fact, ¶ 72, Appendix II, Exhibit 23].

*Stanton Cummings, Ltd. Acquires an Interest in NCPS/NDVS*

39.    In October 1999, SC-Ltd, exercised its option to acquire a one-sixth

share of the Zammitos' interest in NCPS/NDVS.  The total consideration paid

was $375,000.   This included SC-Ltd's incentive bonus ($225,000) and the

execution of eight promissory notes by the HWHG-Trust (two to each of the

Zammito children with a total value of $150,000).  [Healey Affidavit, ¶¶54, 74-75;

Admissions of Fact, ¶¶ 106-107, Appendix II, Exhibit 23].   Ownership of SC-Ltd's

interest in NCPS, Inc and NDVS, Inc was conveyed to the HWHG-Trust.  [Healey

Affidavit, ¶ 75].

*Medicare Fraud at Norfolk-Bristol Ambulance Service, Inc.*

40.    On or before September, 1996, the Office of the U.S. Attorney

initiated a fraud investigation based upon allegations received from former

employees of NBA-Inc and ASA-Inc that the ambulance companies "routinely

and as a matter of practice, intentionally submitted, or caused to be submitted for

reimbursement, claims for [Medicare] services that had not, in fact, been

rendered" and issued a subpoena to AMR-Inc requiring the company to disclose certain medical necessity forms submitted to Medicare. [See, Qui Tam Complaint, Appendix II, Exhibit 18].

### American Medical Response, Inc. Makes an Escrow Fund Claim Against Ambulance Systems of America, Inc., 1996

41.    On or about September 26, 1997 AMR-Inc submitted a claim against the escrow account established at the time of AMR-Inc's acquisition of ASA-Inc in the amount of $10.5 million dollars and instructed the escrow agent not to release any funds during the pendent investigation. [Admission of Facts, ¶ 88, Appendix II, Exhibit 23; Letter of September 26, 1997, Appendix I, Exhibit 16].

42.    On or about October 22, 1997, the ASA-Inc stockholder representative, which included Zammito, Sr., responded to AMR-Inc's claim against escrow. [Letter of October 22, 1997, Appendix I, Exhibit 17].

### The Qui Tam Action

43.    On October 9, 1998, a qui tam action filed by the two former employees of NBA-Inc, who, after the merger, went to work for AMR-Inc, was unsealed alleging that NBA-Inc and ASA-Inc had engaged in fraudulent Medicare billing practices during the time that Zammito, Sr. and the Zammito family had direct control of the former company as sole owners of ASA-Inc. [Admissions of Fact, ¶ 86, Appendix II, Exhibit 23; See, Qui Tam Complaint, Appendix II, Exhibit 18].

44.    The U.S. Attorney determined that seventy-two percent of the forms submitted by NBA-Inc, Chaulk, and another entity acquired by ASA-Inc failed to

satisfy Medicare requirements and provided foundation for civil and criminal liability. [Healey Affidavit, ¶ 59-61].

### Acquisition of Colornet Graphics LLC 1999

45.     In 1999, Healey negotiated the formation of a business venture known as Colornet Graphics LLC ("CG-LLC") on Zammito's behalf. [Healey Affidavit, ¶ 63]. An operating agreement for CG-LLC was executed on or about March 30, 1999. [Admissions of Fact, ¶ 91, Appendix II, Exhibit 23]. Pursuant to the ongoing agreement between Zammito, Sr. and Healey, SC-Ltd acquired one-sixth ownership of Zammito's interest in CG-LLC. [Healey Affidavit, ¶63-66; Admissions of Fact, ¶ 94, Appendix II, Exhibit 23].

### Acquisition of Skyways Communications LLC 1999

46.     In 1999, Healey negotiated the formation of a business venture known as Skyways Communications LLC ("SC-LLC") on Zammito's behalf. [Healey Affidavit, ¶ 67]. An operating agreement for SC-LLC was executed in or about April, 1999. [Admissions of Fact, ¶ 96, Appendix II, Exhibit 23]. Pursuant to the ongoing agreement between Zammito and Healey, SC-Ltd acquired one-sixth ownership of Zammito's interest in SC-LLC. [Admissions of Fact, ¶ 99, Appendix II, Exhibit 23].    SC-Ltd and Zammito eventually sold their interests to other part owners of SC-LLC. [Healey Affidavit ¶ 67-70]

### Acquisition of Seacoast Offshore Services, Inc. 1999

47.     In 1999, Healey negotiated the acquisition of Seacoast Offshore Services, Inc. ("SOS-Inc") on behalf of Zammito and FleetES-LLC for a cost of

$1,875,000. [Healey Affidavit, ¶ 71]. SC-Ltd, never exercised its option to purchase an interest in SOS-Inc. [Healey Affidavit ¶ 71-73].

### Acquisition of American Environmental Technologies, Inc. 2000

48.    In 2000, Healey negotiated the acquisition of American Environmental Technologies, Inc. ("AET-Inc") on behalf of Zammito and FleetES-LLC for a cost of $3,000,000 (three million dollars). FleetES-LLC acquired the assets of AET-Inc on or about January 21, 2000. [Healey Affidavit, ¶ 77-79].

### Acquisition of New England Roll-Off Services LLC 2000

49.    In 2000, Healey negotiated the formation of a business venture known as New England Roll-Off Services LLC ("NEROF-LLC") on Zammito's behalf. [Healey Affidavit ¶ 80]. An operating agreement for NEROF-LLC was executed in or about March, 2000. [Admissions of Fact, ¶ 113, Appendix II, Exhibit 23]. Zammito participated as a part owner of NEROF-LLC by using a Zammito controlled entity known as RPCV LLC to issue a revolving line of credit to NEROF-LLC in the amount of $562,000 (five hundred sixty-two thousand dollars). This amount was the principal source of NEROF-LLC's funding. [Admissions of Fact, ¶ 114, Appendix II, Exhibit 23]. Pursuant to the ongoing agreement between Zammito and Healey, SC-Ltd acquired one-sixth ownership of Zammito's interest in NEROF-LLC. [Healey Affidavit ¶ 80-83; Admissions of Fact, ¶ 116, Appendix II, Exhibit 23].

### Acquisition of Harte Toyota 2000

50.    On or about December 16, 2000, Zammito acquired Harte Toyota and related entities for a purchase price of $4,959,410 (four million nine hundred

fifty-nine thousand four hundred and ten dollars) and the assumption of $900,000 (nine hundred thousand dollars) in debt owed by Glen Harte ("Harte") to Luzo Bank. [Healey Affidavit, ¶ 84-86]. Zammito Automotive Group, Inc. ("ZAG-Inc") took ownership, and the business was subsequently re-named Toyota of Dartmouth. [Admissions of Fact, ¶ 124, Appendix II, Exhibit 23].

### Medicare Investigation Finds Zammito-Related Fraud 2002

51.    In or about June 2002, at the conclusion of the U.S. Attorney's investigation, AMR-Inc executed a settlement and release agreement with the United States Department of Justice and Department of Health and Human Services that revealed that ASA-Inc had committed extensive fraud in its billing practices during years that Zammito was the sole owner of ASA-Inc. As part of the agreement, $8.5 million of the ASA-Inc escrow account was paid as a penalty to the government, including $3.8 million contributed to the escrow by ASA-Inc. [Healey Affidavit, ¶ 113-115; Settlement Agreement and Release, Appendix II, Exhibit 19].

52.    As a result, the escrow distribution to HF-Ltd and to HFCR-Trust was substantially reduced with a loss of approximately $462,000 (four hundred sixty-two thousand dollars).    Neither HF-Ltd nor HFCR-Trust knew of, participated in, or benefited from the fraud perpetrated by Zammito in connection with ASA-Inc Medicare billing. [Healey Affidavit, ¶113-115]

## Legal Argument

### The Legal Standard

Summary judgment is appropriate "the pleadings, depositions, answers to interrogatories and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c).* A fact is "material" if it "carries with it the potential to affect the outcome of the suit under the applicable law." *Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000)(internal quotations and citation omitted).* "An issue is 'genuine' if the evidence presented is such that a reasonable jury could resolve the issue in favor of the nonmoving party." *Fajardo Shopping Center, S.E. v. Sun Alliance Ins. Co. of Puerto Rico, Inc., 167 F.3d 1, 7 (1st Cir. 1999); see also Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir.), cert. denied, 515 U.S. 1103, 115 S. Ct. 2247, 132 L. Ed. 2d 255 (1995).*

The party moving for summary judgment "bears the initial burden, which may be discharged by pointing to the absence of adequate evidence supporting the nonmoving party's case." *Michelson v. Digital Financial Services, 167 F.3d 715, 720 (1st Cir. 1999) (citations omitted).* Once the moving party has met its burden, "the onus is on the nonmoving party to present facts that show a genuine issue for trial." *Id. (citations omitted).* In determining whether summary judgment is proper, the court "view[s] all facts in the light most favorable to the nonmoving party and indulge[s] all inferences advantageous to that party, provided they arise reasonably from the record." *Villanueva v. Wellesley College, 930 F.2d*

*124, 127 (1st Cir.) (citation omitted), cert. denied, 502 U.S. 861, 112 S. Ct. 181, 116 L. Ed. 2d 143 (1991).* The party opposing summary judgment, however, "may not rest on mere allegations or denials of his pleading. . . ." *Barbour v. Dynamics Research Corp., 63 F.3d 32, 37 (1st Cir. 1995) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)), cert. denied, 516 U.S. 1113, 116 S. Ct. 914, 133 L. Ed. 2d 845 (1996).* Rather, to resist summary judgment, the nonmoving party must produce "definite, competent evidence" on which the nonmovant bears the ultimate burden of proof. *Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991)(citations omitted), cert. denied, 504 U.S. 985, 112 S. Ct. 2965, 119 L. Ed. 2d 586 (1992); see also, Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548, 2552 (1996)(stating that summary judgment must enter "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").*

Likewise, when adjudicating a motion to dismiss under Rule 12(b)(6), the court must apply the notice pleading requirements of Rule 8(a)(2). *Educadores Puertorriquenos En Accion v. Hernandez, 367 F.3d 61, 66-67 (1st Cir. 2004).* Under that lenient rule, the complaint needs only to include "a short and plain statement of the claim showing that the pleader is entitled to relief." *Fed. R. Civ. P. 8(a)(2).* This statement must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson, 355 U.S. 41, 47, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957); Educadores, 367 F.3d at 66.*

Case 1:04-cv-10161-REK   Document 46   Filed 06/06/2005   Page 21 of 29

In addition, when considering a motion to dismiss under Rule 12(b) (6), the court must take the allegations in the plaintiff's pleadings as true and must make all reasonable inferences in favor of the plaintiff. *See, Pena-Borrero v. Estremeda, 365 F.3d 7, 11 (1st Cir. 2004).* A complaint may be dismissed for failure to state a claim "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Id. (internal quotation marks omitted).*

Still, "notice pleading notwithstanding, Rule 12(b)(6) is not entirely a toothless tiger." *Educadores, 367 F.3d at 67 (quoting Dartmouth Review v. Dartmouth Coll., 889 F.2d 13, 16 (1st Cir. 1989)).* In any action subject to notice pleading standards, "the complaint should at least set forth minimal facts as to who did what to whom, when, where, and why – although why, when why means the actor's state of mind, can be averred generally." *Id. at 67-68.* Thus, while requirements of Rule 8(a) (2) are minimal, "minimal requirements are not tantamount to nonexistent requirements." *Gooley v. Mobil Oil Corp., 851 F.2d 513, 514 (1st Cir. 1988).*

Finally, when evaluating a motion to dismiss under Rule 12(b) (6), the court must "eschew any reliance on bald assertions, unsupportable conclusions, and opprobrious epithets*." Chongris v. Bd. of Appeals, 811 F.2d 36, 37 (1st Cir. 1987) (citation and internal quotation marks omitted).* Such eschewal is merely an application of Rule 8(a)(2), not a heightened pleading standard and has been applied equally in all types of cases. *Educadores, 367 F.3d at 68; see also, Arruda v. Sears, Roebuck & Co., 310 F.3d 13, 18 (1st Cir. 2002) (holding plaintiff*

*to this standard in a bankruptcy action); LaChapelle v. Berkshire Life Ins. Co.,*
*142 F.3d 507, 508 (1st Cir. 1998)(holding plaintiff to this standard in an action*
*alleging breach of contract and intentional infliction of emotional distress).*

## I   Counts I Through VIII (Sic) Of The Zammitos' Counterclaim And Third-Party Complaint Against Harry W. Healey, Individually, Must Be Dismissed

Despite more than a year of extensive discovery, the plaintiffs have utterly failed to prove that Healey, as an *individual*, was part of any legal relationship with the plaintiffs that would expose him to liability.  In fact, the plaintiffs had a legal relationship *only* with the corporations for whom Healey worked as an employee.  None of the claims for relief are directed toward the corporate entities that employed Healey and with whom the plaintiffs had their only legally enforceable relationship.   Instead, the claims for relief are directed toward Healey, *individually,* who, as an employee of the corporations with which the plaintiffs had a business relationship, cannot be liable as a matter of law for any claims that plaintiffs should have made against his corporate employer. Furthermore, as discussed below, the complete absence of any discovery or evidence on a theory of "piercing the corporate veil" (and theoretically exposing Healey to liability) requires dismissal of Counts I through VIII (sic) of the Zammitos' Counterclaim and Third-Party Complaint.

   *a)    The Naming of Healey, Individually, Rather Than His Corporate Employers Was Knowing, Intentional, and Strategic.*

While the plaintiffs named the corporations in their complaint, for obvious strategic reasons they only made claims against Healey, individually.    The

22

plaintiffs are quite clear in their understanding of the distinction that they made in naming Healey as an individual defendant. In Paragraph 11 of their Third-Party Complaint, the plaintiffs state in the entirety:

> Counterclaim Defendant, Harry W. Healey, Jr. ("Healey"), is an individual residing in Hingham, Plymouth County, Massachusetts. Healey is President of Huntington Forbes, Ltd. ("HF-Ltd.") and Stanton Cummings, Ltd. ("SC-Ltd").

In naming Harry W. Healey, Jr., as a defendant, the Third-Party Complaint captures his name and all subsequent references to him individually as "Healey". With the exception of Count IV, which does not identify a defendant but presumably for purposes of this argument would include Healey, all eight remaining counts name Healey individually as the sole defendant.

    *b)    There Is No Evidence Of A Legal Relationship With Healey Individually.*

The plaintiffs, in Paragraph 26 of their Third-Party Complaint, again show a clear understanding of the circumstances surrounding their 1991 hiring of Healey's company, HF-Ltd., and not Healey as an individual. Paragraph 26 states in its entirety:

> Relying upon these representations, Norfolk-Bristol hired Mr. Healey's company as a consultant to advise the Company on its financial controls. Based upon Mr. Healey's professed expertise, Norfolk-Bristol agreed to pay Huntington Forbes $10,000 per month for his services.

[Zammito Third-Party Complaint, ¶ 26]

Documentary evidence produced during discovery confirms that the employment relationship was one between business entities and not individuals. For example, in a crucial 1995 engagement letter of agreement from the

23

Zammito-owned Ambulance Systems of America, Inc. ("ASA-Inc"), it is absolutely clear that ASA-Inc. engaged HF-Ltd, and not Healey individually, as a consultant. The letter of agreement is addressed to "Huntington Forbes Ltd." and begins, "Dear Huntington Forbes Ltd:". The first sentence of the engagement letter states: "We are pleased that you have agreed to become a consultant to Ambulance Systems of America, Inc., including its parent, subsidiaries or affiliates (the "Company")." Paragraph 6(b), titled "Entire Agreement", states: "This Agreement embodies the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and supersedes all prior oral or written agreements and understandings relating to the subject matter hereof." The letter is signed by Robert J. Zammito, Sr. only as a representative of ASA-Inc and by Healey only as a representative of HF-Ltd and not in either person's individual capacities. [See letter dated January 10, 1995 from ASA-Inc to HF-Ltd, Appendix I, Exhibit 6].

In all of the Zammitos' business dealings, the plaintiffs only paid Healey's companies, and not Healey as an individual, for services that Healey rendered as an employee of SC-Ltd and HF-Ltd. There is a wealth of corroborating documentary evidence supporting this proposition, including stacks of invoices issued by SC-Ltd. and HF-Ltd. and payments by the Zammitos to those entities. [Appendix I, Exhibits 14, 15]. In contrast, the plaintiffs cannot produce a single piece of documentary or testamentary evidence that Healey, as an individual, had any contractual relationship with the Zammitos and their various entities. They did not pay Healey directly for the simple reason that they knew that they

had hired the entities for which Healey was an employee and not Healey himself. This is a crucial point, because the Third-Party Complaint's counts allege claims against Healey, individually, and does not in fact seek any relief from either of the corporate entities that would be the appropriate defendants in the context of the plaintiffs' legal theories and prosecution of this case.

In addition to the plaintiffs' allegations in their pleadings that they hired SC-Ltd. and HF-Ltd. and not Healey, and the corroborating evidence that proves that this is true, the plaintiffs themselves acknowledge in deposition testimony this inescapable reality. Plaintiff Robert Zammito, Jr., made this salient point crystal clear in his deposition:

> Q.   Who was the engagement with?  Was it personally with Mr. Healey or did he have a company under which he did business?
> A.   I believe he had a company.
> Q.   Do you know the name of the company?
> A.   Stanton Cummings or ---- I think it was even something else.  I forget.
> Q.   Can I suggest Huntington Forbes?
> A.   Yes.

[Appendix II, Exhibit 21, Deposition of Robert Zammito, Jr., pp. 39-40]. Robert Zammito, Jr. further acknowledged that the Zammito-related ventures retained the companies for which Healey worked, and not Healey as an individual. In his response to Interrogatory No. 9 (part of the "First Set of Interrogatories from Defendant and Counterclaim Plaintiff, Harry W. Healey, Jr."), he stated: "... [M]y brothers, my sister and I hired Healey to advise us as to potential business we could acquire.  In return for Healey's services, *we agreed to pay his consulting*

25

*firm* the sum of $120,000.00 per year." (Emphasis added) [Appendix II, Exhibit 25].

The plaintiffs do make one allegation in their Third-Party Complaint of an employment relationship between a Zammito entity and Healey individually, but this mere (and solitary) allegation is completely unsupported by any evidence.[1] Plaintiffs allege in Paragraph 42 of their Third-Party Complaint that, at some point between 1996 and 2002 "ASA Holdings agreed to hire Healey as its investment advisor and paid him a monthly fee of between five thousand ($5,000) and ten thousand ($10,000) dollars." This is the only allegation in their Third-Party Complaint that alleges that Healey, as an individual, was hired by a Zammito entity. However, the plaintiffs have completely failed to adduce any discovery in support of this naked allegation.[2]

---

[1] In contrast to the plaintiffs' single Third-Party Complaint allegation that Healey as an individual worked for them, whether that bare and unsupported allegation is the result of poor drafting or a more calculated attempt to create a material issue of fact where none exists, Healey has been at all times consistent in pleadings, interrogatory answers, and deposition testimony. Healey's evidence is uniform that he worked for SC-Ltd and HF-Ltd, and that those were the entities that the plaintiffs retained to do consulting work for them. In fact, Healey repeatedly clarified vague questions and definitions posed by plaintiffs' counsel in discovery to ensure that this essential relationship remained clear and not in dispute. (Exhibit 22, pp. 29-34, 44, 46-54, 56, 74-75, 89-90, 97-98].

[2] The Investment Advisor Act of 1940 15 U.S.C., § 80b-1 *et. seq.*, defines Investment Advisor. According to the Act, an Investment Advisor is one who, in addition to holding himself out as an Investment Advisor, engages in the business of advising others as to the value of securities. Securities are defined under the Act at 15 U.S.C. § 80b-2(18). Except for the bald allegation that Healey "held himself out" as an Investment Advisor, the plaintiffs can produce no proof or point to any evidence which satisfies the Act's requirement that Healey had discretionary authority to invest or manage any of the Zammitos' assets. *See, United States v. Queen, 4 F.3rd 925, 929 (10th Cir. 1993); United States v. Hirsh, 239 F.3rd 221, 227 (2nd Cir. 2001).* Healey was President of Huntington Forbes, Ltd., a business consulting firm. He testified he never held himself out as an Investment Advisor. [See, Healey Deposition, pp. 29-31, Appendix II, Exhibit 22; see also, U.S. Department of Commerce Form F1-6200, 1997, Appendix I, Exhibit 3]. He never had discretionary authority as to securities or any other assets of the Zammitos *[Id]*. Significantly, the plaintiffs can offer nothing to rebut this evidence.

With respect to summary judgment, "the nonmovant must identify properly substantiated facts sufficient to establish a trialworthy issue." *Woods-Leber v. Hyatt Hotels of Puerto Rico, Inc., 124 F.3d 47, 50 (1st Cir. 1997).* To resist summary judgment, the nonmoving party must produce "definite, competent evidence" on which the nonmovant bears the ultimate burden of proof. See *Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991) (and cases cited therein).* In attempting to meet this burden, the plaintiffs in their Third-Party Complaint may not rest on "mere allegations" in the pleading. *Borschow Hospital & Medical Supplies, Inc. v. Cesar Castillo Inc., 96 F.3d 10, 14 (1st Cir. 1996).* Neither can the plaintiffs rely on "conclusory allegations, improbable inferences, and unsupported speculation." *Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990). See also, Lopez-Carrasquillo v. Rubianes, 230 F.3d 409, 412-13 (1st Cir. 2000).* Nevertheless, that is exactly what they attempt to do in Paragraph 42 of their Third-Party Complaint. Even if the plaintiffs were to cite unsupported answers to interrogatories or were to submit an affidavit that reiterated such an allegation, "to the extent that affidavits submitted in opposition to a motion for summary judgment merely reiterate allegations made in the complaint, without providing specific factual information made on the basis of personal knowledge, they are insufficient." *Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 53 (1st Cir. 2000).*

Notwithstanding their slight and unsubstantiated effort in Paragraph 42 of the Third-Party Complaint, the plaintiffs were at all times completely aware of the true nature of their employment relationship with SC-Ltd. and HF-Ltd – and not

27

Healey as an individual – when they created the relationship, during the relationship, when they filed their Third-Party Complaint, and in deposition testimony. The plaintiffs cannot deny that they knew the exact nature of the relationship between Healey and the companies at the time that they filed their Third-Party Complaint.[3] Specifically, ASA and its predecessors in interest had a contractual relationship with HF-Ltd. for consulting services rendered in connection with the Zammito ambulance business, *not with Healey*. The Zammito family had a contractual relationship with SC-Ltd. for consulting services rendered in connection with business ventures that arose subsequent to the sale of ASA, *not with Healey*. Their conscious decision to attempt wrongly to hold Healey personally liable for their allegations against SC-Ltd. and HF-Ltd. can only be seen as a calculated strategic decision – and not a mistake.

> c)   *There Is No Evidence That Would Support Piercing The Corporate Veil.*

Even if the plaintiffs were to succeed on *any* of their claims (which the defendants to the Third-Party Complaint vigorously dispute), they are not entitled to any relief against Healey as an individual. The plaintiffs also have admitted, in Paragraphs 12 and 14 of their Third-Party Complaint, that both HF-Ltd. and SC-Ltd. are corporations organized under the laws of the Commonwealth of Massachusetts. It is significant that there is not even a hint of a claim, either in the Third-Party Complaint or in any of the extensive discovery in this case, that

---

[3] See also Paragraph 11 of the plaintiffs' third-party complaint, in which they state: "Counterclaim Defendant, Harry W. Healey, Jr. ("Healey"), is an individual residing in Hingham, Plymouth County, Massachusetts. Healey is President of Huntington Forbes, Ltd. ("HF-Ltd") and Stanton Cummings, Ltd. ("SC-Ltd."). Thus, all of the subsequent references to Healey in the third-party complaint are limited to Healey as an "individual".

28

the corporations are shells that would be susceptible to a piercing of the corporate veil theory. Instead, the evidence is consistent with the plaintiffs' own professed understanding that their professional and business arrangements were with HF-Ltd. and SC-Ltd. and not Healey as an individual, notwithstanding the fact that Healey, as an employee of the two corporations, conducted the work.[4]

Thus, the Third-Party Complaint is fatally flawed. If the plaintiffs have any claims at all (see discussion *infra*), those doubtful claims should not have been brought against Healey individually but against HF-Ltd. and SC-Ltd. The scheduling order, filed jointly by the parties in this action and adopted by the Court on April 1, 2004, required that all motions to join other parties or to amend the pleadings be filed no later than July 5, 2004. In addition, the scheduling order mandates an end to all factual discovery by November 30, 2004 and expert discovery by March 30, 2005. Because the Third-Party Complaint names HF-Ltd. and SC-Ltd. but raises no claims against either; because all discovery has yielded a complete absence of any wrongdoing by Healey as an individual; and because the deadline to join parties, amend pleadings, and conduct discovery is long past, all potential claims against HF-Ltd., SC-Ltd, and Healey are now barred as waived.

---

[4] Evidence of the exclusive employment relationship between the plaintiffs and the corporations is found, as stated in the above Statement of Material Facts of Record As To Which There Is No Genuine Issue To Be Tried, in the engagement letter between Zammito, Sr. and Huntington Forbes, Ltd. [Healey Affidavit, ¶30; Engagement Letter, Exhibit 5 and in invoices submitted by HF-Ltd and SC-Ltd, Exhibits 14, 15].