d)   *The Plaintiffs May Not, At This Late Date, Amend Their Counterclaim And Third-Party Complaint Or Pursue An Alternative Theory Of Liability.*

Faced with the requirement of dismissal of the plaintiffs' claims against Healey as an individual, and against the corporations as well, the plaintiffs might seek solace in Rule 15 of the Federal Rules of Civil Procedure, which allows, under certain circumstances the amendment of pleadings. However, Rule 15 does not provide an unlimited free pass to those in plaintiffs' position. Indeed, by the Rule's parameters, the plaintiffs cannot be allowed at this late date to amend the pleadings, either to re-target their counts against the corporations or to raise for the first time a pierced corporate veil theory to impute liability to Healey individually.

Although Rule 15(a) allows a party to amend a pleading "by leave of court" that "shall be freely given when justice so requires", justice in this case requires a denial of any such motion to amend the pleadings. The plaintiffs, if they in fact seek relief pursuant to Rule 15, would have to show the court either that they made a mistake, either in misnaming parties or in their legal theory. Neither is present here. As an initial matter, any such request would be made nearly a year after the court-ordered deadline to move to join parties or amend pleadings. It bears repeating that the plaintiffs participated in the creation and filing of the Court's order. "Courts have a legitimate interest in ensuring that parties abide by scheduling orders to ensure prompt and orderly litigation." *United States v. 1948 S. MLK Dr., 270 F.3d 1102, 1110 (7th Cir. 2001).*

Any claim by the plaintiffs that they made a mistake in misnaming parties is, as discussed thoroughly above, completely facetious, without merit, and without recourse. "[W[hat the plaintiff knew (or thought he knew) at the time of the original pleading generally is the relevant datum in respect to the question of whether a mistake concerning identity actually took place." *Leonard v. Parry, 219 F.3d 25, 29 (1st Cir. 2000).* For this reason, "what the defendant knew or should have known and what he did or should have done are relevant to the question of whether justice requires leave to amend under this discretionary provision" of Rule 15. *Id. at 30. See also, Steir v. Girl Scouts of the USA, 383 F.3d 7, 14 (1st Cir. 2004) (quoting Parry).* "Even the most liberal interpretation of 'mistake' cannot include a deliberate decision not to sue a party whose identity plaintiff knew from the outset." *Wells v. HBO & Co., 813 F.Supp. 1561, 1567 (N.D.Ga. 1992).* Furthermore, "Rule 15(c) plainly provides that potential defendants are entitled to repose after a certain period unless they know they have escaped suit only by mistake." *Id. See also Keller v. United States, 667 F.Supp. 1351, 1357-58 (S.D.Cal. 1987) (no mistake where party knew before statute of limitations period expired that it could name defendant but did not).* The plaintiffs have completely failed to show that they were in any way confused about the identities of Healey, HF-Ltd. and SC-Ltd. and their respective roles, responsibilities, and potential liabilities. Indeed, in their pleadings, discovery responses and deposition testimony, the Zammitos repeatedly acknowledge that the engagement was with HF-Ltd and SC-Ltd, not Healey. There is nothing in the record that suggests that the plaintiffs could possibly meet their burden of

showing a "valid reason for neglect and delay" in proposing any amended pleadings. *Invest Almaz v. Temple-Inland Forest Prods. Corp., 243 F.3d 57, 72 (1ˢᵗ Cir. 2001).*[5]

Similarly, any claim by the plaintiffs that they should now be allowed to pursue an alternative legal theory by piercing the corporate veil to impute liability to Healey individually must fail as well. "Although the rule reflects a liberal attitude towards the amendment of pleadings, courts in their sound discretion may deny a proposed amendment if the moving party has unduly delayed in filing the motion, if the opposing party would suffer undue prejudice, or if the pleading is futile." *Campania Management Co. v. Rooks, Pitts & Poust, 290 F.3d 843, 848-49 (7ᵗʰ Cir. 2002) (citing Foman v. Davis, 371 U.S. 178, 181-82 (1962)).* The facts in the *Campania* case are exquisitely instructive on this point. In that case, the plaintiff moved, six days before the date for the close of discovery, to amend its answer to a counterclaim in a way that "reflected a complete reversal in trial strategy". *Id. at 847.* In another motion, the plaintiff sought to file a counterclaim nine days after expiration of the discovery date "that repackaged and resurrected its earlier allegations". *Id. at 847.* The plaintiff's motions were denied because a new legal theory "would have complicated this straightforward breach of contract dispute by raising additional, complex issues merely six days prior to the discovery deadline that was agreed upon by both parties.... The parties had conducted no discovery on this subject, and discovery would have delayed this matter for several months." *Id. at 850.*

---

[5] In *Invest Almaz*, counsel admitted in court that affirmative fraud claims were raised at such a late stage "simply because it hadn't occurred to Invest Almaz to add them earlier." *Invest Almaz at 72.*

To open this case now to possible new theory of piercing the corporate veil or to permit the plaintiffs to "repackage" their allegations or pursue new theories would involve a new round of discovery in order to prevent prejudice to Healey. Under Massachusetts law, a corporation constitutes an independent legal entity, separate and distinct from its officers, directors and shareholders. As such, a corporation is wholly responsible for its debts and obligations. *Spaneas v. Travelers Indem. Co., 423 Mass. 352, 354 (1996).* Only in rare circumstances and for compelling reasons do courts "pierce the corporate veil" by disregarding the corporate form in order to treat a corporation and its stockholders identically, making the stockholders personally responsible for the debts and obligations of the corporation. See *Hanson v. Bradley, 298 Mass. 371, 381 (1937).* The relief is warranted only in "rare particular situations to prevent gross inequity." *My Bread Baking Co. v. Cumberland Farms, Inc., 353 Mass. 614, 620 (1960).* Massachusetts law mandates "strict standards… for piercing the corporate veil." *Birbara v. Gordon Locke, 99 F.3d 1233, 1234 (1st Cir. 1996).* Furthermore, "[v]eil piercing is not warranted in a case involving a breach of contract." *Kroutik v. Momentix, 2003 Mass.Super.LEXIS 112 at 22 (Suffolk Supr.Ct., Van Gestel, J.) (citing Birbara).*

The seminal corporate veil case in Massachusetts is *Evans v. Multicon Construction Corp., 30 Mass.App.Ct. 728 (1991)*, which lists twelve factors to be considered in deciding whether to penetrate the corporate form: (1) common ownership; (2) pervasive control; (3) confused intermingling of business activity, assets, or management; (4) thin capitalization; (5) nonobservance of corporate

33

formalities; (6) absence of corporate records; (7) no payment of dividends; (8) insolvency at the time of litigated transactions; (9) siphoning away of corporate assets by the dominant shareholders; (10) nonfunctioning of officers and directors; (11) use of the corporation for transactions of the dominate shareholders; and (12) use of the corporation in promoting fraud. Discovery on these matters is always extensive and time-consuming and, given the rarity of the successful pierced corporate veil claim, usually yields insufficient evidence to prove the allegation. In situations such as these, "[a] trial court may deny leave to amend when the amendment would cause the opposing party to bear additional discovery costs litigating a new issue and the moving party does not offer to reimburse the nonmoving party for its expenses." *Campania Management Co. v. Rooks, Pitts & Poust, 290 F.3d 843, 849 (7th Cir. 2002).*

The entire sequence of the plaintiffs' litigation posture and prosecution of this case belies any claim that they somehow neglected to pursue a pierced corporate veil theory until this late point in time. In *Leonard v. Parry, 219 F.3d 25, 29 (1st Cir. 2000)*, the First Circuit discussed *Wilson v. United States Government, 23 F.3d 559, 563 (1st Cir. 1994)*, and described it as "not a case in which a plaintiff intended to sue A and sued B by reason of mistake concerning identity. Rather, it is a case in which the plaintiff chose the wrong theory of liability… and sued the wrong party… Rule 15(c)(3) was not designed to remedy a mistake in the selection of a legal theory." *Leonard at 31.* See also Rendall-Speranza v. Nassim, 107 F.3d 913, 917-18 (D.C.Cir. 1997) (rejecting the view that Rule 15(c)(3) applies where "the mistake is one of legal judgment").

Therefore, the applicable law both in this federal circuit and in the Commonwealth of Massachusetts leads to only one just result: a denial of any motion by the plaintiffs to join parties or amend pleadings nearly a year after the time to do has passed and more than six months after the close of discovery and dismissal of Counts I through VIII (sic) of the Zammitos' Counterclaim and Third-Party Complaint.

## II    Count III Of The Third-Party Complaint Should Be Dismissed As The Claim Is Barred By The Statute Of Limitations

Under Massachusetts General Law, Chapter 260, Section 2, an action in contract must be commenced within six years from the date on which the cause of action accrued. *G.L. c. 260, § 2.* A cause of action for breach of contract accrues at the time of the breach. This rule applies even though a specific amount of damages is unascertainable at the time of the breach or even if damages may not be sustained until a later time. *International Mobiles Corp. v. Corroon & Black/Fairfield & Ellis, 29 Mass.App.Ct. 215, 221, 560 N.E.2d 122 (1990); see also, McInerney v. Mason, 59 Mass.App.Ct. 1108, 797 N.E.2d 503 (2003).*

There are, however, situations in which a cause of action for breach of contract is not capable of being discovered because it is based on an "inherently unknowable" wrong. In those cases, the "discovery rule" tolls the accrual date of the statutory period until the injured party knows or should know the facts giving rise to the cause of action. The discovery rule has been applied in breach of contract claims in those cases involving the rendering of professional services where a client would not be expected to retrace the professional's steps nor be

35

able necessarily to recognize the professional's negligence should the client come across it. The inherently unknowable wrong must be incapable of detection by the wronged party through the exercise of reasonable diligence. *International Mobiles Corp. at 222; See also, Protective Life Ins. Co. v. Sullivan, 425 Mass. 615, 631, 682 N.E.2d 624 (1997); Anthony's Pier Four v. Crandall Dry Dock Engr., Inc., 396 Mass. 818, 824-25, 489 N.E.2d 172 (1986); Melrose Housing Authority v. New Hampshire Ins. Co., 24 Mass. App. Ct. 207, 211-12, 507 N.E.2d 787 (1987).*

Under the discovery rule, the statutory period begins running when the prospective plaintiff has "(1) knowledge or sufficient notice that she was harmed and (2) knowledge or sufficient notice of what the cause of harm was." *Bowen v. Eli Lilly & Co., 408 Mass. 204, 208, 557 N.E.2d 739 (1990).* When raised as a defense the plaintiff bears the burden of proving that he did not or should not reasonably have known of the harm. *Williams v. Ely, 423 Mass. 467, 475, 668 N.E.2d 799 (1996).* Ordinarily, the question of when a plaintiff knew or should have known of the existence of a cause of action is a question of fact to be decided by the objective standard of a "reasonable person in the plaintiff's position." *Riley v. Presnell, 409 Mass. 239, 247-48, 565 N.E.2d 780 (1991).*

When applying a statute of limitation to a non-federal cause of action, the date on which the limitations period begins to run should be determined by the state law defining the application of the limitations period. *Carreras-Rosa v. Alves-Cruz, 127 F.3d 172, 174 (1st Cir. 1997); Wilson v. Garcia, 471 U.S. 261, 266-67 (1985).*

In the instant case, Count III of the Third-Party Complaint should be dismissed as the claim is barred by the statute of limitations. Count III of the Third-Party Complaint sets forth a claim for breach of contract in which the Zammito Counterclaim and Third-Party Plaintiffs allege:

> Defendant Healey represented to Mr. Zammito that he had knowledge and experience in handling Third-Party Billing with the Federal Government's Medicare Program.
>
> Based upon this representation, Norfolk Bristol entered into a contract with Healey to make certain its Third-Party Billings systems were efficient and in accordance with government regulations.
>
> Healey misrepresented his knowledge of the third-party billing system.
>
> This misrepresentation by Healey was a material breach of the contract.
>
> As a direct result of Healey's breach, Counterclaim Plaintiff and Third Party Plaintiffs suffered significant damages including the loss of three million eight hundred ($3,800,000) dollars from the escrow fund.

[Counterclaim and Third-Party Complaint, ¶¶ 52-53, 57-59].

It is undisputed that HF-Ltd was retained by Zammito, Sr., as President of ZCE-Inc, to provide financial and corporate managerial consulting services to NBA-Inc in 1991. [Counterclaim and Third-Party Complaint, ¶ 26]. It is further undisputed that HF-Ltd provided such services to NBA-Inc and its successor in interest ASA-Inc until or about October 2, 1995, when AMR-Inc acquired ASA-Inc when it purchased ASA-Inc, NBA-Inc's successor in interest. [Counterclaim and Third-Party Complaint, ¶¶ 32, 36].

On or about September 26, 1997, AMR-Inc submitted a claim against the escrow account established at the time of AMR-Inc's acquisition of ASA-Inc and instructed the escrow agent not to release any funds during the pendent investigation.   [See, Letter of September 26, 1997, Appendix I, Exhibit 16; Admission of Facts, ¶ 88; Appendix II, Exhibit 23].  In doing so, AMR set forth the basis of its claim, stating in relevant part:

> The federal government has made preliminary inquiries regarding the Medicare billing practices of Norfolk-Bristol Ambulance Co. American has conducted a limited post-acquisition audit of Norfolk-Bristol for 1991-1993 and determined that some reimbursement may be in jeopardy.  At this point American is not able to estimate with any certainty the amount of potential exposure.

[Appendix I, Exhibit 16 at Page Two, Claim 1(a)(ii)].

On or about October 22, 1997, the ASA-Inc Stockholder Representative, which included Zammito, Sr., responded to AMR-Inc's claim against escrow, stating in relevant part:

> [Claim 1 (a)(ii)] is even more hypothetical than Claim 1 (a)(i).  It is simply a statement that a claim may exist.  The escrow agreement requires American to have a reasonable belief that it will suffer "Damages" in connection with a claim.    The Stockholder Representative does not believe that American has any such reasonable belief.

[Appendix I, Exhibit 17 at Page Three, Section Claim 1 (a)(ii)].

In light of the foregoing undisputed facts, the Zammito Counterclaim and Third-Party Plaintiffs not only knew or had sufficient notice that they had been harmed but also had sufficient notice of as to source of the harm as of September 26, 1996.  For this reason, Count III should be dismissed as the claim

was filed in April of 2004 and more than two years beyond the six year statutory limitation.

## III Count III Of The Third-Party Complaint Should Be Dismissed As The Zammito Counterclaim And Third-Party Plaintiffs Lack Standing

"The question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin, 422 U.S. 490, 498, 45 L. Ed. 2d 343, 95 S. Ct. 2197 (1975).* The question of standing is one of critical significance. "From an early day it has been an established principle in this Commonwealth that only persons who have themselves suffered, or who are in danger of suffering, legal harm can compel the courts to assume the difficult and delicate duty [of adjudicating disputes or particular issues]." *Doe v. The Governor, 381 Mass. 702, 704, 412 N.E.2d 325 (1980), quoting Kaplan v. Bowker, 333 Mass. 455, 459, 131 N.E.2d 372 (1956); see also, Barbara F. v. Bristol Div. of the Juvenile Court Dep't, 432 Mass. 1024; 735 N.E.2d 357 (2000).* However, standing to bring an action for breach of contract, an intangible form of property, resides with a corporation to the exclusion of shareholders, when the corporation is party to the contract in question. *Colecchi v. Gould Title Co., 18 Mass. L. Rep. 319, 2004 Mass. Super. LEXIS 409, (Mass. Super. Ct. 2004).*

In the instant case, the Zammito Counterclaim and Third-Party Plaintiffs do not have standing to assert a cause of action against Healey or his consulting firm, HF-Ltd, in connection Count III of the Third-Party Complaint. Count III of the Third-Party Complaint sets forth a claim for breach of contract in which the Zammito Counterclaim and Third-Party Plaintiffs allege:

Defendant Healey represented to Mr. Zammito that he had knowledge and experience in handling Third-Party Billing with the Federal Government's Medicare Program.

Based upon this representation, Norfolk Bristol entered into a contract with Healey to make certain its Third-Party Billings systems were efficient and in accordance with government regulations.

[Counterclaim and Third-Party Complaint, ¶¶ 52-53].

To the extent that these allegations form the factual basis of a cause of action for breach of contract, it is clear that standing to bring such action resided with NBA-Inc in its capacity as a corporation organized under the laws of the Commonwealth of Massachusetts. NBA-Inc was party to the contract. As a consequence, all rights and obligations under the agreement were the intangible property of NBA-Inc. In 1995, however, these property rights were acquired by AMR-Inc when it purchased ASA-Inc, NBA-Inc's successor in interest. [Counterclaim and Third-Party Complaint, ¶¶ 32, 36]. In view of these facts, it is significant that neither NBA-Inc nor ASA-Inc nor AMR-Inc are party to the pending litigation. Indeed, the only nexus between the Zammito Counterclaim and Third-Party Plaintiffs and the contract in question is strictly limited to their status as former shareholders of NBA-Inc and its successor in interest, ASA-Inc. This tenuous relationship, however, is insufficient to satisfy the standing requirements under Massachusetts law. For this reason, the Count III of the Third-Party Complaint should be dismissed.

## IV   Count III Of The Third-Party Complaint Should Be Dismissed As The Zammito Counterclaim And Third-Party Plaintiffs Sustained No Damage As A Result Of The Alleged Breach of Contract

Count III of the Third-Party Complaint should also be dismissed as the

Zammito Counterclaim and Third-Party Plaintiffs sustained no damage as a

result of the alleged breach of contract.  Count III of the Third-Party Complaint

sets forth a claim for breach of contract in which the Zammito Counterclaim and

Third-Party Plaintiffs allege:

> Defendant Healey represented to Mr. Zammito that he had knowledge and experience in handling Third-Party Billing with the Federal Government's Medicare Program.

> Based upon this representation, Norfolk Bristol entered into a contract with Healey to make certain its Third-Party Billings systems were efficient and in accordance with government regulations.

> Healey misrepresented his knowledge of the third-party billing system.

> This misrepresentation by Healey was a material breach of the contract.

> As a direct result of Healey's breach, Counterclaim Plaintiff and Third Party Plaintiffs suffered significant damages including the loss of three million eight hundred ($3,800,000) dollars from the escrow fund.

[Counterclaim and Third-Party Complaint, ¶¶ 52-53, 57-59].

To the extent that these allegations form a cause of action for breach of

contract, the Third-Party Complaint sets forth the factual basis of such action by

providing:

> Approximately ten months later, ASA was acquired by American Medical Response, Inc. for approximately ninety million ($90,000,000) dollars.

At the time of the acquisition by AMR, there was an escrow account established in the amount of eleven million, two hundred fifty thousand ($11,250,000) dollars to cover potential claims by Medicare over billing practices by ASA.

During 1996, two former ASA employees began a qui tam action that led the office of the U.S. Attorney to begin an investigation into the billing practices of ASA and several of its predecessor corporations.

In approximately June 2002, AMR entered into a settlement agreement with the U.S. Attorneys Office to resolve the investigation into billing irregularities. As part of the settlement, approximately eight million five hundred thousand ($8,500,000) dollars of the ASA escrow was paid to the government.

As a result of the settlement, Mr. and Mrs. Zammito and their four children received approximately three million eight hundred thousand ($3,800,000) dollars less from the escrow account they would otherwise receive. The alleged billing irregularities that caused the loss of the money occurred during the years that Healey was paid to advise the Company on its billing systems.

[Counterclaim and Third-Party Complaint, ¶¶ 36-40].

As an initial matter, based upon discovery, the factual account set forth in the Third-Party Complaint is materially incomplete to the extent that AMR was not the only signatory to the Settlement Agreement. It is significant that ASA-Inc and its shareholders, including "Mr. and Mrs. Zammito and their four children," were also party to the Settlement Agreement. [See, Settlement Agreement, Page 29, Appendix II, Exhibit 19]. It is equally significant that Zammito, Sr., served as ASA-Inc Stockholder Representative in connection with the Qui Tam action and the AMR-Inc claim against escrow. [See, October 22, 1997, Hutchins, Wheeler & Dittmar Letter Responding to AMR-Inc Claim Against Escrow, Appendix I, Exhibit 17].

An examination of the Qui Tam action relied upon by the Zammito Counterclaim and Third-Party Plaintiffs reveals that the so-called "billing irregularities" were not the product oversight or negligence but rather constituted yet another systemic pattern of racketeering activity by the Zammitos as owners and operators of NBA-Inc designed to defraud the Federal government. The Qui Tam Complaint as well as the Settlement Agreement support this conclusion. In relevant part, the Qui Tam Complaint provides:

From at least 1991 to the present, Defendants and their predecessors in interest knowingly presented or caused to be presented tens of thousands of false or fraudulent claims with deliberate ignorance of or in reckless disregard of the falsity of said claims to the United States by some or all of the following means:

a. The Defendants, routinely and as a matter of practice, intentionally submitted, or caused to be submitted for reimbursement, claims for services that had not, in fact, been rendered;

b. The Defendants, routinely and as a matter of practice, submitted duplicate claims for the same services to be reimbursed by the federally funded programs;

c. Defendants, routinely and as a matter of practice, caused or allowed their employees to submit false claims to federally funded programs relating to non-medical necessities;

d. Defendants, routinely and as a matter of practice, caused or allowed their employees to falsify medical necessity forms;

e. Defendants, routinely and as a matter of practice, caused or allowed their employees to forge authorized signatures of patients, doctors and/or nurses on medical necessity forms;

f. Defendants, routinely and as a matter of practice, caused or allowed their employees to certify to federally funded programs that they had obtained accurate and completed medical necessity forms when in fact they had not;

43

g. Defendants routinely used ambulances to transfer ambulatory patients when only a chair-car, taxi, or automobile would have been required and then billed the federally funded programs for the use of the ambulances falsely claiming that such use was a medical necessity. Medicare does not provide reimbursement for chair-cars. Medicaid will pay for chair-cars, however, the reimbursement rate for an ambulance is approximately six t seven times the rate for a chair-car.

h. Defendants programmed their computers to automatically indicate that a patient's signature was on file when in fact no signature was on file. Employees were trained no to charge this "field" on their computer. Without a signature on file, Medicare has no authority to pay the Defendants.

i. Defendants routinely billed ambulance round trips as emergencies in both directions and routinely and as a matter of practice, submitted claims for emergency services when no emergencies existed;

j. Defendants programmed their computers to automatically indicate "stretcher required" on the claim forms when in fact no stretcher was required.    They did this in order to obtain reimbursement where none would be ordinarily due. In many instances, patients were ambulatory and not bedridden when the ambulance arrived. Upon information and belief, every trip billed by the Defendants indicated "stretcher required" and "signature on file."

k. When audited by Medicare, Defendants, routinely and as a matter of practice, directed their employees to withhold documents from the Government's auditors which would have revealed Defendants' fraudulent behavior;

l. Defendants, routinely and as a matter of practice, simultaneously billed patients, the federally funded programs and insurance companies for the same services, often collecting two or three times for the same services. If multiple payments were received, it was the Defendants' policy not to make refunds;

m. The Defendants, to varying degrees, billed different amounts for the same services depending on who was being billed. For example, the defendants contracted with nursing homes to bill nursing home patients at rates below the rates charged to federally funded programs;

n. Between 1992 and 1994, the Defendants, to varying degrees, used fictitious names, such as "Mary Black" and upon information and belief, "Donald Duck," and other fictitious information to complete medical necessity forms;

o. The Defendants, routinely and as a matter of practice, caused or allowed their employees to indicate on every medical necessity form that the patient was "bed confined" even if the patient was ambulatory; and

p. The Defendants billed ALS services when they were only qualified to provide BLS. This occurred on numerous occasions when the Defendants personnel would meet up with a Town's paramedics transporting patient's in the Town's ambulance. The Defendants would also bill Medicare for transporting the patient when transportation was actually provided by the Town.

[Qui Tam Complaint, ¶ 45, Appendix II, Exhibit 18]. The Settlement Agreement

echoes these allegations:

The United States contends that in connection with [the] submission of false or fraudulent claims to the Massachusetts carrier, the Ambulance Providers engaged in the following specific acts:

i. They submitted or caused to be submitted claim forms stating that patients were bed confined or unable to ambulate when they either had no information to support that statement or the information in their possession affirmatively indicated that the patient was not bed confined and could ambulate;

ii. They submitted or caused to be submitted claim forms stating "Y" to the question of medical necessity when they ether had no information to support that statement or the information in their possession affirmatively contradicted the statement;

iii. They caused or allowed their employees to falsify Certificates of Medical Necessity ("CMN's") by, for example, forging the signatures of doctors and nursed;

45

    iv.    They caused or allowed their employees to fill out or add information Certificates of Medical Necessity, notwithstanding the requirement that CMN's submitted to the Massachusetts carrier be completed and signed only by physicians or nurses;

    v.    They programmed their billing software to describe each and every patient as bed confined, by automatically inserting a "Y" in the corresponding data field on the electronic claims form, irrespective of the actual physical condition of the patients and even though information contained in on the providers' own run reports frequently indicated that the patient had not been bed confined; and

    vi.    They established, implemented and adhered to internal policies whereby they would not disclose or make refunds to the Massachusetts carrier of payments received from Medicare to which they knew they were not entitled – for instance, payments received on claims where the providers knew or later learned that no medical necessity had existed for the trip.

[Settlement Agreement, ¶ 1, Appendix II, Exhibit 19].

As the Qui Tam Complaint and Settlement Agreement evidence, the so-called "billing irregularities" relied upon by the Zammito Counterclaim and Third-Party Plaintiffs formed a pattern of racketeering activity which defrauded the government of millions of dollars. It follows, therefore, that any amount paid under the Settlement Agreement constituted restitution to the extent that unearned revenue was restored to the government. [See, Settlement Agreement, ¶ 2, Appendix, Exhibit 19; Confession of Judgment, Appendix II, Exhibit 20]. It also follows that, because ASA-Inc and its predecessor in interest, NBA-Inc, never earned or were otherwise entitled to amounts restored to the government under the Settlement Agreement, the Zammito Counterclaim and Third-Party Plaintiffs sustained no damage as a consequence of the payment of

such funds from escrow. *Salamon v. Terra, 394 Mass. 857, 859, 477 N.E.2d 1029 (1985) (quoting Restatement of Restitution) ("A person who has been unjustly enriched at the expense of another is required to make restitution to the other").* For this reason, the Count III of the Third-Party Complaint should be dismissed.

## V    Count III Of The Third-Party Complaint Should Be Dismissed As There Is No Evidence To Support The Breach Of Contract Claim

Count III of the Third-Party Complaint should also be dismissed as there is

no genuine issue of material fact to support the breach of contract claim. In the

instant case, the Zammito Counterclaim and Third-Party Plaintiffs set forth a

claim for breach of contract in Count III of the Third-Party complaint, alleging:

> Defendant Healey represented to Mr. Zammito that he had knowledge and experience in handling Third-Party Billing with the Federal Government's Medicare Program.
>
> Based upon this representation, Norfolk Bristol entered into a contract with Healey to make certain its Third-Party Billings systems were efficient and in accordance with government regulations.
>
> Healey misrepresented his knowledge of the third-party billing system.
>
> This misrepresentation by Healey was a material breach of the contract.
>
> As a direct result of Healey's breach, Counterclaim Plaintiff and Third Party Plaintiffs suffered significant damages including the loss of three million eight hundred ($3,800,000) dollars from the escrow fund.

[Counterclaim and Third-Party Complaint, ¶¶ 52-53, 57-59].

47

To the extent that these allegations form a cause of action, there is no evidence beyond the mere allegations contained in the pleadings which support a claim for breach of contract. Indeed, even when viewed in the light most favorable to the non-moving party, the evidence adduced in discovery establishes to a certainty that no material breach of contract occurred which resulted in damage to the Zammito Counterclaim and Third-Party Plaintiffs.

On June 10, 1991, after being introduced by a third party, HF-Ltd, as part of a joint venture with Specialized Management Services Corporation, was engaged by Zammito, Sr., as President of ZCE-Inc, to provide financial and corporate managerial consulting services to NBA-Inc. [June 10, 1991 Engagement Letter, Appendix I, Exhibit 4]. The scope of the intended engagement was expressly set forth in a written agreement executed by the parties:

> We are pleased to submit this proposal to perform a brief review and analysis of the Norfolk Bristol Ambulance Company. This review will relate to your longer term personal and professional objectives, as well as the growth potential for the company.
>
> Our goal is to assess the viability of your stated objectives, the company's growth potential within the local, contiguous market area and the expanded market area, and to quantify the approach and timeline for implementing plans to achieve these objectives.

[Engagement Letter, p. 1, Appendix I, Exhibit 4].

On June 21, 1991, following a review of NBA-Inc, HF-Ltd and Specialized Management Services Corporation jointly issued a report of their findings and recommendations to Zammito, Sr., which provided in part:

It is our judgment that the integrity and viability of your company, as perceived initially, has been substantially validated by our limited engagement.

There are requirements for organizational, financial, and manual and automated system changes which will result in substantial improvements in operating efficiencies, achieving market dominance, management information, and financial controls.

Recognition and resolution of corporate deficiencies must be accomplished prior to any major acquisition or strategic planning process.

To accomplish this, we must:

- o review the capability of the present treasurer to determine whether his background and experience are suitable to define the requirements for an integrated financial system, select it, implement it and monitor its progress and continued suitability to meet the companies needs;

- o develop and implement job and cost accounting systems to manage the operational aspects of the business and ensure that the system has the flexibility and capability to accommodate the changing business needs of the business and the Company;

- o review the timeliness and operating accuracy of the major operations related to the dispatch/driver/delivery functions, ensure timely billing through an automated billing system, and monitor the reimbursement process for timeliness and payment adequacy, as well as the system's capacity to respond to the changing regulatory environment.

[June 21, 1991 HF-Inc Report, Appendix I, Exhibit 5].

Following the issuance of these findings and recommendations, NBA-Inc elected to implement a new automated billing system to support its strategic growth objectives. The task of selecting a replacement system was undertaken by NBA-Inc employees, including Zammito, Jr., and led by the Executive Vice President of the firm, David Morgan ("Morgan"). [Morgan Memorandum of March

49

3, 1992, Appendix I, Exhibit 7].    On March 3, 1992, Morgan issued a memorandum to Zammito, Sr. detailing the specific due diligence undertaken by his team to select EAI Systems, Inc. as the vendor of the firm's new billing system.    It is significant that Morgan made absolutely no reference in his memorandum to either Healey or his consulting firm, HF-Ltd, as having participated in the due diligence.  *[Id.]*.  Following the issuance of the Morgan Memorandum, NBA-Inc entered into an agreement with EAI Systems, Inc. to license its billing system.  [EAI Purchase Agreement, Appendix I, Exhibit 8].

As Vice President of Communications, William Campbell ("Campbell") managed the implementation of the EAI system on behalf of NBA-Inc.  In this capacity, Campbell provided the President of NBA-Inc, Zammito, Jr., with written status reports, outlining the progress of the implementation.  [November 9, 1992, Campbell Memorandum, Appendix I, Exhibit 9; November 23, 1992, Campbell Memorandum, Appendix I, Exhibit 10].  Again, none of these reports referenced either Healey or his consulting firm, HF-Ltd, as having participated in the implementation.  *[Id.]*.

When the EAI implementation encountered difficulty, it was the President of NBA-Inc, Zammito, Jr., who wrote a detailed correspondence to EAI business partner, Bell Atlantic, detailing the history of the EAI transaction and its troubled implementation.  [January 19, 1993 Letter, Appendix I, Exhibit 11].  In that correspondence, only a single reference was made to Healey in regard to a conference call scheduled to address NBA-Inc concerns regarding the implications of delayed implementation.  It is equally significant that such

reference listed Healey's title as "Financial Consultant." This stood in stark contrast to other conference call participants such as EAI Consultants John Felix and Doug Place whose titles were listed as "Medicare Programmer" and "Project Manager," respectively *[id.]* and to the unsupported allegations made in Count III.

Following the EAI implementation, there is no evidence whatsoever to suggest Healey or his consulting firm, HF-Ltd, had any responsibility or oversight with respect to the operation or management of the EAI computer system. For instance, there is absolutely no evidence to suggest Healey programmed or authorized the programming of the system to automatically indicate that a patient's signature was on file when in fact no signature was on file or to automatically indicate "stretcher required" on claim forms or to simultaneously bill patients, federally funded programs and insurance companies for the same services, the specific allegations contained in the Qui Tam Complaint which connect billing systems to the pattern of racketeering activity allegedly undertaken by NBA-Inc and its successors in interest. [Qui Tam Complaint, ¶ 45, Appendix II, Exhibit 18]. Indeed, there is not a single shred of evidence to connect Healey or his consulting firm, HF-Ltd, with any of the sixteen enumerated methods of fraud alleged to have been undertaken by NBA-Inc and its successors against the government.

As no definite, competent evidence exists to support the mere allegations of the Zammito Counterclaim and Third-Party Plaintiffs in Count III of the Third-Party Complaint, there is no genuine issue of material fact presented for trial. Accordingly, the Court should dismiss Count III of the Third-Party Complaint.

**VI** **Count V Of The Third-Party Complaint Should Be Dismissed As There Is No Evidence To Support A Claim For Abuse Of Process**

At the summary judgment stage of this case, it is, perhaps, appropriate to ask the question: On what basis does a party caught in the fraudulent misappropriation of more than 2.6 million dollars, maintain that the resulting litigation from the victims of that fraud constitutes an abuse of process? The short answer is that it does not and cannot as a matter of law. However, as with the decision to initiate this litigation rather than face the consequences of financial transparency and the return of their ill-gotten gains, the Zammitos have demonstrated that they are not strangers to vague and careless pleadings and groundless unsubstantiated allegations.

Count V of the Zammito's Third-Party Complaint alleges that "[b]y filing the Counterclaim and Third-Party Complaint, the Healey Defendants filed a baseless lawsuit and continue to prosecute it for the purpose of damaging the Zammito entities". The Counterclaim and Third-Party Complaint referred to which is being prosecuted by "the Healey Defendants" is to recover more than 2.6 million dollars which, according to an independent forensic audit, was fraudulently misappropriated by the Zammitos.

To maintain an action for abuse of process, the plaintiff must allege and prove: 1) that the defendant used unlawful process to accomplish an ulterior purpose; 2) with malice; and, 3) damages. *Datacomm Interface, Inc. v. Computerworld, Inc., 396 Mass. 760, 775-76, 489 N.E.2d 185, 195 (Mass. 1986); Fabre v. Walton, 436 Mass. 517 (2002).* It must appear from the evidence that the process was used to accomplish some ulterior purpose for which it was not

designed or intended, or which was not the legitimate purpose of the particular process employed. *Silva v. Building Inspector of West Bridgewater, 35 Mass.App.Ct. 451 (1993).* Stated another way, the common law action for abusing legal process is confined to a use of process for the purpose of compelling the defendant to do some collateral thing which he could not lawfully be compelled to do. *Kelley v. Stop & Shop Companies, Inc., 26 Mass.App.Ct. 557 (1988).* "The essence of the tort of abuse of process is use of process as a threat or a club to coerce or extort some collateral advantage not properly involved in the proceeding." *Broadway Management Services Ltd. v. Cullinet Software, Inc., 652 F.Supp. 1501, 1503 (D.Mass. 1987) (citing Cohen v. Hurley, 20 Mass.App.Ct. 439, 442, 480 N.E.2d 658 (1985)).* A plaintiff cannot establish an abuse of process claim absent proof of an ulterior motive. *Ladd v. Polidoro, 424 Mass. 196 (1997).* Likewise, it is well established that malice is essential to support an action for abuse of process and that malice or willfulness in the use of process or its abuse cannot be inferred from mere mistake. *Shaw v. Fulton, 260 Mass. 189 (1926).*

"In cases involving actionable abuse of process, the collateral benefits sought were well-defined and clearly outside the interests properly pursued in the proceeding. *See, e.g., Datacomm, 396 Mass. at 775-76 (1986) (company's litigation was intentionally used as a marketing tool against competitor's trade show); Lorusso v. Bloom, 321 Mass. 9, 71 N.E.2d 218 (1947) (supplementary process used to collect twice on debt already paid); Jacoby v. Spector, 292 Mass. 366, 198 N.E. 157 (1935) (attachment of wages with malicious motive of*

*harassing plaintiff and his employer so as to force plaintiff to contract to purchase household furniture)*; *Reardon v. Saad, 262 Mass. 345, 159 N.E. 751 (1928) (attachment of property to enforce a claim known to be groundless)*; *Malone v. Belcher, 216 Mass. 209, 103 N.E. 637 (1913) (filing for attachment of real property in order to prevent the owner's sale of the property to a third party)*; *White v. Apsley Rubber Co., 181 Mass. 339, 63 N.E. 885 (1902) (maliciously procuring the arrest of plaintiff on criminal charge in order to compel him to abandon a claim of right of occupation of a certain house and actually to withdraw from its occupation)*; *American Velodur Metal, Inc. v. Schinabeck, 20 Mass. App. 460, 481 N.E.2d 209 (1985) (commencing an action against wife for the purpose of coercing a favorable settlement in a divorce proceeding)*, *cert. denied 475 U.S. 1018, 106 S. Ct. 1204, 89 L. Ed. 2d 318 (1986)*; *Carroll v. Gillespie, 14 Mass. App. 12, 436 N.E.2d 431 (1982) (party initiated criminal complaints without probable cause and with intention to use the criminal process to collect a civil debt)*. See also *Stromberg v. Costello, 456 F. Supp. 848 (D. Mass. 1978) (party's application for a criminal complaint, maliciously, without probable cause, and for the purpose of inducing plaintiff to withdraw his civil action for amounts due would constitute an ulterior purpose)*." *Broadway Management Services Ltd. v. Cullinet Software, Inc., 652 F.Supp. 1501, 1503 (D.Mass. 1987)*.

Having the elements of abuse of process in mind, there is no evidence to establish either 1) the unlawful use of process to accomplish an ulterior purpose or 2) malice. Here, the Healey defendants have used completely legitimate

means – the filing of lawful counterclaims – to accomplish a completely legitimate purpose – the return of monies fraudulently misappropriated by the Zammitos. Evidence of Healey's good faith is found in the Expert Report of Jimmy S. Pappas, CPA, CFE, a Certified Fraud Examiner from the firm of Tofias, P.C., who reports on the results of his forensic audit.  [See, Expert Report of Jimmy S. Pappas, CPA, CFE, Appendix II, Exhibit 32].

According to that forensic audit, the Zammitos have  engaged in a pattern of related racketeering activities by which they improperly siphoned away more than 2.6 million dollars from various businesses they owned or controlled unjustly enriching themselves to the detriment of Healey and other investors.   These activities included the payment of phony management fees to a shell company wholly owned by the Zammito children but which had no employees and provided no "management services;" the payment of salaries for the Zammito children for no-show jobs; and, other acts of misappropriation.  [Pappas Report, Appendix II, Exhibit 32, pp. 3-4].  Acting in concert, the Zammitos accomplished this scheme through mail fraud, acts of embezzlement, theft, tax fraud, extortion and illegal debt collection activities and other illegal conduct.  [Pappas Report, Appendix II, Exhibit 32, pp. 4-8].  They concealed their illegal activities by preparing fraudulent financial statements [Pappas Report, Appendix II, Exhibit 32, pp. 8-10].

"...[N]o Massachusetts case has held that an intention to cause a party to expend substantial time and money to defend against the claims in a suit constitutes an 'ulterior motive.' ... [T]he cases show that 'ulterior motive' is more than the intent to harass; there must be intention to use process for coercion or

harassment to obtain something not properly part of the suit." *Broadway Management Services Ltd. v. Cullinet Software, Inc., 652 F.Supp. 1501, 1503 (D.Mass. 1987).*   "A person's interest against defending groundless actions brought maliciously is protected by the ability to bring an action for tort of malicious prosecution.  A party does not state a claim for abuse of process by alleging mere commencement of litigation to enforce a claim that the person commencing the litigation knows or reasonably should have known to be groundless." *Broadway Management Services Ltd. v. Cullinet Software, Inc., 652 F.Supp. 1501, 1503 (D.Mass. 1987) (citing Beecy v. Pucciarelli, 387 Mass. 589, 596, 441 N.E.2d 1035 (1982)).*

In view of the overwhelming evidence of the Zammito's fraud, it is remarkable, indeed, it is astonishing, that the use of lawful process to recover these monies could be characterized as an abuse of process.  There is simply no evidence to support such allegations.  Accordingly, Count V of the Zammitos' Counterclaim and Third-Party Complaint should be dismissed.

**VIII    Count VII Of The Third-Party Complaint Should Be Dismissed As There Is No Evidence To Establish Liability Under G.L. Chapter 93A**

Count VII of the Zammitos' Counterclaim and Third-Party Complaint is yet another example of vague and careless pleadings which fail to satisfy the requirements of Rule 8(a) and naked, unsubstantial allegations.  In Count VII, the plaintiffs simply incorporate by reference Paragraphs 1 through 71 of their Counterclaim and Third-Party Complaint and allege that "Healey's actions constituted unfair and deceptive practices under Massachusetts General Laws, Chapter 93A".  There is no specific pleading as to which of "Healey's actions"

constitute unfair or deceptive acts. It is, therefore, impossible to know which alleged actions *in particular* allegedly violate Chapter 93A. Are they referring to the preceding breach of contract claim involving Harte Toyota? Norfolk-Bristol Ambulance Services, Inc.? It is simply impossible to tell.

A review of the plaintiff's answers to interrogatories concerning the factual basis of Count VII provides some clues as to the basis for this claim, however, no proof. In responding to Interrogatory No. 12 which seeks the basis for Count VII, the plaintiff incorporates his response to a previous interrogatory in which Zammito alleges that Healey held himself out as an investment advisor; was well paid; and, relying on his advice the Zammitos "lost millions of dollars". While these allegations are familiar, as discussed previously in this memorandum, there is simply no evidence to support them.[6]

Nevertheless, neither a good faith dispute over an amount of money owed nor a simple breach of contract is a sufficient basis as a matter of law for liability under M.G.L., Chapter 93A. *Arthur D. Little, Inc., v. Dooyang Corp., 147 F.3rd 47 (Ist Cir. 1998).* Chapter 93A "requires conduct that reaches a level of rascality that would raise an eyebrow of someone inured to the rough and tumble world of commerce." *Singh v. Blue Cross Blue Shield of Massachusetts, 182 F.Supp. 164, 180 (D.Mass. 2001)(quoting Levings v. Forbes & Wallace, Inc., 8 Mass.App.Ct. 498, 504 (1979).* "The statute does not specifically define 'unfair' or 'deceptive, . . ." but Massachusetts courts have recognized that "[a] practice is

---

[6] As to the allegations that the Zammitos "lost millions of dollars" due to Healey's poor advice, it is worth noting that the Zammitos recently sold their interest in NCPS/NDVS, an investment Healey helped to acquire for approximately 20 million dollars. When it was acquired in 1996, the Zammitos paid 2.1 million dollars.

unfair if it is within the penumbra of some common-law, statutory, or other established concept of unfairness; is immoral, unethical, oppressive, or unscrupulous; and causes substantial injury to other businessmen." *Kenda Corp. v. Pot O'Gold Money Leagues, Inc., 329 F.3d 216, 234 (1st Cir. 2003) quoting Linkage Corp. v. Trustees of Boston Univ., 425 Mass. 1, 679 N.E.2d 191, 209 (Mass. 1997) (modifications and internal quotations omitted)."*

The standard for behavior that falls within the Ch. 93A proscription is notably imprecise, encompassing any actions that "attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce, have an extortionate quality that gives it the rancid flavor of unfairness, or fall within at least the penumbra of some common-law, statutory, or other established concept of unfairness." *St. Paul Fire & Marine Ins. Co. v. Ellis & Ellis, 262 F.3d 53, 66 (1st Cir. 2001) (internal quotations and citations omitted); see also St. Gobain Indus. Ceramics, Inc. v. Wellons, Inc., 246 F.3d 64, 73 (1st Cir. 2001) (noting that Ch. 93A "does not contemplate an overly precise standard of ethical or moral behavior" (quoting Arthur D. Little, Inc. v. Dooyang Corp., 147 F.3d 47, 55 (1st Cir. 1998)); Spencer v. Doyle, 50 Mass. App. Ct. 6, 733 N.E.2d 1082, 1087 (Mass. App. Ct. 2000) (noting that ch. 93A claims are neither wholly contractual or tortious, but "may encompass conduct which amounts to . . . misrepresentation").* Broadly stated, chapter 93A was designed to foster more civilized behavior in the business world. *Continental Ins. Co. v. Bahnan, 216 F.3d 150, 156 (1st Cir. 2000): See, Arthur D. Little, Inc. v. Dooyang*

*Corp., supra; Quaker St. Oil Ref. Corp. v. Garrity Oil Co., 884 F.2d 1510, 1513 (1st Cir. 1989).*

A breach of contract without more, does not violate chapter 93A. See *Whitinsville Plaza, Inc. v. Kotseas, 378 Mass. 85, 100-01, 390 N.E.2d 243, 251 (1979); Pepsi-Cola Metro. Bottling Co. v. Checkers, Inc., 754 F.2d 10, 18 (1st Cir. 1985).* Moreover, a mere non-payment of debt does not normally constitute a chapter 93A violation. See *Quaker State Oil Refining Corp. v. Garrity Oil Co., 884 F.2d 1510, 1513-14 (1st Cir. 1989) (affirming district court's decision which granted summary judgment sua sponte because refusal to pay invoice and debt on promissory notes without more was not sufficient to constitute a 93A violation).* "Where there is a good faith dispute over whether payment is actually owed, and that dispute is clearly articulated, it also appears that there is not Chapter 93A liability." *Callahan v. Harvest Bd. Int'l, Inc., 138 F.Supp.2d 147, 166-67 (D.Mass. 2001)(citations omitted).*

Admittedly, an intentional breach of contract intended to secure benefits for the breaching party can constitute a Chapter 93A violation. See *Anthony's Pier Four, Inc. v. HBC Assoc., 411 Mass. 451, 474, 583 N.E.2d 806, 821 (1991) ("conduct that is in disregard of known contractual arrangements and intended to secure benefits for the breaching party constitutes an unfair act or practice for ch. 93A purposes") (citation omitted).* However, this breach of contract must also have an "extortionate quality that gives it the rancid flavor of unfairness." *Atkinson v. Rosenthal, 33 Mass. App. Ct. 219, 226, 598 N.E.2d 666, 670 (1992); Pepsi Cola Metro. Bottling, 754 F.2d at 17-19 (Chapter 93A violation found where*

*payment withheld as a wedge to enhance bargaining power)*; *Arthur D. Little, Inc., 147 F.3d at 55-56 (court found 93A liability where defendants "wrongful purpose was to extract a favorable settlement from [plaintiff] for less than the amount defendant knew it owned by repeatedly promising to pay, not doing so, stringing out the process, and forcing [plaintiff] to sue"); Community Builders, Inc. v. Indian Motorcycle Assoc., Inc., 44 Mass. App. Ct. 537, 559, 692 N.E.2d 964, 978-79 (1998) (where defendant engaged in willful effort to impair plaintiff's right to be paid under contract and when defendant could have made necessary payments but through foot-dragging to put pressure on plaintiff to compromise its claims, court found that defendant's conduct amounted to more than mere nonpayment of debt)*. No such factors can be found here.

The 93A claim must fail for the additional reason that the plaintiff has failed to claim an injury apart from that caused by the alleged breach of contract and has failed to demonstrate a "loss of money or property" as required by chapter 93A. *See, Mass. Gen. Laws. Ch. 93A, § 11. See also Lyle, 132 F.3d at 114-15 (loss of money must stem from deceptive act).* Plaintiff does not allege any damage separate and apart from the breach of contract claim. Callahan's attempt to convert her breach of contract claim to a 93A action should fail. *See, Mass. Sch. of Law, 142 F.3d at 41-43 (letter transmitting alleged misinformation does not rise to level of 93A claim); Lyle, 132 F.3d at 114-15 (backdated termination letter does not state a claim under Ch. 93A, at most a breach of contract claim asserted).* Thus, except for vague and conclusory allegations there is no evidence that would support a Chapter 93A claim and to the extent

that the plaintiff is referring to allegations involving breach of contract in the preceding counts, there is insufficient evidence for liability as a matter of law. Accordingly, Count VII must also be dismissed.

## Prayer For Relief

**WHEREFORE**, for all of the foregoing reasons, Counts I through VIII (sic) of the Third-Party Complaint should be dismissed.

Respectfully submitted;

THE COUNTERCLAIM DEFENDANT

By his attorneys:

Stephen J. Lyons
(BBO#309840)
KLIEMAN, LYONS, SCHINDLER
 & GROSS
21 Custom House Street
Boston MA 02110
Telephone: 617.443.1000

Dated: June 6, 2005

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document together with the supporting Appendices were served upon the attorney of record for each other party by hand on June 6, 2005.

Stephen J. Lyons, Esq.