## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 04-10161-REK

| | |
|---|---|
| ROBERT J. ZAMMITO, JR., | ) |
| PAUL M. ZAMMITO, | ) |
| CHRISTOPHER ZAMMITO and | ) |
| VALARIE A. MORDINI, | ) |
| Plaintiffs | ) |
| v. | ) |
| HARRY W. HEALEY, JR., GRANTOR TRUST | ) |
| and PETER W. HEALEY, as Trustee of | ) |
| HARRY W. HEALEY, JR., GRANTOR TRUST, | ) |
| Defendants | ) |
| | ) |
| HARRY W. HEALEY, JR., individually, and as | ) |
| Trustee of THE HUNTINGTON FORBES | ) |
| CHARITABLE REMAINDER TRUST, | ) |
| HUNTINGTON FORBES, LTD., | ) |
| STANTON CUMMINGS, LTD., | ) |
| PETER W. HEALEY, as Trustee of | ) |
| THE HEALEY GRANDCHILDREN'S TRUST – II, | ) |
| Third-Party Plaintiffs, | ) |
| Third-Party Defendants in Counterclaim | ) |
| v. | ) |
| ROBERT J. ZAMMITO, SR., | ) |
| VALERIE L. ZAMMITO, | ) |
| ASA HOLDINGS, INC., and | ) |
| ASA HOLDINGS LP, | ) |
| Third-Party Defendants, | ) |
| Third-Party Plaintiffs in Counterclaim, | ) |
| and | ) |
| Third-Party Plaintiffs, | ) |
| v. | ) |
| JOHN A. MALLOY, III and | ) |
| WILLIAM R. HEALEY, | ) |
| Third-Party Defendants | ) |
| | ) |
| MELLON BANK | ) |
| (a/k/a Mellon Trust of New England), | ) |
| Bank Trustee. | ) |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS AND THIRD-PARTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## **BACKGROUND**[1]

In 1975, Robert J. Zammito, Sr. started the ambulance company known as

Norfolk-Bristol County Ambulance Service (the "Company") based in Foxborough and

Mansfield, Massachusetts. The Company was very successful and grew rapidly. Mr.

Zammito's wife, Valerie L. Zammito, also was involved in the management of the

Company. As their children grew older they, too, each actively worked for the Company.

From the very beginning, the business plan was to grow through strategic

acquisitions. The Company expanded geographically in a way that permitted a smooth

integration of operations. Within the first year, the Company acquired Colonial

Ambulance Company. By the end of the 1970s, it had also acquired Hayward

Ambulance Company, which was based in Middleboro, Massachusetts.

Norfolk-Bristol continued to flourish, and during the 1980s it acquired two more

ambulance companies, known as Commonwealth Ambulance and Beemis. During the

1989-1990 timeframe, the Company expanded the business yet again by the acquisition

of Stavis Ambulance Company.

By 1991, Norfolk-Bristol Ambulance was extremely successful, it had continued

to grow strategically, and was poised for further acquisition opportunities. The basic

business operations were fairly straight-forward. In the beginning, the Company

primarily transported patients for routine medical appointments; it later expanded into

emergency transfer services. The billing procedures, however, were complex and

cumbersome. The federal government, under the Medicare Part B Program, covered the

transportation costs through an elaborate regulatory labyrinth involving the Health Care

---

[1] The "Background" section was drawn in part from the Affidavit of Robert J. Zammito, Sr. filed on April 16, 2004.

2

Financing Administration ("HCFA"), now known as the Centers for Medicare and Medicaid Services. The HCFA, in turn, assigned to private insurance carriers the task of processing and paying Part B claims from the Medicare Trust Fund. With most of the Company's revenues flowing through this billing system (hereafter "Third-Party Billing"), appropriate and efficient billing procedures became the Company's biggest difficulty.

## Healey Hired As Financial Controls Consultant
## 1991-1995

By approximately 1991, the Company had an existing banking relationship with John A. Malloy, III, who had been employed by U.S. Trust. Mr. Zammito met Mr. Malloy in his capacity as a banker who had done business with the Company. Mr. Malloy told Mr. Zammito that the Company needed to improve its financial controls, and that he knew someone who could help. Mr. Malloy then introduced Mr. Zammito to Harry W. Healey, Jr. Unbeknownst to Mr. Zammito at that time, Healey and Malloy enjoyed a longstanding personal and business relationship. Although Norfolk-Bristol's business was flourishing, the Company was looking for assistance with its billing systems. Annual revenues were in the tens of millions of dollars and the Company had in excess of twenty people working in the billing department. Mr. Healey represented to Mr. Zammito that his company, Huntington-Forbes, Ltd., had expertise dealing with Third-Party Billing practices and that he could help manage the billing systems. Healey further represented that he had been Chairman of the Board of South Shore Hospital and was knowledgeable about the billing requirements.

Relying on these representations, Norfolk-Bristol hired Mr. Healey's company as a consultant to advise the Company on its financial controls. Based upon Mr. Healey's

3

professed expertise, Norfolk-Bristol agreed to pay Huntington-Forbes $10,000 per month for his services. After a review of the Company's billing systems, Mr. Healey made recommendations with regard to the Company's billing systems. The Company followed Mr. Healey's recommendations on these matters.

Meanwhile, the Company continued to grow and Mr. Zammito identified potential new acquisitions. In approximately 1992, Mr. Zammito and Robert J. Zammito, Jr., commenced discussions about acquiring Worcester-Himmer Ambulance Company. During the same time, Healey sought to expand his role as consultant to Norfolk-Bristol. Mr. Zammito agreed to the continuation of the relationship and included Mr. Healey on the team involved with the acquisition. Typically, Mr. Zammito alone worked with the Company's accountants and lawyers on the transactions. Healey now became involved in the process.

Mr. Zammito next identified Charter Ambulance Company as another acquisition target, and commenced negotiations for its acquisition. Healey again participated as part of the team on the Charter acquisition.

Healey was not responsible for identifying either the Worcester-Himmer or Charter acquisitions. His involvement began only after the initial decision for acquisition had made by Mr. Zammito.

By the early 1990s, Norfolk-Bristol had changed its name to Ambulance Systems of America, Inc. (ASA-Inc.), and had acquired a total of seven other ambulance companies. Of the seven acquisitions, Healey participated only in the last two. By the mid 1990s, Mr. Zammito had identified Chaulk Ambulance as a potential partner for a merger. Healey became aware of the interest. At this time Mr. Zammito and his wife,

4

Valerie L. Zammito, owned approximately sixty (60%) percent of the combined

companies, and their four children collectively owned approximately forty (40%) percent.

## Healey Learns Of Chaulk Merger Deal
### 1994-1995

After learning of the potential merger deal with Chaulk, Healey approached Mr.

Zammito and requested that he be given a ten (10%) percent interest in ASA should the

merger take place. On behalf of ASA, Inc., Mr. Zammito agreed. In January 1995, ASA

and Chaulk merged and retained the ASA name. After the merger, Mr. Zammito and his

wife, Valerie L. Zammito, owned approximately twenty-four (24%) percent of the

merged Company and their four children collectively owned approximately sixteen

(16%) percent. Healey was given an interest in the Company equal to approximately five

(5%) percent. As part of the agreement for merger, former executives of Chaulk became

President, Chief Executive Officer, and Chief Financial Officer. Robert J. Zammito, Jr.

became Vice President. Neither Mr. Zammito nor Mrs. Zammito remained actively

involved in the Company on a regular basis.

## ASA Sold
### 1995

Approximately ten months later, ASA was acquired by American Medical

Response, Inc. for approximately ninety million ($90,000,000) dollars. At the time of the

acquisition by AMR, there was an escrow account established in the amount of eleven

million, two hundred fifty thousand ($11,250,000) dollars to cover contingent liabilities.

Healey was one of three stockholder representatives under the escrow agreement.

During 1996, two former ASA employees began a qui tam action that led the

office of the U.S. Attorney to begin an investigation into the billing practices of ASA and

several of its predecessor corporations. In approximately June 2002, AMR entered into a settlement agreement with the U.S. Attorneys Office to resolve the investigation into billing irregularities. As part of the settlement, approximately eight million five hundred thousand ($8,500,000) dollars of the ASA escrow was paid to the government. The settlement was reached without any finding of fraud or admission of liability by ASA.

As a result of the settlement, Mr. and Mrs. Zammito and their four children received approximately three million eight hundred thousand ($3,800,000) dollars less from the escrow fund than they otherwise would have received. The alleged billing irregularities that caused the loss of this money occurred during the years that Healey was paid to advise the Company on its billing systems.

## Healey Hired As Investment Advisor
## 1996-2002

After the sale of AMR, ASA Holdings LP ("ASA Holdings"), a Massachusetts limited partnership, was established and funded by the four Zammito children. The purpose of ASA Holdings was for each child to contribute towards a pool of money that would be used for investment purposes. The idea behind ASA Holdings was for the children to have a fund available to invest in business opportunities. The plan was for the children to establish a "holding company" entity and invest equally together, while actively participating in the management of their investments.

Healey approached Mr. Zammito about continuing a professional relationship in which he would serve as investment advisor to the children and Mr. Zammito. Healey stated that within several years their money would multiply several times over. He proposed that the children should utilize their ASA Holdings investment fund to invest in businesses that they would actively participate in managing, then sell their interests

6

within three to five years. ASA Holdings agreed to hire Healey as its investment advisor and paid him a monthly fee of ten thousand ($10,000) dollars from 1996 through 2002. Mr. Zammito never told Healey that he would have an option, with no time limit, to acquire a one-sixth interest in any of the ASA Holdings investments.

Healey admits that he was never a registered investment advisor, licensed to provide investment advice. Nonetheless, he served as the primary investment advisor to the family and advised the children to invest in National Check Protection Service, Inc./National Data Verification Service, Inc. (1996), Fleet Environmental Services, LLC (1996), Colornet Graphics, LLC (1999), Skyways Communications LLC (1999), and New England Roll-Off, LLC (2000). While being paid through the Zammito children's management company, he also advised Mr. Zammito, Sr. regarding his purchase of Harte Toyota of Dartmouth (2000). The children sold to the Harry W. Healey Grantor Trust a percentage of their stock in NCPS/NDVS. Rather than pay for the stock with cash, the Grantor Trust issued promissory notes in partial consideration for the interest. The children similarly sold a percentage of their interest in Fleet Environmental Services to Harry W. Healey, Jr., individually. Mr. Healey paid for the interest in Fleet by issuing promissory notes. The children have lost millions of dollars on their investments in Colornet, Skyways, and New England Roll-Off.

In the fall of 2002, Harry Healey ended his relationship as the family's investment advisor. But from 1996 until he left, Mr. Healey was involved in virtually every significant decision made by the children with regard to their investments, and the operation of the various companies. He was the driving force behind the establishment of

the various corporate structures, including the use of a management company to pay the salaries and expenses of the Zammito children and himself.

At the time of his departure, Healey informed Mr. Zammito that he was entitled to approximately $250,000 for commissions, excluding his obligations under the promissory notes. Healey then raised the figure to $500,000. The notes were due on or before October 31, 2003. The principal amount owed on the NCPS/NDVS notes is $150,000; and the principal amount owed on the Fleet notes is $100,000. No interest has ever been paid on any of the notes.

The Grantor Trust and Healey defaulted on the notes. It was after the Zammito children sought to collect on the notes that Defendants raised for the first time the various claims that are the subject of the Counterclaim and Third-Party Complaint. By re-writing the history of the relationship between the parties, and displaying a shameless ability to verify inconsistent facts, Defendants have turned a disagreement over a settlement of their affairs into a shareholder dispute, and then deployed "the litigation equivalent of a thermonuclear device"[2]– a civil RICO claim. Defendants launched a series of improbable allegations against the Zammitos. A self-described "bunch of hicks with close to $50 million dollars who couldn't balance a checkbook,"[3] and who had listened to Healey "ninety-nine percent of the times,"[4] are now accused of masterminding a racketeering scheme. As set forth in greater detail below, the only thing more improbable than the allegations against the Zammitos is the precarious legal foundation upon which

_____

[2] Miranda v. Ponce Fed. Bank, 948 F.2d 41, 44 (1st Cir. 1991).

[3] *See Mitchelson Aff. at Ex. B (11/11/04 Robert J. Zammito, Sr. Depo at 176:13-20).*

[4] *Id. at 296:4-7.*

8

they are based. The Zammitos demonstrate in their memorandum that 40 of the 45
counts alleged have no basis in law or fact.

## ARGUMENT AND AUTHORITIES

Summary judgment has a special niche in civil litigation. Its "role is to pierce the
boilerplate of the pleadings and assay the parties' proof in order to determine whether
trial is actually required." Wynne v. Tufts Univ. Sch. Of Med., 976 F.2d 791, 794 (1st
Cir.1992), *cert. denied* 507 U.S. 1030, 113 S.Ct. 1845, 113 S.Ct. 1845 (1993). The
device allows courts and litigants to avoid full-blown trials in unwinnable cases, thus
conserving the parties' time and money, and permitting courts to husband scarce judicial
resources. *Id.*

It is well known that a court may grant summary judgment "if the pleadings,
depositions, answers to interrogatories, and admissions on file, together with the
affidavits, if any, show that there is no genuine issue as to any material fact and that the
moving party is entitled to a judgment as a matter of law." *Fed.R.Civ.P.56(c).* Once a
properly documented motion has engaged the gears of Rule 56, the party to whom the
motion is directed can shut down the machinery only by showing that a trialworthy issue
exists. National Amusements v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995).

Not every factual dispute is sufficient to thwart summary judgment; the contested
fact must be "material" and the dispute over it must be "genuine." In this regard,
"material" means that a contested fact has the potential to change the outcome of the suit
under the governing law if the dispute over it is resolved favorably to the nonmovant.
United States v. One Parcel of Real Property with Buildings, 960 F.2d 200, 204 (1st

9

Cir.1992). By like token, "genuine" means that "the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party …." *Id.*

The summary judgment standard requires the trial court to make an essentially legal determination rather than to engage in differential fact-finding. McCarthy v. Northwest Airlines, Inc., 56 F.3d 313, 314-15 (1st Cir. 1995). The following demonstrates that summary judgment is appropriate for forty of the forty-five counts in the Counterclaim and Third Party Complaint.

### I. THE ZAMMITO CHILDREN ARE ENTITLED TO JUDGMENT AGAINST THE GRANTOR TRUST ON THE NOTES.

The Complaint
(Counts I-VIII)

The four Zammito children have moved for summary judgment against the Harry W. Healey Jr. Grantor Trust on Counts I –VIII of the Complaint. The Grantor Trust issued four recourse and four non-recourse promissory notes ("Notes") to each of the Zammito children in partial consideration for the interest in NCPS/NDVS that they sold to the Trust. Under Massachusetts law, once the holder of a note produces the note and proves the maker's signature, the maker has the burden of proving a defense to payment. *G.L. c. 106, §3-308(b)*; *see also* Coupounas v. Madden, 401 Mass. 125, 129, 514 N.E.2d 1316 (1987) (once a note holder establishes its *prima facie* case, it is incumbent upon the maker to prove the existence of a defense by a preponderance of the evidence). In their Complaint, the Zammitos alleged all of the elements necessary to establish the Grantor Trust's liability under the Notes. *See* Community National Bank v. Dawes, 369 Mass. 550, 558, 340 N.E.2d 877 (1976) (bank established its *prima facie* case by showing that defendant executed the note and defaulted in payment).

10

In its Answer, Peter W. Healey, the Trustee of the Grantor Trust, admitted (or
failed to deny) that 1.) he executed the Notes on or about October 31, 1999. *Answer at ¶
8 and 14;* 2.) the Notes were due and payable on October 31, 2003. *Answer at ¶ 12 and
17; and* 3.) he did not pay the Notes when they came due but "they have at all times been
and remain ready, willing and able to satisfy their obligations under the [Notes]." See,
*e.g., Answer at ¶ 20.*

Under the Uniform Commercial Code, once the signature is admitted and the
promissory note is produced, the holder is entitled to recover unless the defendant
establishes a valid defense or claim in recoupment. *G.L. c. 106, §3-308(b).* The Code
delineates the following specific defenses to a promissory note: infancy of the obligor,
duress, lack of legal capacity, illegality of the transaction, fraud that induced the obligor
to sign the instrument, and discharge of the obligation. *G.L. c. 106, §3-305(a)(1).* An
obligor may also raise a claim in recoupment but only if the claim arose from the
transaction that gave rise to the instrument. *G.L. c. 106, §3-305(a)(3).* The Grantor Trust
failed to assert any of the foregoing defenses in its Answer.

There is only one other defense category that a maker of a promissory note may
raise. Pursuant to § 3-305(a)(2) of the Code, an obligor may claim any defense "that
would be available if the person entitled to enforce the instrument were enforcing a right
to payment under a simple contract." *G.L. c. 106, §3-305(a)(2).* While many defenses
exist to a "simple contract,"[5] the Grantor Trust only raised one: that it was relieved of its
obligations under the Notes because of the Zammitos' "improper accounting and

---

[5] Volume 17 of Massachusetts Practice cites to nearly 40 affirmative defenses that one would have to a
simple contract. These defenses range from accord and satisfaction to insanity. *See 17 Mass. Practice §
2.44- 2.88 (1997).*

11

management practices, self-dealing, wasting of corporate assets, failure to observe corporate formalities, and other irregularities." *See, e.g., Answer at ¶ 20.* The Grantor Trust claims these activities amounted to fraud and excused its obligations to perform under the Notes. When alleging fraud in the context of a "simple contract," a party must demonstrate that fraudulent misrepresentations were a "material inducement or influence" in the decision to sign the contract. Vye v. McKenney, 266 Mass. 573, 577, 165 N.E. 665 (1929). Peter W. Healey has testified that he never spoke with any of the Zammito children prior to executing the Notes. *See Mitchelson Aff. at Ex. D (Deposition of Peter W. Healey at 16:5-10).* Moreover, only Harry W. Healey, Jr. was present when Peter Healey executed the Notes on behalf of the Grantor Trust. *Id. at 16:11-14.* Because he never spoke to the Zammito children prior to or during the execution of the Notes, Peter Healey does not, and indeed cannot, claim that they induced or influenced him. The Grantor Trust has thus failed properly to allege fraud as a defense. With no other recognized defense asserted, and the Zammito Children's *prima facie* case for recovery under the Notes admitted, judgment should enter in their favor pursuant to Counts I-VIII of the Complaint.

## II. THE HEALEY DEFENDANTS HAVE FAILED TO PLEAD FRAUD WITH THE PARTICULARITY REQUIRED BY RULE 9(b).

(Counts II, XI, XVII, XXIV, XXXI and XVIII)

Valerie L. Zammito, Robert J. Zammito, Jr., Paul M. Zammito, Christopher Zammito, and Valarie A. Mordini have moved for summary judgment on Counts II, XI, XVII, XXIV, XXXI and XVIIII of the Defendants' Counterclaim and Third-Party Complaint. Although not defendants in the Complaint, Harry W. Healey, Jr., individually, and as Trustee of the Huntington Forbes Charitable Remainder Trust;

Huntington Forbes, Ltd.; Stanton Cummings, Ltd.; and Peter W. Healey, as Trustee of The Healey Grandchildren's Trust – II all joined in filing the "Defendants' Answer, Counterclaim and Third Party Complaint." They are referred to herein as the "Healey Defendants." In addition to claiming fraud as a defense to the Notes, the Healey Defendants have alleged common law fraud against each of the Zammitos.

To prove fraud, the Healey Defendants must demonstrate that 1.) each of the Zammitos made a false representation; 2.) of a material fact; 3.) with knowledge of its falsity; 4.) for the purpose of inducing Defendants to act on those false representations; and 5.) the Defendants relied on the representations as true and acted upon those false representations of material facts to their damage. Goldman v. Barnett, 793 F.Supp. 28, 31 (D. Mass. 1992). In addition to establishing its *prima facie* case of fraud, the Defendants must also adhere to the specified pleading requirements of Fed.R.Civ.P. 9(b). In all averments of fraud, "the circumstances constituting fraud or mistake shall be stated with particularity." *Fed.R.Civ.P. 9(b).* The purpose of Rule 9(b)'s heightened pleading requirement is to "prevent a plaintiff from filing first and searching for a cause of action later." In re Receivership Estate of Indian Motorcycle Manuf., Inc., 299 B.R. 36, 44 (D. Mass. 2003). To comply with Rule 9(b), Defendants must specify "(1) the allegedly fraudulent statements; (2) the identity of the speaker; (3) where and when the statements were made; and (4) why the statements were fraudulent." Id. at 44. The Defendants fail to meet their burden. "Defendants' Answer, Counterclaim and Third Party Complaint" contains numerous allegations of corporate malfeasance on the part of the Zammitos. The pleadings fail to identify, however, any *misrepresentations* the Zammitos made to the Defendants that satisfy Rule 9(b). In simply making vague and conclusory

13

allegations the Defendants' fail to identify "the who, what, where and when of the allegedly false or fraudulent representation" as required by the Rule 9(b). Rodi v. Southern New England School of Law, 389 F.3d 5, 15 (1st Cir. 2004). Consequently Defendants' fraud claims in the Counterclaim and Third-Party complaint fail as a matter of law against all but Robert J. Zammito, Sr.

### i. Valarie Mordini
### (Count XXXVIII)

Although the Defendants allege that Valarie Mordini made "misrepresentations of material fact" to them (*Counterclaim and Third Party Complaint at ¶ 340),* the circumstances are not stated with any particularity. Despite having nearly two years, and ample opportunity, to recall or discover any fraudulent misrepresentation Valarie Mordini might have made to them, Defendants simply failed so to do. The allegation of fraud against Valerie Mordini is that she is a fractional owner of RPCV, LLC, and as such remains a residual beneficiary of payments made to RPCV. *See Mitchelson Aff. at Ex. A (11/30/04 Healey Depo at 107:13-24).* The Defendants' failure to put forth any misrepresentations that Valarie made to them, or how any statement she made might have induced them in any way to act against their interests, is fatal to the claim of fraud. Count XXXVIII of the Counterclaim and Third Party Complaint fails as a matter of law, and the Court should enter judgment in favor of Ms. Mordini on Count XXXVIII.

### ii. Paul M. Zammito and Christopher Zammito
### (Counts XXIV, XXXI)

Because Defendants have again failed to satisfy the requirements of Rule 9(b), the claim against the two brothers can be examined together. Nowhere in the Counterclaim and Third-Party Complaint do the Defendants identify any representation to them made

14

by either Paul M. Zammito or Christopher Zammito. Nor do any affidavits or other documents identify any statements - let alone fraudulent ones - that these brothers made to the Healey Defendants. Just as with Valarie Mordini, the Defendants simply contend that Paul Zammito's and Christopher Zammito's ownership in RPCV, LLC amounts to fraud. *See e.g. Mitchelson Aff. at Ex. A (11/30/04 Healey Depo at 103:11-104:2); see also Id. at 104:5-16.* These bare, conclusory allegations of fraud are not legally sufficient to comply with Rule 9(b). Counts XXIV and XXXI of the Counterclaim and Third-Party Complaint fail as a matter of law, and the court should enter judgment in favor of Paul M. Zammito and Christopher Zammito.

### iii. Robert J. Zammito, Jr.
### (Count XVII)

The Defendants at least attempt to identify the particular circumstances of an alleged misrepresentation against Robert J. Zammito, Jr. At his deposition, Harry W. Healey Jr. testified that the September 2002 letter from Robert Zammito, Jr. to Healey and other owners of Fleet Environmental Services, LLC, that was sent on Fleet letterhead,[6] constituted fraud. *See Mitchelson Aff. at Ex. A (11/30/04 Healey Depo at 100:2-13).* The problem, however, is that Defendants fail to identify what was fraudulent about the letter or how the Defendants relied on these statements to their detriment. Indeed, Harry Healey's own handwritten note, dated the day after the letter, shows that Robert Zammito, Jr. allegedly advised him *prior to sending the letter* that he did not expect Healey to provide Fleet with a capital influx. *See Mitchelson Aff at Ex. E.* There was no fraud, no inducement, and no damage resulting from this letter. Defendants

---

[6] See Mitchelson Aff. at Exhibit U.

15

again have failed to allege fraud with sufficient particularity. Count XVII therefore also fails as a matter of law, and judgment should enter in favor of Robert J. Zammito, Jr.

### iv. Valerie L. Zammito.
### (Count XI)

Defendants claim that "in carrying out the activities described herein, Valerie Zammito made misrepresentations as to material fact to" [the Healey Defendants]. *Counterclaim and Third Party Complaint at ¶ 192.* The 191 paragraphs leading up to this allegation do not, however, identify any misrepresentations Mrs. Zammito made to anyone. Other than identifying her as a defendant in ¶ 14 of the Counterclaim and Third-Party Complaint, there is no other mention of Mrs. Zammito until the litany of baseless claims against her begins at ¶ 182. The failure, once again, to adhere to the requirements of Fed.R.Civ.P 9(b) is fatal to the fraud claim. The reason for Defendants failure to plead fraud against Mrs. Zammito with particularity is quite simple: *she never made any misrepresentations to the Defendants.* Indeed, during his deposition Harry Healey mentioned Mrs. Zammito only once. When asked if he could describe any specific fact with regard to the fraud claim against Mrs. Zammito, Healey could only respond that she "faxed me the financial statement from her home." *See Mitchelson Aff. at Ex. A (11/30/04 Healey Depo at 99:9-19).* Plaintiffs have produced tens of thousands of pages of documents in discovery, answered written interrogatories and given deposition testimony. Yet all the Healey Defendants can muster to support their fraud claim against Mrs. Zammito is that a financial statement that they claim was somehow fraudulent was faxed from the machine at her home. There is no evidence that Mrs. Zammito actually faxed this financial statement, let alone any detailed allegation of why the financial

16

statement was fraudulent. This fraud claim is insufficient under both Rule 9(b) and the caselaw set forth above. Judgment should enter in favor of Mrs. Zammito on Count XI.

### III.    HEALEY'S CONTRACT CLAIMS ARE VOID AS A MATTER OF LAW UNDER THE STATUTE OF FRAUDS.

Count IV alleges breach of an oral contract against Robert J. Zammito, Sr. Count V contains a claim for breach of the implied covenant of good faith and fair dealing with regard to the alleged oral contract. Neither claim has merit. Healey claims that "during the winter months of 1995-96" he and Robert J. Zammito, Sr. entered into an oral agreement with the following terms: 1.) a monthly consulting fee of $5,000 that would increase to $10,000 after two investment acquisitions had been completed; 2.) a ten percent commission for each completed investment; and 3.) an option to purchase (with no time limit) up to one-sixth of the Mr. Zammito's investment at his investment cost. *Counterclaim and Third- Party Complaint at ¶ 47.* All parties involved acknowledge that the foregoing "agreement" was never memorialized in writing. *See Mitchelson Aff. at Ex. A (11/30/04 Healey Depo at 129:3-20); see also Id. at Ex. B (11/12/04 Senior Depo at 332:19-21).* As set forth below, Healey's claim to an oral agreement fails as a matter of law. Because the oral contract is void, Robert J. Zammito, Sr. cannot be in breach of the agreement.

### A.    The alleged oral agreement for a commission violates the Statute of Frauds.

Chapter 259, § 7 of the General Laws states in relevant part:

**Any agreement to pay compensation for service**
as a broker or finder or for service rendered in
negotiating a loan or **in negotiating the purchase,
sale or exchange of a business**, its good will,
inventory, fixtures, or an interest therein, including
a majority of voting interest in a corporation, **shall
be void and unenforceable unless such
agreement is in writing, signed by the party to be
charged therewith, or by some other person
authorized.** For the purpose of this section, the
term "negotiating" shall include identifying
prospective parties, providing information
concerning prospective parties, procuring an
introduction to a party to the transaction or assisting
in the negotiation or consummation of the
transaction. The provisions of this section shall
apply to a contract implied in fact or in law to pay
reasonable compensation but shall not apply to a
contract to pay compensation for professional
services of an attorney-at-law or a licensed real
estate broker or real estate salesman acting in their
professional capacity. *G.L. c. 259, § 7 (emphasis
added)*.

The legislative purpose of section 7 is "to discourage claims for commission based on

conversations which persons heard differently or remembered differently." Alexander v.

Berman, 29 Mass.App.Ct. 458, 462, 560 N.E.2d 1295 (1990). Healey's claims are a

textbook example of the evils addressed by the Statute of Frauds.

Healey has made numerous allegations under oath. In the Counterclaim and

Third-Party Complaint, his initial affidavit, his first response to interrogatories, and his

deposition, Healey clearly states that his alleged oral agreement with Mr. Zammito, Sr.

contained a provision for payment of a "commission." In Count XLVI of his

Counterclaim, Healey itemizes "commission due." *Counterclaim and Third-Party

Complaint at ¶ 377.* Healey repeats his itemized "Commissions due" in his responses to

the Zammitos' interrogatories. *See Mitchelson Aff. at Ex P (Supplemental Answers of*

18

*Harry W. Healey, Jr. to Plaintiffs First Set of Interrogatories at p. 7).* It is not simply Healey's choice of the word "commission" that renders his claim void. Healey's testimony, read against the language of section 7, establishes unequivocally that his alleged oral agreement for a commission is void under the Statute of Frauds. At his deposition, Healey admitted:

- His agreement for a commission was not in writing, signed by the party to be charged therewith. *See Mitchelson Aff. at Ex. A (11/29/04 Healey Depo at 126:3-4 and 129:3-20);*

- The commission was for "negotiating the purchase of" the Zammitos acquisition of companies. *Id. at 139:6-13.*

- Healey's "negotiating" included the following:
    - "Identifying the prospective parties". *Id. at 144:5-145:9;*
    - "Providing information concerning prospective parties". *Id.;* and
    - "Negotiating the transaction". *Id.*

Healey's testimony matches the language of section 7 virtually verbatim. There is no doubt that his claim to an oral commission agreement is proscribed by this section, thus rendering any such agreement "void and unenforceable." Nonetheless, upon realizing in March 2005, that chapter 259, § 7 rendered his oral contract void and unenforceable, Healey immediately sought to recast his claim.

According to his most recent affidavit, the 10% he claims to be owed for negotiating the purchase of various businesses is no longer a commission, but instead a "bonus." Healey's mendacity in submitting affidavits is appalling. In his original affidavit, signed under the pains and penalties of perjury on January 22, 2004, Healey

19

swears that his oral agreement with the Zammitos included a "ten percent commission for each completed investment." *See ¶ 49.* After learning that the Statute of Frauds bars an oral commission agreement, Healey changed his sworn testimony. In a subsequent affidavit signed under the pains and penalties of perjury on April 14, 2005, Healey now claims that the "ten percent commission" is instead a "bonus." In addition, Healey now alleges that there is, in fact, a writing that memorializes his commission agreement with the Mr. Zammito, Sr. These "writings" do not, however, satisfy the Statute of Frauds.

**B.     The "writings" Healey now claims memorialize his commission agreement are insufficient because they were not signed by an authorized person and, in any event, these writings demonstrate that there was never a "meeting of the minds" as to the terms of the oral contract.**

      i.    Kevin Martin was not a person authorized to bind Mr. Zammito, Sr. to an oral contract with Healey.

Healey claims that certain letters he received from Kevin P. Martin memorialized the commission agreement. *See Mitchelson Aff. at Ex. A (11/29/04 Healey Depo at 130:10-135:3).* To survive under the Statute of Frauds, Healey must demonstrate that Martin had authority to sign for Mr. Zammito, Sr., and these writings establish a "meeting of the minds" as to the terms of the agreement. Healey can prove neither. It is also Healey who has the burden of showing that Martin had authority to sign a writing on Zammito's behalf. Gordon v. O'Brien, 320 Mass. 739, 741, 71 N.E.2d 221 (1947). In Gordon, the Supreme Judicial Court held that neither the existence of a longstanding relationship nor the fact that Martin may have signed on another's behalf in other instances is sufficient to establish agency. Id. Contrary to the holding in Gordon, Healey relies solely on the claim that Martin's role as the "Zammito's accountant"[7] is sufficient

---

[7] *See e.g. Counterclaim and Third Party Complaint at ¶ 99.*

to establish that Martin was authorized to create and execute a "writing" on Mr.
Zammito's behalf. Their longstanding relationship is not denied. *See, e.g., Mitchelson
Aff. at Ex. B (11/12/04 Senior Depo at 297:18-298:3); see also Id. at Ex. F (3/15/05
Deposition of Kevin P. Martin [hereinafter "Martin Depo] at 77:14-78:2).* Healey
misses the point because a longstanding relationship alone is insufficient to establish that
Martin was a person authorized to bind Mr. Zammito to an oral contract with Healey.
*See* Gordon, *supra.*

Moreover, Martin's testimony refutes any attempt to establish that he was
authorized to act on Mr. Zammito's behalf in dealing with Healey. Martin testified at his
deposition that his exchange of correspondence with Healey and his son, Bob Healey,
was "not necessarily resolving anything so much as coming up with the accounting so
that the parties could resolve or do whatever they're going to do." *See Mitchelson Aff. at
Ex. F (Martin Depo at 105:21-24).* Martin further testified that Bob Healey and he were
just "two accountants . . . trying to get numbers on a piece of paper to see if there's an
agreement." *Id. at Martin Depo at 104:6-8.* Clearly, Martin himself did not believe he
was acting on Mr. Zammito's behalf for purposes of entering into an oral contract. Nor
did Bob Healey ever testify that he was authorized to enter into an oral contract on behalf
of his father. But in a disturbing and rather bizarre development, Bob Healey refused at
his deposition to discuss the nature of his conversations with Harry Healey, asserting the
attorney-client privilege.[8] Bob Healey, a partner at the accounting firm Ernst & Young,[9]
never disclosed to Martin – or anyone else involved – that he was acting as an attorney.

_____

[8] *See Mitchelson Aff. at Ex.G (12/2/04 Deposition of Robert C. Healey at 12:12-24).*

[9] *See Mitchelson Aff. at Ex.G (12/2/04 Deposition of Robert C. Healey at 5:21-6:8).*

Martin was led to believe that he and Bob Healey simply were trying to understand the accounting on various transactions. In any event, the Healey Defendants have failed to establish that Martin was a "person authorized" within the meaning of the Statute of Frauds.

            ii.    The writings Healey relies upon do not establish an agreement was reached on the material terms.

Notwithstanding the above, there are no circumstances under which Martin's correspondence reasonably could be considered a writing that memorialized the oral commission agreement. A memorandum sufficient to satisfy § 7, "must contain the terms of the contract *agreed upon*." Cousbelis v. Alexander, 315 Mass. 729, 730-731, 54 N.E.2d 47 (1944) (emphasis added). ["i]t is axiomatic that to create an enforceable contract, there must be agreement on the material terms of that contract, and the parties must have a present intention to be bound by that agreement." Situation Management Systems, Inc. v. Malouf, Inc., 430 Mass. 875, 878, 724 N.E.2d 699 (2000). The parties must have "progressed beyond the stage of imperfect negotiation." Id.

Healey claims that the September 27, 2001, letter "is the quintessential document that accurately describes" the Zammito/Healey financial relationship and "satisfies any requirements of the Statute of Frauds."[10] *Mitchelson Aff. at Ex. T (Motion for Preliminary Injunction and Other Equitable Relief with Statement of Reasons and Authorities" dated April 20, 2005, at p. 34)*. Healey's contention that any correspondence from Martin to Healey during the fall of 2001 memorializes the alleged agreement is absurd. This September 27, 2001, letter is not even addressed to Healey. *See Mitchelson Aff at Ex. H.* Even if it did contain the agreed upon terms, the fact that

_____

[10] The only other correspondence upon which Healey relies to overcome the Statute of Frauds is a group of self-serving letters he wrote to his attorneys.

22

this letter was not sent to Healey means that Mr. Zammito could not have had "a present intention to be bound" by this letter. Malouf, *supra*. Perhaps more importantly, however, the September 27, 2001, letter fails to show "an agreement on the material terms of the contract" because *Healey disavowed the letter*. On October 4, 2001, Martin sent Healey a revised copy of his September 27th letter. In response to this October 4 letter, Healey wrote to Martin by letter dated as of "October 9, 2001" and proclaimed "I am in receipt of your summary of the Zammito Healey transactions dated October 4th, 2001, *and frankly don't understand any of it."  See Mitchelson Aff. at Ex. I (emphasis added)*. Healey further disputes Martin's understanding of the agreement by claiming "nowhere did I indicate nor has anyone asked or raised the issue of my being responsible for debt . . . I would not have agreed to be responsible for any debt whatsoever."  *Id*. Clearly, therefore, the deal that Martin supposedly memorialized is at odds with the deal that Healey believed existed.  Without an agreement as to material terms, there can be no contract.

The alleged oral agreement is void and unenforceable under G.L. c. 259, § 7. Robert J. Zammito, Sr. is entitled to judgment in his favor on Count IV.  Where the alleged oral contract is void, he is also entitled to judgment in his favor on Count V.

IV.    *CHAPTER 93A IS INAPPLICABLE TO THE HEALEY DEFENDANTS'
       CLAIM.
          (Counts III, XII, XVIII, XXV, XXXII, XXXIX)*

In what has become commonplace in any litigation where fraud is alleged, the Healey Defendants claim that the Zammitos' actions violated Massachusetts General Laws Chapter 93A.  Because Defendants' allegations of Chapter 93A violations are

sparse, the Court must look to the underlying factual allegations to determine whether there is any basis for violation of the statute.

In their Counterclaim and Third Party Complaint, the Defendants spend over 130 paragraphs detailing an alleged complex scheme where the Zammitos, in their capacity as majority shareholders, defrauded the Healey Defendants' minority interest. The provisions of Chapter 93A are not, however, available for claims of corporate malfeasance like the ones here because the alleged wrongful acts occurred between parties in the same venture. Manning v. Zuckerman, 388 Mass. 8, 12, 444 N.E.2d 1262 (1983) (the unfair and deceptive acts that 93A prohibits "are those that may arise in dealings between discrete, independent business entities *and not those that may occur within a single company.*") (emphasis added); *see also* Szalla v. Locke, 421 Mass. 448, 451, 657 N.E.2d 1267 (1995) (disputes between parties in same ventures do not fall within the scope of 93A). Moreover, should this Court view the Healey Defendants claims as arising from more than one venture, Chapter 93A still would be inapplicable because the statute does not apply to shareholder grievances arising from governance of a corporation. Riseman v. Orion Research, Inc., 394 Mass. 311, 314, 475 N.E.2d 398 (1985).

Based upon the foregoing, Chapter 93A is inapplicable to the Healey Defendants claims of the Zammitos' corporate malfeasance. Accordingly, judgment should be entered in favor of the individual Zammitos on Counts III, XIII, XVIII, XXV, XXXII, XXXIX.

## V. THERE IS NO FIDUCIARY DUTY ESTABLISHED BY THE FACTS
### (Counts VI and VII - Robert J. Zammito, Sr.)
### (Counts XIII and XIV - Valerie L. Zammito)

The Healey Defendants allege both a "breach of fiduciary duty" and a "breach of

fiduciary duty to shareholders" against all of the Zammitos. There seems to be no reason

for this duplication, especially where the breach of fiduciary duty claim does not allege

why the Zammitos would have had any fiduciary duty to the Healey Defendants other

than as shareholders. Defendants have not joined as parties any of the corporate entities

in which any Zammito serves as a director or officer and in which Defendants have an

interest.

To establish a breach of fiduciary duty, Defendants must prove that each of the

Zammitos owed a duty to them, breached that duty, and the Defendants suffered damages

as a result of the breach. Beaconsfield Townhouse Condo. Trust v. Zussman, 49 Mass.

App.Ct. 757, 759, 733 N.E.2d 141 (2000); Hanover Ins. Co. v. Sutton, 46 Mass. App.Ct.

153, 164, 705 N.E.2d 279 (1999). Because the Healey Defendants failed to allege that

the Zammitos owed them a fiduciary duty as a matter of law, Defendants must

demonstrate either a "special relationship" or that they placed "particular trust and

confidence" in each of the Zammitos in order to establish a fiduciary duty as a matter of

fact. Hawkes v. Lackey, 207 Mass. 424, 432 (1911); *see also* Doe v. Harbor Schools,

Inc., 2005 WL 957740, *6 (Mass.App.Ct. April 28, 2005). A *de facto* fiduciary duty can

be established by considering the following factors: a.) whether the circumstances

surrounding the relationship would lead a reasonable person to believe he or she could

confide in, or rely on, the other for a particular purpose, Cann v. Barry, 293 Mass. 313,

316-317, 199 N.E. 905 (1936); b.) the relative degree of skill or expertise the alleged

beneficiary and fiduciary possess with respect to the matters the fiduciary relationship allegedly covers, Broomfield v. Kosow, 349 Mass. 749, 755, 212 N.E.2d 556 (1965); or c.) whether the putative fiduciary knew of the reliance. Reed v. A.E. Little Co., 256 Mass. 442, 448-449, 152 N.E. 918 (1926).

The Healey Defendants have claimed to be shareholders with certain of the Zammitos in: 1.) NCPS/NDVS; 2.) Fleet Environmental Services LLC; 3.) Skyways Communication LLC; 4.) Colornet Graphics LLC; and 5.) New England Roll-Off LLC. Neither Valerie L. Zammito nor Robert J. Zammito, Sr. is a shareholder in any of the foregoing companies. *See Mitchelson Aff. at Ex. J.* Indeed, Robert J. Zammito, Sr. testified that, since the sale of the ambulance company in 1995, he was essentially retired until he purchased Zammito Automotive Group in 2002. *See Mitchelson Aff. at Ex. B (11/11/04 Senior Depo at 22:4-23:12).* Mrs. Zammito has also testified that she has no ownership or involvement in the management of the entities in which the Healey Defendants are shareholders. *See Mitchelson Aff. at Ex. K (Deposition of Valerie L. Zammito at 20:13-21:20).* Therefore, the Healey Defendants have put forth no evidence that would establish a *de facto* fiduciary duty owed by either Robert J. Zammito, Sr. or Valerie L. Zammito.[11]

Shareholders in a close corporation owe each other a fiduciary duty of "utmost good faith and loyalty." Medical Air Tech. Corp. v. Marwan Inv., Inc., 303 F.3d 11, 20 (1st Cir. 2002)(*quoting* Donahue v. Rodd Electrotype Co. of New England, 367 Mass.

---

[11] Viewing the criteria set forth above in light of the testimony, it is more likely that Healey owed the Zammitos a fiduciary duty. Robert J. Zammito, Sr. testified that after selling the ambulance company "here we are a bunch of hicks with close to $50 million dollars who couldn't balance a checkbook. This was Harry's world. I said to Harry 'what are we going to do with this?'" When Harry proposed that the children "buy companies and sell them every five years," Mr. Zammito, Sr. thought the idea "was a terrific goddamn thing." *See e.g. Mitchelson Aff. at Ex. B (11/11/04 Senior Depo at 176:13-20).*

578, 328 N.E.2d 505 (1975)). But there is no evidence that either Mr. or Mrs. Zammito owned any interest in the companies. *See Mitchelson Aff. at Ex. B (11/11/04 Senior Depo at 23:19-28:3); see Mitchelson Aff. at Ex. J ( Deposition of Valerie L. Zammito Depo at 20:13-22:2).* With no legal fiduciary duty claimed and no *de facto* fiduciary duty established, Counts VI, VII, XIII, and XIV fail as a matter of law and judgment should enter in favor of Robert J. Zammito, Sr. and Valerie L. Zammito.

### VI. THE CLAIM OF UNJUST ENRICHMENT IS UNTIMELY.
(Counts VIII, XV, XXI, XXVIII, XXXV, XLII, XLIV and XLV)

Defendants have alleged that the Zammitos engaged in "extensive Medicare fraud" in their capacity as owners and controllers of Ambulance Systems of America, Inc. *See, e.g., Counterclaim and Third Party Complaint at ¶ 175.* As evidence of this "extensive Medicare fraud" Defendants cite to the settlement between American Medical Response, Inc., which acquired ASA, and the United States Government. *Id. at 176.* Defendants also claim that the Zammitos "have been unjustly enriched by the misappropriation of assets of [ASA] that rightfully belong to shareholders and other holders of interest in the entity." *Id. at 176.*

The unjust enrichment claims that Defendants level against the Zammitos are emblematic of haphazard manner in which the Counterclaim and Third Party Complaint are pled. It is unclear whether Defendants' claim is that the alleged Medicare fraud, or the settlement payment, unjustly enriched the Zammitos. Regardless of the confused foundation upon which this claim rests, however, it is both untimely and legally deficient.

### A.   If the supposed "extensive Medicare fraud" is the basis for the Zammitos unjust enrichment, the claim is untimely.

In Massachusetts, the statutes of limitations applicable to law actions based on contract and tort are also applicable to suits in equity. Desmond v. Moffie, 375 F.2d 742, 743 (1st Cir. 1967). The court must look to the "gist of the action" or the essential nature of the plaintiff's claim in determining which statute of limitations to apply. Hendrickson v. Sears, 365 Mass. 83, 85, 310 N.E.2d 131 (1974). The usual form of "action to recover from another money which in equity and good conscience he is not entitled to keep is in contract." Kagan v. Levenson, 334 Mass. 100, 103, 134 N.E.2d 415 (1956). Thus, a six year statute would apply if the unjust enrichment claim were based on the same allegations as a breach of contract claim. Micromuse, Inc. v. Micromuse, PLC, 304 F.Supp.2d 202, 209 (D.Mass.2004). The Defendants do not, however, allege that the unjust enrichment stems from a contract.[12] Therefore, the statute of limitations for an unjust enrichment claim relating to ASA would be the three year tort statute. *See e.g.* Epstein v. C.R. Bard, Inc., 2004 WL 1598912 (D. Mass. July 19, 2004) (where complaint makes no mention of contract basis for claim, it sounds in tort and is subject to the three year statute of limitations).

If the alleged "Medicare fraud" is the basis for the enrichment, the three year statute of limitations renders the claim untimely. According to the initial government claim, the alleged Medicare fraud occurred from "January 1, 1993 to December 31,

---

[12] Indeed, if the Healey Defendants were to allege that the unjust enrichment claim stemmed from a contract with the Zammitos, the claim would fail as a matter of law because "where a contract does govern the parties' relationship, the contract provides the measure of the plaintiff's right and no action for unjust enrichment lies." *See* Micromuse, *supra.*

28

1998." *See Mitchelson Aff. at Ex. K (AMR Settlement Agreement and Release at p.3 ¶
G)*. According to Healey, the last activity the Zammitos or Healey had with any
ambulance company, and specifically ASA, occurred in or around October, 1995, when
American Medical Response acquired ASA. *See Counterclaim and Third Party
Complaint at ¶ 43.[13]* Thus, any "enrichment" the Zammitos could have received from the
alleged "Medicare fraud" would have occurred during or before 1995. Under either a
three year or six year statute of limitations argument, the unjust enrichment claim would
be untimely.

Moreover, Defendants cannot avoid the lateness of their claims by clinging to the
life preserver of the "discovery rule." Normally, a cause of action accrues on the
happening of an event likely to put the plaintiff on notice. Micromuse, 304 F.Supp.2d at
209. The discovery rule starts a limitations period running "when events occur or facts
surface which would cause a reasonably prudent person to become aware that she or he
had been harmed." Felton v. Labor Relations Commission, 33 Mass. App. Ct. 926, 928,
598 N.E.2d 687 (1992). At that point, the statute of limitations begins to run even if the
plaintiff does not know the full extent of his injuries. Bowen v. Eli Lilly & Co., 408
Mass. 204, 207, 557 N.E.2d 739 (1990). A plaintiff, once placed on notice of a potential
harm, has a duty to investigate the cause and extent of his injury. Doucette v. Handy &
Harmon, 35 Mass.App.Ct. 724, 726, 625 N.E.2d 571 (1994).

The Zammitos have maintained that Healey was intimately involved in the
ambulance company's Third-Party Billing. *See Mitchelson Aff. at Ex. C (Junior Depo at
64:19-65:14)*. Indeed, that was the primary reason Healey was hired. Healey surely

---

[13] Some of the Zammito Children stayed on at the combined entity for a nominal time but they were
employees and no longer owners.

would have been aware of any billing irregularities. In addition, Healey stated that he was aware of the investigation that began in 1996. *See e.g. Counterclaim and Third Party Complaint at ¶ 60.* In fact, he was one of only three shareholder representatives to the escrow agreement. *See Mitchelson Aff. at Ex. S.* Defendants themselves have produced hundreds of documents relating to the government's investigation, which demonstrates that they were kept apprised of the government's claim, and the decisions the Zammitos were making in relation to this investigation. Healey has also produced drafts of settlement agreements with the government, and the correspondence from ASA's attorneys relating to same, which also indicates that he was kept "in the loop" regarding this investigation. Defendants clearly knew, or should have known, about any alleged "Medicare fraud" by the end of the 1990s – at the very latest. Under the three year tort statute of limitations the unjust enrichment claim is time barred.

## B.      If the settlement agreement is the basis for the Zammitos unjust enrichment, the claim fails as a matter of law.

To satisfy the elements of unjust enrichment, a plaintiff must show "(1) an enrichment; (2) an impoverishment; (3) a relation between the enrichment and the impoverishment; (4) an absence of justification and (5) the absence of a remedy provided by law." Commonwealth of Massachusetts v. Mylan Lab., 357 F.Supp.2d 314, 324 (D.Mass. 2005). To establish liability in an unjust enrichment claim involves a showing that "wealth is in one person's hands when it should be in another's." Id. Unjust enrichment, as a basis for restitution, requires more than benefit to one party. Instead, the benefit must be unjust. *See* Salamon v. Terra, 394 Mass. 857, 859, 477 N.E.2d 1029 (1985).

If the Healey Defendants claim of unjust enrichment stems from the belief that the Zammitos were somehow enriched because of the payment of the settlement, they have failed to grasp the meaning of the term "enrichment." According to a June 7, 2002, memorandum to the "former stockholders of [ASA]" the settlement caused almost a 9 million dollar reduction in the escrow account. *See Mitchelson Aff. at Ex. L.* At the time of its establishment, and at the date of this memorandum, the Zammitos owned over 18% of this escrow fund while the Healey Defendants owned less than 5%. Thus, to the extent that the settlement reduced the escrow fund, the Zammitos were impoverished in an amount exponentially greater than the Healey Defendants. A claim of enrichment, therefore, is factually and legally baseless. Thus, Counts VIII, XV, XXI, XXVIII, XXXV, XLII, XLIV and XLV are without merit.

## VII.   THERE IS NO VIABILITY TO THE CLAIM OF A FRAUDULENT TRANSFER BECAUSE THERE WAS NO TRANSFER AND NO FRAUD. *(Counts IX, XXII, XXIX, XXXVI, and XLIII)*

The Healey Defendants believe that the Zammitos conversion of NCPS/NDVS from a corporate entity to a business trust was a fraudulent conveyance because it was done "with the actual intent to hinder, delay or defraud." *See e.g. Counterclaim and Third Party.[14]* Defendants give no citation for their fraudulent conveyance claim. The first problem with the claim is that Massachusetts no longer recognizes a "fraudulent conveyance." *See* Federal Refinance Co., Inc. v. Klock, 352 F.3d 16, 22, n.1 (1st Cir. 2003) (noting how Massachusetts repealed the Uniform Fraudulent Conveyance Act and

---

[14] Defendants do not bring a claim of fraudulent conveyance against Mrs. Zammito. They still, however, allege that somehow Senior was involved in NCPS/NDVS. *See Counterclaim and Third Party Complaint at Count IX.* The fraudulent conveyance claim against Senior should be dismissed because Senior has testified that he was never a shareholder in NCPS/NDVS nor is he a trustee or beneficiary of the NCPS/NDVS business trusts. *See Mitchelson Aff. at Ex. B (11/11/04 Senior Depo. at 23:19-28:3).* Thus, Senior would have had no part in any "transfer" involving NCPS/NDVS.

replaced it with the Uniform Fraudulent Transfer Act in 1996). If Defendants claim is under the rubric of the relatively new Fraudulent Transfer Act, it is simply inapplicable to the conversion of NCPS/NDVS to a business trust.

The purpose of the Uniform Fraudulent Transfer Act set forth in G.L. c. 109A (hereinafter "109A") is to preserve a debtor's assets so that creditors may look to them if the debtor becomes insolvent. *See* First Fed. Sav. & Loan Assn. v. Napoleon, 428 Mass. 371, 378, 701 N.E.2d 350 (1998) (examining the UFCA). Thus, a conveyance is not established as a fraudulent conveyance unless there is a "resulting diminution in the assets of debtor available to creditors." Richman v. Leiser, 18 Mass.App.Ct. 308, 312, 465 N.E.2d 796 (1984).

Converting NCPS/NDVS into a business trust did not violate 109A because it simply recast the structure of this asset instead of changing possession. *See* Minkin v. Comm. of Revenue, 425 Mass. 174, 178, 680 N.E.2d 27 (1997) (the corporate trust "is essentially a business organization cast in trust form"). Indeed, the Exchange Agreement for each entity expressly stated that the shareholders were exchanging "his or her Company Shares for Shares of Beneficial Interest in the Trust . . . so that, upon completion of such exchange, each of the Stockholders shall have exactly the same ownership percentage in the Trust as his or her former ownership percentage in the Company. *See Mitchelson Aff. at Ex. M (Exchange Agreement for NCPS).* The conversion from a corporate entity to a business trust was not a transfer under the Massachusetts Uniform Fraudulent Transfer Act because there was no change of

ownership of the companies. This was simply a recasting of the companies' structure for tax reasons that were beneficial to all shareholders.[15]

Should the Court view the NCPS/NDVS conversion to business trusts as a "transfer," the Defendants would be unable to prove any fraud. Defendants claim that the conversion "provided the four Zammito children, as trustees, with autonomous control over the business activities of" NCPS/NDVS. *See Counterclaim and Third Party Complaint at ¶ 109.* Naming the majority shareholders in the corporate entities as sole trustees, however, while making the Grantor Trust a beneficiary, is permissible. *See e.g.* Commisioner of Corps. & Taxation v. Springfield, 321 Mass. 31, 43, 71 N.E.2d 593 (1947); Richardson v. Clarke, 372 Mass. 859, 862, 364 N.E.2d 804 (1977) (a provision for majority control of a business trust "as in corporate organizations, is a practical and effective means of facilitating business operations"). Besides, the Zammitos as trustees still owed the Grantor Trust the same fiduciary duty they would have had NCPS/NDVS remained a corporate entity. Indeed, the Defendants could still protect themselves from any corporate malfeasance on the part of the trustees of the business trust because they had not lost the right to sue. *See* Peterson v. Hopson, 306 Mass. 597, 612-613, 29 N.E.2d 140 (1940)(a holder of transferable shares representing a beneficial interest in a business trust can recover from trustees who divert trust assets). The recasting of a corporate entity to a trust entity is perfectly permissible and does not affect the Defendants rights.[16]

---

[15] According to § 7 of chapter 109A, a transfer is made "with respect to an asset that is not real property or that is a fixture, when the transfer is so far perfected that a creditor on a simple contract cannot acquire a judicial lien otherwise than under this chapter that is superior to the interest of the transferee." *See G.L. c. 109A, § 7(1)(ii).*

[16] Although the Healey Defendants claim otherwise, the Zammitos also assert that Peter Healey signed the Exchange Agreement on behalf of the Trust. Therefore, the Zammitos cannot be charged with a fraudulent intent because the Healey Defendants were aware of the conversion to a trust at the time it occurred.

The conversion, therefore, cannot be viewed as a fraudulent transfer. As such, Counts

IX, XXII, XXIX, XXXVI, XLIII fail as a matter of law.

## VIII. *THE HEALEY DEFENDANTS HAVE FAILED TO ESTABLISH A CLAIM OF CIVIL RICO.*

Civil RICO "is an unusually potent weapon – the litigation equivalent of a

thermonuclear device." Miranda v. Ponce Fed. Bank, 948 F.2d 41, 44 (1st Cir. 1991).

The RICO statute is to be used in specified circumstances and cannot be used:

> as a surrogate for local law, as a panacea to redress
> every instance of man's inhumanity to man, or as a
> terrible swift sword capable of righting all wrongs
> of a troubled world. Id. at 49.

The entire premise of the Healey Defendants' RICO claims against the Zammitos

is that the Zammitos have "improperly siphoned funds and other corporate assets," paid

"salaries to [the Zammitos] who do not work at companies" and paid "personal expenses

for [the Zammitos]" using corporate funds. *See Counterclaim and Third Party*

*Complaint.* These claims present at best nothing more than a garden variety breach of

fiduciary duty claim, coupled with a breach of contract claim – neither of which should

invoke the import of civil RICO. *See* United States v. Greenleaf, 692 F.2d 182, 188 (1st

Cir. 1982)(a breach of fiduciary duty does not constitute mail fraud); *see also* McEvoy

Travel Bureau, Inc. v. Heritage Travel, Inc., 904 F.2d 786, 791 (1st Cir. 1990)(a simple

claim for breach of contract claim is not grounds for mail or wire fraud). Even if the

Defendants' allegations of fraud could support a RICO claim, the manner in which the

Defendants plead civil RICO is so replete with legal errors that it cannot survive a

summary judgment motion.

34

**A.**     **The RICO claim is untimely because it has been more than four years since the first alleged injury caused by the scheme to defraud.**

The Racketeer Influenced and Corrupt Organizations Act (RICO) as codified in Sections 1961-1968 of Title 18 of the United States Code does not provide a statute of limitations. The United States Supreme Court, however, has instituted a four (4) year statute of limitations for RICO claims. Agency Holding Corp. v. Malley-Duff and Associates, Inc., 483 U.S. 143, 156 (1987). The First Circuit has adopted, and the Supreme Court has ratified, that the RICO four (4) year statute begins to run when a plaintiff discovered, or should have discovered his injury. Rotella v. Wood, 528 U.S. 549 (2000); Rodriguez v. Banco Central, 917 F.2d, 664, 665 (1st Cir. 1990). More importantly, the RICO claim accrues when the plaintiff discovers his or her injury, *even if he or she has not yet discovered the pattern of racketeering*. Hodas v. Sherburne, Powers & Needham, P.C., 938 F. Supp. 60, 63 (D. Mass. 1996) (emphasis added).

The Healey Defendants allege that the Zammitos have engaged in RICO related activities "from approximately 1992 and continuing through the present." *See e.g. Counterclaim and Third Party Complaint at ¶ 137.* In Count XLVI of the Counterclaim and Third Party Complaint, the Healey Defendants quantify the amount of "substantial injury and loss" they have purported to suffer from the Zammitos' 12 years of racketeering activity at $3,369,641. *See Counterclaim and Third Party Complaint at ¶ 378.* The first amount of substantial injury and loss the Healey Defendants claim is when Healey alleges that he did not receive $212,000 from "the Ambulance Systems of America, Inc. and AmNet, Inc. Merger." *Id.* Healey alleges that on January 11, 1995:

> In order to deal with the money due to HF-Ltd as a
> consequence of the cash "boot" payment,
> [Zammito] proposed and Healey agreed to defer
> payment of $212,000 (two hundred twelve thousand
> dollars) to [Healey] until a reasonable time after a
> completion of the merger between ASA-Inc and
> AmNet-Inc. *See Counterclaim and Third Party
> Complaint at ¶ 38.*

Healey further alleges:

> During the AMR-Inc acquisition negotiations,
> [Zammito] requested and Healey agreed to continue
> to defer payment of the remaining percentage of the
> AmNet-Inc "boot" payment due to Healey until the
> release of a portion of the escrow funds two years
> after the closing date. *See Counterclaim and Third
> Party Complaint at ¶ 38.*

Under the "discovery of the injury, but not the scheme" doctrine espoused by

the First Circuit, Healey had four years from the first injury he claims to have suffered to

discover the remaining elements of his RICO claim and file suit. Healey has alleged the

first "injury" he suffered as a result of the Zammitos' supposed racketeering scheme was

the Zammitos failure to make a $212,000 payment to him in 1997.[17] Healey, therefore,

had until 2001 to file his RICO claim. His failure to do so renders his individual RICO

claim untimely.

## B.     The RICO claim is untimely because it has been more than four years since they discovered the alleged scheme to defraud.

Not only has it been more than four years since Healey Defendants suffered their

first injury from the alleged "scheme to defraud," it has been more than four years since

all of the Healey Defendants discovered the alleged "scheme" itself. Defendants claim

---

[17] In fact, nearly all of Healey's claims to commissions accrued by early 2000. Each of these commission claims is subject to the same analysis as the "boot" payment. Indeed, it is difficult to understand why, by the time the American Environmental Technologies commission supposedly went unpaid in early 2000, Healey continued to allow hundreds of thousands of dollars to remain outstanding.

that the RICO "scheme to defraud" consisted of the Zammitos "improperly siphoning

funds and other corporate assets out of the entities" and that the Healey Defendants were

unaware of this scheme until, at the earliest, May 2001. *See Counterclaim and Third

Party Complaint at ¶ 103.* Indeed, Defendants further claimed that it was not until after a

September 2001 meeting with Martin and Robert J. Zammito, Sr. that Healey "discovered

several categories of improper financial payments within [NCPS/NDVS] including

"payroll payments to Zammito's children who did not work at the companies" and

"payment of personal expenses of Zammito shareholders, such as cellular telephone

accounts, automobile insurance, and health insurance." *Counterclaim and Third Party

Complaint at ¶ 102.* The Healey Defendants contend that they may rely on the doctrine

of "fraudulent concealment" to toll the statute of limitations. As set forth below, this is

simply not a viable claim.

To invoke the doctrine of fraudulent concealment, a plaintiff must prove three

elements: (1) wrongful concealment of actions by the defendant; (2) failure of the

plaintiff to discover operative facts that are the basis of his cause of action within the

limitations period; and (3) plaintiff's due diligence in discovery of the facts. Berkson v.

Del Monte Corp., 743, F.2d 53, 55 (1st Cir. 1984).  Moreover, a defendant must have

concealed so much that the plaintiff can not reasonably have discovered a cause of action

through his own diligent inquiry. Hodas, 938 F. Supp. at 64-65. (even if defendant put

plaintiff "off the trail" it does not counter real evidence that the plaintiff "knew

something was amiss" well beyond the actual discovery of his injury).

The Defendants' claim that they were unaware that NCPS was paying "unrelated"

expenses until September 2001 is nothing short of fabrication. To begin, Healey has

admitted that he received health insurance paid by NCPS for years prior to September 2001. *See Mitchelson Aff. at Ex. A (11/30/04 Healey Depo at 57:9-11).* According to Healey, the fact that NCPS was paying his insurance was appropriate because "I think any benefits that are ascribed to a third party by a person that does not control the checkbook is fine."[18] *Id. at 58:7-16.* Armed with this knowledge as early as 1998, the Defendants were obligated to engage "diligent inquiry" to discover if there were other "unrelated" expenses being paid. *See* Hodas, *supra.* Their failure to engage in any such inquiry precludes their reliance on the "discovery rule."

In addition to inside knowledge that NCPS was paying at least some unrelated expenses as early as 1998, the Defendants were also aware that NCPS was paying some unrelated expenses of the Zammitos by 1999. That year, Healey instructed Janet Graham of NCPS to "pull-out" all expenses that were "unrelated" to NCPS. *See Mitchelson Aff. at Ex. N (Deposition of Janet Graham at 28:11-29:8).* As instructed by Healey, Ms. Graham created a year-end expense table[19] with certain expenses unrelated to NCPS [including those of the Zammitos and Healey] in the column marked "Reclassify." *Id. at 32:1-13.* Ms. Graham testified that Healey requested that she prepare this table because there was party interested in purchasing NCPS during this time. *Id. at 28:16-18.* Although she could not recall the potential buyer, she was clear that Healey was the only one who had ever asked to have such expenses "pulled-out." *Id. at 29:12-16.* Where Healey requested that Ms. Graham "pull out" these expenses in 1999, he obviously was aware of their existence at that time.

---

[18] Of course, Healey in fact knew exactly what was occurring. The Grantor Trust was a shareholder of NCPS, and thus in charge of controlling NCPS' "checkbook," at the time NCPS was paying Healey's health insurance.

[19] *See Mitchelson Aff. at Ex. O.*

By 1999, Defendants were aware of both the damage they allege from the RICO scheme, as well as the alleged scheme itself. Their failure to assert these claims until January 2004 results in their RICO claim being time barred.

**C.    The RICO claim fails as a matter of law because Defendants have failed properly to plead the "enterprise" requirement.**

A successful civil RICO action requires proof of four elements: "(1) conduct; (2) of an enterprise; (3) through a pattern; (4) of racketeering activity." In re Lupron Marketing and Sales Practices Litigation, 295 F.Supp.2d 148, 163 (D. Mass. 2003), *quoting*, Sedina, S.P.R.D.L. v. Imrex Co., 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). Under the statute, a RICO enterprise is defined as "any individual, partnership, corporation, association, or other legal entity and any union or group of individuals associated in fact although not a legal entity." *18 U.S.C. § 1961(4).* To successfully allege a civil RICO claim, "the person or persons alleged to be engaged in racketeering activity must be entities distinct from the enterprise." Odishelidize v. Aetna Life & Casualty Co., 853 F.2d 21, 23 (1st Cir. 1988); *see also* Miranda, 948 F.2d at 44 (the same entity cannot do "double duty" as both the RICO defendant and the RICO enterprise). Indeed, even if "the enterprise itself is blameworthy, it cannot also be answerable as a defendant" under RICO. Schofield v. First Commodity Corp., 793 F.2d 28, 30 (1st Cir. 1986). Similarly, "the failure to identify any enterprise, distinct from a named person defendant, is fatal under RICO." Doyle v. Hasbro, 103 F.3d 186, 191 (1st Cir. 1996). Scattershot allegations are insufficient. Instead, the Healey Defendants must show that each alleged RICO participant "took *some* part in directing the enterprise affairs." Reves v. Ernst & Young, 507 U.S. 170, 179, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993).

In the Counterclaim and Third Party Complaint, the Healey Defendants allege that the "enterprise" consists of "Robert J. Zammito, Sr. and other Zammito family members." *See e.g. Counterclaim and Third Party Complaint at ¶ 137.* Other definitions of the "enterprise" cited by the Healey Defendants include "Robert Zammito and other plaintiffs, individually and through the businesses they controlled, engaged in an illegal enterprise." *See Mitchelson Affidavit at Ex. Q (Healey Responses to Interrogatories at Response 5).* Therefore, reviewing the Healey Defendants' claims, either the Zammitos are both the RICO defendants and the "enterprise" or the Healey Defendants have failed to identify and establish the enterprise as distinct from the Zammitos. Either scenario is fatal to the RICO claim. Accordingly, because Defendants' have failed to establish the RICO "enterprise," judgment should enter in favor of all Zammitos on Counts I, X, XVI, XXIII, XXX, and XXXVII.

**D.      The RICO claim fails as a matter of law because there is no "racketeering activity."**

      i.      Defendants fail to either plead the predicate acts with particularity or establish the viability of the predicate acts.

            1.      *Defendants have failed to plead the predicate acts with particularity in accordance with Fed.R.Civ.P. 9(b).*

A pattern of racketeering activity "requires at least two" predicate acts. *18 U.S.C. § 1961(5).* Predicate acts are "acts chargeable or indictable under any one or more of certain specified criminal laws." *18 U.S.C. § 1951(b)(5); see also* Feinstein v. Resolution Trust Corp., 942 F.2d 34, 41 (1st Cir. 1991). Without viable predicate acts a RICO claim collapses. Ahmed v. Rosenblatt, 118 F.2d 886, 888 (1st Cir. 1997). In addition, predicate acts must be pled with particularity. Id. at 889.

In their Counterclaim and Third Party Complaint, the Healey Defendants allege that each of the Zammitos engaged in "racketeering activity" consisting of "several violations of mail fraud . . . and wire fraud." Proving mail and wire fraud "requires proof that (1) the defendant knowingly devised or participated in a scheme to defraud; (2) to obtain money or property by means of false or fraudulent pretenses, representations and promises; and (3) that the mails or *interstate* wire facilities were used in carrying out the scheme." Neder v. United States, 527 U.S. 1, 20, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999)(emphasis added). A violation of the mail and wire fraud statutes must be pled with particularity under Fed.R.Civ.P. 9(b). New England Data Services, Inc. v. Becher, 829 F.2d 286, 290 (1st Cir. 1987).

Defendants claims of wire and mail fraud are legally deficient. Failure to plead the predicate acts with the particularity required by Fed.R.Civ.P. 9(b) is fatal. *See* Efron v. Embassy Suites (Puerto Rico), Inc., 223 F.3d 12, 20 (1st Cir. 2000) (RICO claims premised on mail or wire fraud "must be particularly scrutinized because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it."). Defendants allege six (6) predicate acts in the Counterclaim and Third Party Complaint.[20] For these allegations to comply with the requirements of Fed.R.Civ.P. 9(b), Defendants must detail "what conduct was fraudulent; *why the conduct was fraudulent or unlawful*; how the fraudulent conduct was carried out; and when and where the fraudulent conduct took place." M&1 Heat Transfer Products Ltd. v. Willke, 131F.Supp.2d 256, 261 (D. Mass. 2001) (emphasis added). The allegations of

---

[20] Harry Healey testified that he did not know of any predicate acts other than what was plead. *See Mitchelson Aff. at Ex. A (11/30/0 Healey Depo. At91:4- 93:21).*

41

predicate acts fail to satisfy any of the foregoing requirements. For example, Defendants

contend that the following is a predicate act:

> Zammito's[21] use of the mail to send Healey a
> letter[22] in or about September 2002 requesting that
> FEH-LLC and shareholders make additional capital
> contributions to FleetES-LLC to avoid failure,
> while also asserting that RTFE-LLC, a Zammito
> entity and shareholder in FEH-LLC, refused to
> contribute any funds to the business.[23]

The foregoing is, at best, an inaccurate summary of the letter and at worst a blatant

misrepresentation. Moreover, this allegation fails to adhere to the particularity

requirement of Fed.R.Civ.P. 9(b) because Defendants do not identify why this letter was

fraudulent or unlawful.[24] *See* M&I Heat Transfer Products, *supra.* Under the

circumstances facing Fleet, it was a reasonable business judgment by management to

inquire whether shareholders were willing to infuse capital into the company before

making any final decisions. Robert J. Zammito, Jr.'s letter in September 2002, was in no

way fraudulent or unlawful. Failure to plead the predicate acts with particularity is fatal

to the wire and mail fraud claim.

> 2. *The alleged predicate acts do not amount to wire or
>    mail fraud.*

Even if the Healey Defendants plead the wire and mail fraud claims with the

requisite particularity, they would not survive legal scrutiny. An essential element of the

federal wire fraud statute is the use of *interstate* communication lines. *See* Neder, *supra;*

---

[21] Although this letter was from Robert J. Zammito, Jr., Defendants attribute all predicate acts to Robert J. Zammito, Sr.

[22] See Mitchelson Aff. at Ex. U.

[23] *Counterclaim and Third Party Complaint at ¶ 140(3).*

[24] Indeed the Defendants fail to identify why any of the six mailings they rely upon should be considered fraudulent or unlawful.

42

*see also* Hernadez v. Ballesteros, 333 F.Supp.2d 6, 12 (D. P.R. 2004).  Defendants only

allegations of wire fraud stem from faxes Robert J. Zammito, Sr. sent from his house on

Cape Cod to Healey in Hingham, Massachusetts. *See Mitchelson Aff. at Ex. Q (Healey*

*response to int 5 at p. 26).*  No "interstate communication lines" were used.  Thus, the

wire fraud statute is inapplicable.

Defendants' mail fraud claim suffers from a similar legal defect.  Mail fraud is

"(1) the devising or attempting to devise a scheme or artifice to defraud (2) the knowing

and willing participation in the scheme *with the specific intent to defraud*; and (3) the use

of the mails in furtherance of the scheme."  United States v. McCann, 366 F.3d 46, 51 (1st

Cir. 2004) (emphasis added).  A "scheme to defraud" is an attempt to "wrong one in his

property rights by dishonest methods."  McNally v. United States, 483 U.S. 350, 358, 107

S.Ct. 2875, 97 L.Ed.2d 292 (1987).  For a mailing to be "in furtherance" of a "scheme to

defraud," the mailing "must be for the purpose of executing the scheme or part of the

execution of the scheme *as conceived by the perpetrator at the time.*"  United States v.

Pimental, 380 F.3d 575, 586 (1st Cir. 2004).  Defendants contend that the "scheme to

defraud" was the Zammitos' "improperly siphoning funds and other corporate assets out

of the entities to the detriment of other investors and minority interest holders." *See, e.g.,*

*Counterclaim and Third Party Complaint at ¶ 137.*  The fatal flaw in the Healey

Defendants' mail fraud claim is their failure to establish how the mailings set forth in the

Counterclaim would be "in furtherance" of this supposed "scheme to defraud."  In

Pimental, the defendant was alleged to have engaged in a scheme where he used mailings

to lie to various workers' compensation insurance company representatives about the

nature of his company's work.  The false statements contained in these mailings tended to

43

reduce the premium payments owed for workers' compensation insurance. The First Circuit held that the mailings that formed the basis of the fraud were found to "help maintain a harmonious relationship between the perpetrator and the victim" because the mailings were designed to "lull the victims into a false sense of security . . . and therefore make the apprehension of the defendant *less likely* than if no mailings had taken place." Pimental, 380 F.3d at 586-588. Lulling the victim into a false sense of security "contributes to the prevention of the scheme's detection" and if a mailing does so it satisfies the "in furtherance of" requirement of the mail fraud statute. Id.

In the case at bar, the mailings Defendants claim form the basis of the mail fraud are the exact opposite of the "in furtherance of" the scheme. Rather, the Zammitos mailings of items such as financial statements kept the Defendants fully apprised of all of the business activities.[25] In contrast to Pimental, the Zammitos did nothing to "lull" the Defendants into any false sense of security. They were completely open and transparent about the management fees. *See Mitchelson Aff at Ex. Q (NCPS/NDVS 1999-2003 Year End Financial Statements).* Healey doubtless was intimately aware of how much these fees were and how much the Zammitos received in salaries and expenses. [26] To the extent there was any scheme to defraud, the Zammitos certainly did not use the mail "in furtherance" of such a scheme. Where Defendants claim of mail fraud is unsupportable, the RICO claim fails as a matter of law.

E.   **Defendants have failed properly to plead that there was a "pattern" of racketeering activity.**

---

[25] Healey admits that he was provided copies of NCPS financial reports on a monthly basis from 1996 to 2002. *See Mitchelson Aff. at Ex. A (11/30/04 Healey Depo at 79:2-80:14).*

[26] For example, both Robert J. Zammito, Sr. and Robert J. Zammito, Jr. testified that Healey recommended that NCPS/NDVS pay the younger Zammito a $100,000.00 bonus in 2000. *See Mitchelson Aff. at Ex. B (11/11/04 Senior Depo at 185:18-186:14); see also Id. at Ex. C (Junior Depo at 76:20-79:1).*

44

In addition to pleading viable predicate acts with particularity, a RICO plaintiff must demonstrate that the predicate acts: 1.) are related. H.J., Inc. v. Northwestern Bell Telephone, 492 U.S. 229, 237, 109 S.Ct. 2893, 106 L.Ed.2d 195; 2.) amount to, or pose, a threat of continued criminal activity. Id.; and 3.) caused an injury to business or property. Libertad v. Welch, 53 F.3d 428, 441 (1st Cir. 1994).

To demonstrate that the "racketeering activity" was a "pattern" there must be a showing of "continuity." Continuity is both a closed and open-ended concept referring to either a closed period of repeated conduct or to past conduct that by its nature projects into the future with a threat of repetition. H.J., Inc., 492 U.S. at 241-242. Closed-ended continuity requires a showing of "related predicate acts extending over a substantial period of time. Id. at 242. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not meet the requirements of closed-ended continuity. Id. Demonstrating that the alleged "racketeering acts themselves include a specific threat of repetition indefinitely in the future [or] . . . are part of an ongoing entity's regular way of doing business" shows open-ended continuity. Id.

> i. There is no open-ended continuity because Defendants no longer own NCPS/NDVS.

The Defendants main RICO allegation is that NCPS/NDVS improperly paid management fees to the Zammitos. NCPS/NDVS was sold to a third party in May, 2005. NCPS/NDVS will therefore no longer be paying management fees to the Zammitos. The only other viable company in which the Defendants are minority shareholders is Fleet Environmental Services LLC ("Fleet"). Fleet's CEO, Brian House, testified that Fleet stopped paying management fees to the Zammitos in January 2002. *See Mitchelson Aff.*

*at Ex. R (Deposition of Brian J. House 81:9-82:17).* With management fees no longer

being paid, there is no danger that the Zammitos alleged "racketeering activity" will

continue "indefinitely into the future." *See* H.J., Inc., *supra.* Therefore, there is no

evidence of "open-ended" continuity.

> ii. There is no closed-ended continuity because of both the short temporal
> duration and the limited scope of the alleged "scheme to defraud."

Defendants have alleged six predicate acts of wire and mail fraud occurring over

the course of three years. *See e.g. Counterclaim and Third Party Complaint at ¶ 140.*

For the purposes of RICO continuity, it is only these six predicate acts that should be

considered by the Court. *See* Giuliano v. Fulton, 399 F.3d 381, 388 (1st Cir. 2005)

(where the First Circuit held "we will not imply or read into [a complaint] the mail or

wire connection [in a RICO claim] where it is not alleged specifically."). Under the

holding of the Supreme Court in H.J., Inc. such few predicate acts over this short of time

would be insufficient to establish closed-ended continuity because "too few acts would

suggest that the defendants were engaged in only 'sporadic activity' . . . and too short a

period of time would suggest that the defendants were not engaged in 'long term criminal

conduct.'" Fleet Credit Corp. v. Sion, 893 F.2d 441, 447 (1st Cir. 1990), *quoting*, H.J.,

Inc., 492 U.S. at 242.

Even if this Court looked beyond the temporal duration of the scheme, however,

closed-ended continuity could not be established. The "scheme to defraud" is nothing

more than an allegation that the Zammitos breached their fiduciary duty to minority

shareholders by receiving improper management fees. The alleged schemers are the

Zammitos, and the only parties damaged by the alleged scheme are the Grantor Trust.

Continuity cannot be found where the RICO claim concerns "a single, narrow scheme

targeting few victims." Giuliano, 399 F.3d at 390; *see also* Systems Management v.

Loiselle, 303 F.3d 100, 105 (1st Cir. 2002) (RICO is not aimed at a single narrow criminal

episode, even if that single episode involves behavior that amounts to several crimes);

*see also* Efron, 223 F.3d 19 ("combination of a single scheme, single injury, and few

victims . . . make it virtually impossible for plaintiffs to state a RICO claim.")  With no

ability to establish that the Zammitos engaged in a "pattern" of racketeering activity,

Defendants' RICO claims fails as a matter of law.

> iii.    Defendants RICO claim fails because they have failed to establish
> that the racketeering activity was the proximate cause of their
> alleged damage.

A civil RICO claim cannot succeed unless one or more of the specified acts of

racketeering caused the plaintiff's injuries. Camelio v. American Federation, 137 F.3d

666, 669 (1st Cir. 1998).  Merely proving that the alleged predicate acts were a "cause-in-

fact" of the plaintiff's injuries will not be sufficient. Holmes v. Securities Investor

Protection Corp., 503 U.S. 58, 268, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992).  Instead, §

1964(c) requires proof that "at least one of the defendant's predicate acts was the

proximate cause of the plaintiff's injuries." Id.  Examining again the six alleged

predicate acts listed in the Counterclaim and Third Party Complaint, it is clear that the

Defendants are unable to establish causation in the RICO context.  Not only do the

Defendants fail to allege how any of the predicate acts resulted in damage, the facts and

common sense preclude such a finding.

For example, take the September 2002, letter from Robert J. Zammito, Jr. to

shareholders of Fleet. *See Counterclaim and Third Party Complaint at ¶ 140(3).*  The

Defendants claim that this letter is one of the predicate acts of mail fraud.  Yet, as stated

47

earlier, Healey himself wrote that Robert J. Zammito, Jr. advised him to ignore this letter; that it was not meant for him. This alleged predicate act in no way resulted in the Defendants suffering any damage. Indeed, of the six predicate acts alleged, the Defendants have failed to identify, and will be hard-pressed to prove, how they caused any damages specifically because they have never provided any of the Zammitos' companies with any capital. Defendants therefore, are unable to establish that these predicate acts are the proximate cause the alleged damage.

### CONCLUSION

The claims in the Counterclaim and Third Party Complaint are nothing more than a reaction to the Zammitos' attempt to collect a valid debt. Plaintiffs and Third-Party Defendants are entitled to summary judgment in their favor on forty Counts of the Counterclaim and Third-Party Complaint.

ROBERT J. ZAMMITO, JR., ET AL
By their attorneys,

Kevin M. Considine (BBO #542253)
Timothy M. Mitchelson (BBO #630331)
Kevin M. Considine, P.C.
One Boston Place – 28th Floor
Boston, MA 02108
617-723-9900

Dated: June 6, 2005

48

## CERTIFICATE OF SERVICE

I, Timothy M. Mitchelson, hereby certify that I have this 6th day of June 2005,

served a copy by hand delivery of the foregoing to Stephen J. Lyons, Esq., Kleiman,

Lyons, Schindler & Gross, 21 Custom House Street, Boston, Massachusetts 02110.

Timothy M. Mitchelson