IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO: 04-10161-REK

| | |
|---|---|
| ROBERT J. ZAMMITO, JR.;<br>PAUL M. ZAMMITO;<br>CHRISTOPHER ZAMMITO; and<br>VALARIE A. MORDINI,<br>    Plaintiffs and Counterclaim Defendants<br>v.<br><br>HARRY W. HEALEY, JR., GRANTOR TRUST and<br>PETER W. HEALEY as Trustee of<br>HARRY W. HEALEY, JR., GRANTOR TRUST,<br>    Defendants and Counterclaim Plaintiffs<br><br>HARRY W. HEALEY, JR. individually, and as Trustee of<br>THE HUNTINGTON FORBES CHARITABLE<br>REMAINDER TRUST;<br><br>HUNTINGTON FORBES, LTD.;<br>STANTON CUMMINGS, LTD.;<br>PETER W. HEALEY, as Trustee of<br>THE HEALEY GRANDCHILDREN'S TRUST – II,<br>    Third Party Plaintiffs<br>    Third Party Defendants in Counterclaim<br><br>v.<br>ROBERT J. ZAMMITO, SR.;<br>VALERIE L. ZAMMITO;<br>ASA HOLDING COMPANY, INC.; and<br>THE ASA HOLDINGS LP,<br>    Third Party Defendants<br>    Third Party Plaintiffs in Counterclaim<br>    Third Party Plaintiffs<br><br>v.<br><br>JOHN A. MALLOY, III and<br>WILLIAM R. HEALEY,<br>    Third Party Defendants<br><br>MELLON BANK (aka Mellon Trust of New England),<br>    Bank Trustee | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR LEAVE TO
FILE REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION
FOR PARTIAL SUMMARY JUDGMENT**

detailed description of all 121criminal offenses revealed during discovery. *[See, March 18, 2005 letter to counsel for the Plaintiffs, Kevin M. Considine, Esquire, Exhibit A]*.

3. Moreover, the same predicate acts were pled and described in detail in the Defendants' Motion for Preliminary Injunctive Relief which was filed with this Court and served upon counsel for the Plaintiffs on April 20, 2005. Thus, the Plaintiffs were on notice more than three (3) months prior to the filing of motions for summary judgment of each and every one of the 121 predicate acts (committed by them) and revealed during discovery.

4. Under the circumstances, the Plaintiffs were well aware of the discovery of these additional predicate acts well before the filing of the Defendants' Opposition to the Plaintiffs' Motion for Partial Summary Judgment. For the Plaintiffs to now feign surprise or to imply that they were not aware or on notice of these additional predicate acts disclosed during discovery prior to the filing of the Defendants' Opposition is, at best, misleading and disingenuous. It is nothing more than an attempt by the Plaintiffs to have the last word or a "second bite at the apple" in connection with the recently filed motions for summary judgment.

**WHEREFORE:** for all of the foregoing reasons, the Plaintiffs' and Third-Party Defendants' Motion for Leave to File a Reply to the Defendants' Opposition



## KLIEMAN, LYONS, SCHINDLER & GROSS

A PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS

COUNSELLORS AT LAW

STEPHEN J. LYONS
JAMES C. GROSS
THOMAS C. BAILEY
ANNE J. WHITE
JONATHAN S. SCHINDLER
JANET KENTON-WALKER

OF COUNSEL
RIKKI J. KLIEMAN
ROMEO R. ADAMS

21 CUSTOM HOUSE STREET

BOSTON, MASSACHUSETTS 02110

TELEPHONE: 617-443-1000

TELEFAX:    617-443-1010

JOSEPH I. SCHINDLER
(1952-1999)

JAMES E. LYONS
(1921-1993)

**<u>VIA FACSIMILE AND MAIL</u>**

March 18, 2005

Kevin M. Considine, Esquire
Kevin M. Considine, P.C.
One Boston Place, 28th Floor
Boston, MA  02108

Re:    Robert Zammito, et als. v. Harry W. Healey, Jr., et als.
       <u>Civil Action No: 04-10161REK</u>

Dear Kevin:

This letter is intended to respond to your letter of March 15, 2005 in which you suggest that there is no reasonable basis for my clients to pursue their claims for fraud and civil RICO. For the reasons set forth below, we respectfully but strongly disagree.

*Misrepresentations of Material Facts and Fraud*

At the heart of this case are the so called "management fees". Beginning in September 2000, NCPS/NDVS, Fleet and other businesses in which my clients and others held a minority shareholder interest began the payment of "management fees" to RPCV, a limited liability company which is wholly owned and controlled by the Zammito children. According to corporate financial statements prepared by Kevin P. Martin, CPA and based upon information provided by Robert Zammito, Jr. and others, between September of 2000 and December 31, 2004, those "management fees" amounted to more than 2.6 million dollars. I should add that these management fees were *in addition* to salaries the Zammito children received from NCPS/NDVS in the amount of 1.67 million dollars even though they did not work there.

Discovery conducted to date has confirmed that the Zammitos and RPCV provided no management services in return for the receipt of these "management fees". Indeed, discovery has revealed that NCPS/NDVS already had an

KLIEMAN, LYONS, SCHINDLER & GROSS

Kevin M. Considine, Esquire
March 18, 2005
Page 2

experienced management team in place which had been successfully operating the Company for nearly ten years. These key employees continued to manage the Company after the Zammitos acquired a controlling interest in 1998. There is no evidence that the Zammito children, who received more than 2.3 million dollars in "management fees" alone from NCPS/NDVS, did anything to justify those fees. RPCV has no employees; no contract to provide management services; and, there were no itemized statements describing the management services provided. Indeed, neither the Zammito children nor the President of NCPS/NDVS could describe the management services allegedly provided nor articulate a single business justification for the payment of such exorbitant fees. The same is true for Fleet Environmental Services, LLC, which paid the Zammito children more than $300,000 in a single year as management fees.

*The Forensic Audit*

In response to the Zammitos' activities, we have retained the accounting and consulting firm of Tofias, P.C. of Cambridge, Massachusetts to perform a forensic audit of NCPS/NDVS and other Zammito controlled businesses. The audit investigation has been headed by Jimmy Pappas, a Certified Public Accountant and Certified Fraud Examiner and a Principal of the Dispute and Investigative Advisory practice of Tofias, P.C. Mr. Pappas has extensive experience in providing investigative and dispute advisory services to law firms, publicly traded companies and privately held entities in the context of internal investigations, shareholders' disputes; securities fraud; audit malpractice; business disputes; crisis management and related litigation.

Based upon his review of the corporate and financial records of NCPS/NDVS and other documents, Mr. Pappas determined that from 2000 through 2004 NCPS/NDVS paid management fees and salaries to the Zammito children which were unearned and for which there was no business or legal justification in the amount of $2,380,654.

The American Institute of Certified Public Accountants ("AICPA") defines asset misappropriation as:

> "the **theft** of an entity's assets...Misappropriation of assets can be accomplished in various ways, including embezzling receipts, stealing assets, or **causing an entity to pay for goods or services that have not been received**. Misappropriation of assets

KLIEMAN, LYONS, SCHINDLER & GROSS

Kevin M. Considine, Esquire
March 18, 2005
Page 3

may be accompanied by false or misleading records or documents, possibly created by circumventing controls." (See, AICPA Professional Standards as of June 1, 2004, AU Section 316, *Consideration of Fraud in a Financial Statement Audit*, paragraph 6) (bold emphasis added)

At the time of trial, Mr. Pappas will testify that the $2,380,654 received by the Zammito children or by RPCV, LLC, the management company which they wholly own and control, constitutes asset misappropriation or theft and that as a minority shareholder, Mr. Healey was injured economically due to the misappropriation. It should be noted that Mr. Pappas' testimony will be supported by the testimony of our human resource expert, David Wudyka, CCP, SPHR, MBA, BSIE.

*The Civil RICO Claims*

By siphoning away corporate funds in the form of management fees through RPCV and their other misappropriation of corporate assets and self-dealing, the Zammitos, acting in concert individually and through corporate entities they owned and controlled, created an illegal enterprise and engaged in a pattern of racketeering activities prohibited by 18 U.S.C., Section 1961, the Racketeer Influenced and Corrupt Organizations Act (RICO).

Section 1961 enumerates more than twenty types of conduct prohibited under Federal and State law which are each considered to be acts of "racketeering activity" and which, in RICO parlance, are often referred to as "predicate acts".

*The Predicate Acts*

Contrary to the assertion that "the necessary predicate acts simply are not present" contained in your letter of March 15, 2005, discovery conducted to date has revealed at least 121 separate predicate acts involving mail fraud (18 U.S.C., Section 1341); wire fraud (18 U.S.C., Section 1343); interstate transportation of fraudulently obtained funds (18 U.S.C., 2314); tax evasion (26 U.S.C., Section 7201); submitting false income tax returns (26 U.S.C., Section 7206(1)); embezzlement (M.G.L., Chapter 266, Section 30); extortion (18 U.S.C., Section 1951; M.G.L.. Chapter 265, Section 25); threats of economic harm (M.G.L.,

KLIEMAN, LYONS, SCHINDLER & GROSS

Kevin M. Considine, Esquire
March 18, 2005
Page 4

Chapter 271, Section 39); and, unlawful debt collection activities (18 U.S.C., Section 1964(a)). Let me briefly review some of these predicate acts for you.

    a)    *Mail and Wire Fraud*

          i.    *False and Deceptive Financial Statements*

The creation of false and deceptive financial statements or the omission of important information from financial statements constitutes fraud. In this case, the financial statements created by the Zammitos contained material misrepresentations of fact concerning the so-called "management fees". Those financial statements were used to conceal the Zammitos' criminal activities by characterizing as management fees what in reality was the misappropriation of corporate funds. The use of the United States mail to distribute these false and deceptive financial statements to Mr. Healey and other minority shareholders constitutes at least four (4) separate predicate acts of mail fraud.

          ii.    *Fraudulent Solicitation of Capital by Mail*

In addition, discovery has revealed that in 2002, Robert Zammito, Jr., sent a letter to Harry W. Healey and the other minority unit holders of Fleet Environmental Services, LLC, soliciting additional capital contributions. That letter states that unless additional capital contributions are received, Fleet would face foreclosure proceedings. In reality, Fleet's financial difficulties were caused by the fact that the Zammitos had caused Fleet to pay unwarranted management fees. The use of the mails in an attempt to obtain additional funds in furtherance of the Zammitos scheme also constitutes at least three (3) additional acts of mail fraud.

          iii.    *The Fraudulent Business Trusts Correspondence*

As you know, it has been alleged that the Zammitos fraudulently converted NCPS/NDVS to business trusts without the knowledge or consent of Mr. Healey. In furtherance of this scheme, the Zammitos created so called Exchange Agreements bearing the falsified signatures of Peter Healey, as Trustee. In furtherance of this scheme, the Zammitos, through their accountant, Kevin P. Martin, CPA, used the mails to request that Mr. Healey execute restated promissory notes on behalf of the Harry W. Healey Grantor Trust. We will introduce evidence at the time of trial from a forensic document examiner and

KLIEMAN, LYONS, SCHINDLER & GROSS

Kevin M. Considine, Esquire
March 18, 2005
Page 5

handwriting expert, Paul McDonald, who was formally a criminal investigator for the Massachusetts State Police and who will testify that the signatures of Peter Healey appearing on these documents are not genuine.

The creation of these fraudulent business trusts furthered the Zammitos' racketeering activities in that the trusts divested Mr. Healey of his rights as a shareholder and provided the Zammito children with autonomous control over not only the operation but distributions from NCPS and NDVS. The use of the mails in connection with this racketeering activity constitutes at least four (4) additional acts of mail fraud.

    iv.  *The Healey/Zammito Relationship Correspondence*

On September 10, 2001, Mr. Healey wrote to the Zammitos' accountant, Kevin P. Martin, CPA, concerning distributions from NCPS/NDVS and his tax liability. On September 27, 2001, following this request, Kevin P. Martin, CPA, wrote a letter to Robert Zammito, Sr. to inform him of Mr. Healey's request for a distribution from NCPS/NDVS. In that letter, Kevin P. Martin, CPA included a schedule of the Zammito/Healey transactions which accurately sets forth Healey's contributions and compensation.

As we learned at the deposition of Kevin P. Martin, CPA, there followed a series of meetings and discussions between Martin and Zammito in which Martin urged Zammito to alter his compensation arrangements with Healey. There followed a facsimile letter from Martin to Zammito on October 4, 2001 and at least one other on November 26, 2002 revising Zammito's obligation to Healey while increasing Healey's obligation to Zammito. These communications furthered the Zammitos' racketeering activities in that they demanded that Healey pay additional funds to the Zammitos in order to maintain his "partnership" position in the investments. As such, these wire communications are in violation of 18 U.S.C., Section 1343 (wire fraud) and constitute at least two (2) additional separate predicate acts.

  b)  Tax Fraud

The deduction of unearned and improper management fees resulted in the underreporting of corporate income for NCPS/NDVS and Fleet by the Zammitos. The Zammitos also failed to report this as income on their individual tax returns. By concealing the income they received from RPCV as legitimate management

KLIEMAN, LYONS, SCHINDLER & GROSS

Kevin M. Considine, Esquire
March 18, 2005
Page 6

fees and expenses, the Zammitos intentionally and fraudulently underreported their income and the income of NCPS/NDVS and Fleet in violation of 26 U.S.C., Section 7201 (tax evasion) and 26 U.S.C., Section 7206(1) (submitting false income tax returns).

The filing of fraudulent tax returns in furtherance of "any scheme or artifice to defraud or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises" constitutes mail fraud in violation of Section 1341. *Ideal Steel Supply Corp. v. Anza*, 373 F.3d 251 (2nd Cir. 2004); See also, *Lincoln National Life Insurance Co. v. Silver*, 114 F.3d 1191 (7th Cir. 1997); *United States v. Richman*, 944 F.2d 323 (7th Cir. 1991); *Liquid Air Corp. v. Rogers*, 834 F.2d 1297 (7th Cir. 1987); *Illinois Department of Revenue v. Phillips*, 771 F.2d 312 (7th Cir. 1985). The mailing by the Zammitos of at least twenty (20) fraudulent individual returns and eight (8) fraudulent corporate returns constitutes at least forty-eight (48) additional acts of mail fraud.

   c)   *Embezzlement*

According to the deposition testimony, Robert Zammito, Jr., exercised exclusive autonomous control over the financial accounts of NCPS/NDVS and Fleet. Discovery revealed that in furtherance of their scheme to defraud minority shareholders, the Zammitos, through RPCV, issued monthly "invoices" to NCPS/NDVS and Fleet. We are in possession of these invoices. According to the general ledgers of NCPS/NDVS and Fleet, the Zammitos received monthly payments from NCPS/NDVS and Fleet in the amount of these invoices.

There were at least fifty-two (52) such transactions based upon document and electronic data reviewed to date by our forensic auditors. Each such distribution represents a separate act of embezzlement of funds from NCPS/NDVS and Fleet and a violation of M.G.L., Chapter 266, Section 30. As such, each act of embezzlement constitutes a separate predicate act under RICO. See, *D'Orange v. Feely*, 894 Supp. 159 (S.D.N.Y. 1995). See also, *Carpenter v. United States*, 484 U.S. 19, 98 L.Ed.2d 275, 108 S.Ct. 316 (1987); *United States v. Altman*, 48 F.3d. 96 (2nd Cir. 1995).

   d)   *Extortion and Illegal Debt Collection Activities*

In 2003, Mr. Healey requested an allocation of tax losses incurred by Fleet Environmental Services, LLC to which he was entitled as a unit owner. Despite

KLIEMAN, LYONS, SCHINDLER & GROSS

Kevin M. Considine, Esquire
March 18, 2005
Page 7

several requests for this and other information necessary for the preparation of Healey's income tax returns, the Zammitos refused to provide this information unless Healey agreed to execute certain promissory notes in the amount of $100,000 and payable to RTFE. As you know, it was Healey's belief that he had executed such notes in 2000 after being requested to do so by Martin in a memorandum dated December 26, 2000. The notes were apparently lost.

On March 12, 2003, Martin wrote to Mr. Healey to request that Healey sign promissory notes indicating that unless Healey executed the notes, he was not entitled to an allocation of tax loss. This was false. In fact, Healey had received appropriate tax credit in the previous year despite the absence of such promissory notes. There followed a series of no fewer than fifteen (15) letters, including eight (8) letters from either Martin or Robert Zammito, Jr. in which the execution of replacement notes was stated as a condition for providing Healey with the information he needed to complete his tax returns. In addition to eight (8) separate acts of mail fraud, these letters constitute violations of 18 U.S.C., Section 1951; M.G.L.. Chapter 265, Section 25 (extortion); M.G.L., Chapter 271, Section 39 (threats of economic harm); and, 18 U.S.C., Section 1964(a) (unlawful debt collection activities).

*Rule 11 and Sanctions*

In view of the foregoing overwhelming evidence of your clients' illegal racketeering activities, I am concerned by what appears to be an inappropriate invocation of Rule 11 in your letter of March 15, 2005. For this reason, I have taken the time to set out in some detail the activities of the Zammitos which are prohibited under RICO in order to not only demonstrate the seriousness with which we view these activities but also to demonstrate that we have been especially diligent in filing civil RICO charges.

Rule 11 requires a "reasonable inquiry". *Robinson v. Dean Witter Reynolds, Inc.*, 129 F.R.D. 15, 19 (D.Mass. 1989). Accord, *Hochen v. Bobst Group, Inc.*, 198 F.R.D. 11, 14-15 (D.Mass 2000). In *EEOC v. Tandem Computers, Inc.*, 158 F.R.D. 224 (D.Mass. 1994), the Court held that a Rule 11 motion can itself constitute a violation of Rule 11 and must not be presented for an improper purpose or to increase the cost of litigation needlessly. *See also*, *Cruz v. Savage*, 691 F.Supp. 549, 556 (D.P.R. 1998).

KLIEMAN, LYONS, SCHINDLER & GROSS

Kevin M. Considine, Esquire
March 18, 2005
Page 8


*Liability of Daniel Lalumiere*

As I indicated in my letter of March 9, 2005, based upon the deposition testimony of Daniel Lalumiere, we believe there is evidence that, as President of NCPS/NDVS, Mr. Lalumiere breached his fiduciary duties as a corporate officer to the corporation and to minority shareholders. I mention this here only with reference to your disclosure obligations. You should be advised that we expressly reserve the right to bring suit against Daniel Lalumiere and against NCPS/NDVS in connection with these matters.

*The Sale of NCPS/NDVS*

We, too, are concerned that the illegal activities of the Zammitos, when fully disclosed to eFund, will threaten the sale NCPS/NDVS. As you know, Mr. Healey is entitled to 16.67 percent of the proceeds of the sale. Based upon the information you have provided to me concerning the expected sale price which eFund has agreed to pay for NPCS/NDVS, this would amount to approximately $3,340,000 in economic damages to Mr. Healey due to the Zammitos' illegal racketeering activities in addition to the management fee scheme described above.

As you know, the RICO statute specifies that compensatory damages be trebled. It also provides for the award of attorneys fees and, in some cases, punitive damages. See, *Liquid Air Corp. v. Rogers*, 834 F.2d 1297 (7th Cir. 1987), cert. denied 109 S.Ct. 3241 (1988). I urge you to consider this factor in deciding whether or not to accept our clients' settlement proposal.

Very truly yours,


Stephen J. Lyons

SJL/pjk